No. 24-1493

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

IN RE: BESTWALL LLC,

*Debtor*,

THE OFFICIAL COMMITTEE OF ASBESTOS CLAIMANTS
OF BESTWALL LLC,

*Appellant*,

v.

BESTWALL LLC,

*Appellee*.

On Direct Appeal from the United States Bankruptcy Court
for the Western District of North Carolina
Case No. 17-31795 (LTB), Hon. Laura T. Beyer

### BRIEF FOR APPELLANT

Natalie D. Ramsey
Davis Lee Wright
ROBINSON & COLE LLP
1201 North Market Street
Suite 1406
Wilmington, Delaware 19801
(302) 516-1700

Thomas J. Donlon
ROBINSON & COLE LLP
1055 Washington Boulevard
9th Floor
Stamford, Connecticut 06901
(203) 462-7500

August 26, 2024

David C. Frederick
Joshua D. Branson
Alejandra Ávila
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900

Mark Kutny
Robert A. Cox, Jr.
HAMILTON STEPHENS STEEL
  + MARTIN, PLLC
525 North Tryon Street, Suite 1400
Charlotte, North Carolina 28202
(704) 344-1117

*Counsel for Appellant Official Committee of Asbestos Claimants of Bestwall LLC*

# DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by all parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. <u>24-1493</u> (22-1135) Caption: <u>In Re: Bestwall LLC</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>The Official Committee of Asbestos Claimants</u>
(name of party/amicus)

who is <u>Appellant</u>, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity?  ☐ Yes ☒ No

2. Does party/amicus have any parent corporations?  ☐ Yes ☒ No
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ Yes ☒ No
   If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐ Yes ☒ No
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question)  ☐ Yes ☒ No
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding?  ☒ Yes ☐ No

i

If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

See attached for list of members of The Official Committee of Asbestos Claimants.

7.    Is this a criminal case in which there was an organizational victim?    ☐ Yes ☒ No
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.


Signature:    _/s/ Natalie D. Ramsey_    Date: August 26, 2024

Counsel for:    Official Committee of Asbestos Claimants

## MEMBERS OF THE OFFICIAL COMMITTEE
## OF ASBESTOS CLAIMANTS

Paul Tice, *Successor-in-Interest to the Claims of Linda Hofferber, Dec'd*
c/o Matthew Bergman
Bergman Draper Oslund PLLC
821 Second Avenue, Suite 2100
Seattle, WA 98104

Rick Bengston, *Successor-in-Interest to the Claims of Gary Bengston, Dec'd*
c/o Michael Shepard
Shepard Law
160 Federal Street
Boston, MA 02110

Steven J. Watts, *Successor-in-Interest to the Claims of Jeffrey A. Watts, Dec'd*
c/o Christian Hartley
Maune Raichle Hartley French &
  Mudd, LLC
300 W. Coleman Boulevard
Suite 200
Mount Pleasant, SC 29464

Barbara McAlpine, *Independent Administrator of the Estate of Martin Edward McAlpine*
c/o Maura Kolb
The Lanier Law Firm
6810 FM 1960 West
Houston, TX 77069

Elizabeth Ann Harding, *Special Administrator of Stephen F. Lanphear, Dec'd*
c/o Beth A. Gori
Gori Julian & Associates, PC
156 North Main Street
Edwardsville, IL 62025

Margaret U. Trumbull, *Personal Representative of the Estate of R. Scott Trumbull*
c/o Perry Weitz
Weitz & Luxenberg, P.C.
700 Broadway
New York, NY 10003

Rick Benson, *Successor-in-Interest to the Claims of Eric Benson, Dec'd*
c/o Andrew O'Brien
O'Brien Law Firm, PC
815 Geyer Avenue
St. Louis, MO 63104

Emma Pearl Dixon, *Personal Representative of John Harvey Dixon, Dec'd*
c/o Carol A. Hastings
Law Offices of Peter G. Angelos, P.C.
100 N. Charles Street, 22nd Floor
Baltimore, MD 21201

Nikol Chuidian, *Special Administrator of Cresante Perreras, Dec'd*
c/o Steven Kazan
Kazan, McClain, Satterley &
  Greenwood, PLC
55 Harrison Street, Suite 400
Oakland, CA 94607

Patricia Deetz, *Special Administrator of Dave Deetz, Dec'd*
c/o Robert J. Cooney, Jr.
Cooney & Conway
120 N. LaSalle Street, 30th Floor
Chicago, IL 60602

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT ......................................................... i

TABLE OF AUTHORITIES ........................................................ vi

INTRODUCTION ..................................................................... 1

JURISDICTIONAL STATEMENT ................................................. 4

STATEMENT OF THE ISSUES .................................................... 4

STATEMENT OF THE CASE ...................................................... 4

SUMMARY OF ARGUMENT ..................................................... 12

STANDARD OF REVIEW ......................................................... 15

ARGUMENT .......................................................................... 15

I.     THE BANKRUPTCY CLAUSE OF THE CONSTITUTION
       DOES NOT PROVIDE SUBJECT-MATTER JURISDICTION
       TO THE BANKRUPTCY COURT OVER THIS CASE ............................ 15

       A.     The Original Meaning Of The Bankruptcy Clause Is
              Limited To Actually Bankrupt Debtors ................................ 16

              1.     Pre-ratification laws regulated the relationship
                     between creditors and actually bankrupt debtors
                     who either refused to pay or struggled to pay their
                     debts .......................................................... 17

              2.     Post-ratification developments confirm the
                     historical understanding that bankruptcy is
                     reserved for actually bankrupt debtors ..................... 25

       B.     The Limitation Of The Bankruptcy Power Accords With
              Other Constitutional Rights And Protections ..................... 28

              1.     Asbestos victims' constitutional rights require
                     interpreting the Bankruptcy Clause as excluding
                     jurisdiction over debtors like Bestwall .................... 28

2.    Courts cannot construe legislation to empower them to hear bankruptcy cases that go beyond the federalism limits imposed by the Constitution ........................31

C.    Bestwall Is Not An Actually Bankrupt Debtor Under The Meaning Of The Bankruptcy Clause....................................................33

D.    The Court Must Read 28 U.S.C. § 1334 Consistent With The Bankruptcy Clause's Substantive Limits .....................................34

II.    THE BANKRUPTCY COURT'S REASONS FOR EXERCISING JURISDICTION ARE UNFOUNDED ...............................35

A.    The Bankruptcy Court Misconstrued The Historical Record And Improperly Relied On Policy..........................................36

B.    The Court Misconstrued Supreme Court Precedent ...........................38

C.    The Court Conflated Statutory Insolvency With The Constitutional Requirement Of Actual Bankruptcy............................39

D.    The Court's Ruling Contravenes Constitutional-Avoidance Principles.........................................................................42

CONCLUSION.........................................................................................46

REQUEST FOR ORAL ARGUMENT ....................................................................46

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

CONSTITUTIONAL AND STATUTORY ADDENDUM

# TABLE OF AUTHORITIES

Page

**CASES**

*A.H. Robins Co.*, *In re*, 880 F.2d 709 (4th Cir. 1989) ...............................................41

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*,
576 U.S. 787 (2015)........................................................................24

*Bestwall LLC*, *In re*:

606 B.R. 243 (Bankr. W.D.N.C. 2019), *aff'd*, 2022 WL 67469
(W.D.N.C. Jan. 6, 2022), *aff'd*, 71 F.4th 168 (4th Cir. 2023),
*reh'g denied*, No. 22-1127, Dkt. 82 (4th Cir. Aug. 7, 2023),
*cert. denied*, Nos. 23-675 & 23-702 (U.S. May 13, 2024)............................10

2022 WL 67469 (W.D.N.C. Jan. 6, 2022), *aff'd*, 71 F.4th 168
(4th Cir. 2023), *reh'g denied*, No. 22-1127, Dkt. 82 (4th Cir.
Aug. 7, 2023), *cert. denied*, Nos. 23-675 & 23-702 (U.S. May
13, 2024) .....................................................................................10

71 F.4th 168 (4th Cir. 2023), *reh'g denied*, No. 22-1127, Dkt.
82 (4th Cir. Aug. 7, 2023), *cert. denied*, Nos. 23-675 & 23-702
(U.S. May 13, 2024) .................................................................6, 10

No. 22-1127, Dkt. 82 (4th Cir. Aug. 7, 2023) ...........................................10

*Bowles v. Russell*, 551 U.S. 205 (2007)....................................................16

*Campbell v. Alleghany Corp.*, 75 F.2d 947 (4th Cir. 1935) ............................27, 39

*Carolin Corp. v. Miller*, 886 F.2d 693 (4th Cir. 1989)..............................11, 43, 44

*Central Virginia Cmty. Coll. v. Katz*, 546 U.S. 356 (2006)............17, 20, 24, 27, 37

*Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264 (1821) .....................................32

*Colorado River Water Conservation Dist. v. United States*,
424 U.S. 800 (1976)........................................................................32

*Continental Illinois Nat'l Bank & Tr. Co. of Chicago v. Chicago, R.I.
& P. Ry. Co.*, 294 U.S. 648 (1935)................................. 18, 25, 26, 33, 37, 38

*Demetres v. East West Constr., Inc.*, 776 F.3d 271 (4th Cir. 2015) .................. 37-38

*Dimick v. Schiedt*, 293 U.S. 474 (1935).................................................................30

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ........................................23, 24

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr.
    Trades Council*, 485 U.S. 568 (1988)........................................................34, 35

*Escambia Cnty. v. McMillan*, 466 U.S. 48 (1984)................................................45

*Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477
    (2010).................................................................................................................39

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989)....................................29, 30

*Grogan v. Garner*, 498 U.S. 279 (1991)................................................................43

*Hanover Nat'l Bank v. Moyses*, 186 U.S. 181 (1902) .........................................26

*Harrington v. Purdue Pharma L. P.*, 144 S. Ct. 2071 (2024) .................................27

*International Ass'n of Machinists v. Street*, 367 U.S. 740 (1961)..........................34

*James v. Allen*, 1 U.S. (1 Dall.) 188 (Pa. Com. Pl. 1786).....................................24

*Johns-Manville Corp.*, *In re*, 36 B.R. 727 (Bankr. S.D.N.Y. 1984).......................41

*Kelly v. Robinson*, 479 U.S. 36 (1986) .................................................................31

*Kirkland*, *In re*, 600 F.3d 310 (4th Cir. 2010) ........................................................15

*Kunzler v. Kohaus*, 5 Hill 317 (N.Y. 1843) .......................................................23, 27

*Little Creek Dev. Co.*, *In re*, 779 F.2d 1068 (5th Cir. 1986) .................................43

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982)..........................................28

*LTL Mgmt., LLC*, *In re*, 64 F.4th 84 (3d Cir. 2023) ................................................45

*Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365 (2007).......................43

*Marshall*, *In re*:

 300 B.R. 507 (Bankr. C.D. Cal. 2003), *aff'd*, 403 B.R. 668
 (C.D. Cal. 2009), *aff'd*, 721 F.3d 1032 (9th Cir. 2013) ...................39, 40, 41

 403 B.R. 668 (C.D. Cal. 2009), *aff'd*, 721 F.3d 1032
 (9th Cir. 2013) ......................................................................................40

 721 F.3d 1032 (9th Cir. 2013) ............................................................40

*Martin v. Wilks*, 490 U.S. 755 (1989) ...........................................................29

*Mary Helen Coal Corp. v. Hudson*, 235 F.3d 207 (4th Cir. 2000).........................35

*Mason v. Haile*, 25 U.S. (12 Wheat.) 370 (1827) ......................................21

*New Horizon of NY LLC v. Jacobs*, 231 F.3d 143 (4th Cir. 2000).........................15

*NLRB v. Bildisco & Bildisco*, 465 U.S. 513 (1984)......................................44

*NLRB v. Noel Canning*, 573 U.S. 513 (2014)............................................24

*Ogden v. Saunders*, 25 U.S. (12 Wheat.) 213 (1827) ...................................24

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999)....................................28, 29

*Parsons v. Bedford*, 28 U.S. (3 Pet.) 433 (1830) .....................................30

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) ...........................28

*Railway Lab. Executives' Ass'n v. Gibbons*, 455 U.S. 457 (1982) .......26, 27, 38, 39

*Reid v. Covert*, 354 U.S. 1 (1957).............................................................30

*Reiman*, *In re*, 20 F. Cas. 490 (S.D.N.Y. 1874) (No. 11,673) .........................27, 39

*Rudd v. Laughlin*, 866 F.2d 1040 (8th Cir. 1989).....................................40

*Schoenthal v. Irving Trust Co.*, 287 U.S. 92 (1932) .................................29

*SEC v. Jarkesy*, 144 S. Ct. 2117 (2024)..................................................30

*State v. Gee*, 1 Bay 163 (S.C. Ct. Com. Pl. 1791) .....................................21

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) .........................................34, 37

*Tulsa Pro. Collection Servs., Inc. v. Pope*, 485 U.S. 478 (1988) ...........................28

*United States v. Denedo*, 556 U.S. 904 (2009) .......................................................16

*United States v. Hansen*, 599 U.S. 762 (2023) .......................................................35

*United States v. Huebner*, 48 F.3d 376 (9th Cir. 1994) ..........................................40

*United States v. Rahimi*, 144 S. Ct. 1889 (2024) ........................................17, 25, 37

*United States v. Sprague*, 282 U.S. 716 (1931) ................................................. 23-24

*Village Props., Ltd.*, *In re*, 723 F.2d 441 (5th Cir. 1984) ........................................31

*Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164 (4th Cir. 2010)......................16, 35

*Wright v. Union Cent. Life Ins. Co.*, 304 U.S. 502 (1938) ...................26, 27, 38, 40

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ................................................................35

*Zarnel*, *In re*, 619 F.3d 156 (2d Cir. 2010) ............................................................40

## CONSTITUTION, STATUTES, REGULATIONS, AND RULES

U.S. Const.:

    Art. I, § 8, cl. 4 (Bankruptcy Clause) .................................1-4, 12, 14-17, 24, 27-28, 33-38, 40, 43-45

    Art. III .........................................................................................31, 37

    Amend. I ............................................................................................35

    Amend. V (Due Process Clause) .......................................................35

    Amend. VII ........................................................................................29

Bankruptcy Act of 1841, ch. 9, 5 Stat. 440........................................................27

Bankruptcy Act of 1867, ch. 176, 14 Stat. 517....................................................27

Bankruptcy Act of 1898, ch. 541, 30 Stat. 544....................................................26

Bankruptcy Code (11 U.S.C.):

§ 105(a) ...................................................................................10

§ 362(a) ...................................................................................30

§ 363(b)-(c) .................................................................................9

§ 502(b)(6) ...............................................................................15

§ 524(a)(1)-(2) .........................................................................30

§ 524(g) .......................................................................................6

§ 510 .........................................................................................15

§ 541(a)(1) ...............................................................................30

§ 1112(b)............................................................................42, 43

§ 1112(b)(1) .............................................................................11

§ 1129(b)(2) ...............................................................................9

28 U.S.C. § 157(b)(5)...............................................................31

28 U.S.C. § 158 ..........................................................................4

28 U.S.C. § 158(d)(2)(B) ..........................................................4

28 U.S.C. § 1334............................................. 3, 4, 12, 14, 16, 34, 42

28 U.S.C. § 1411 ......................................................................31

28 C.F.R. § 58.8 .........................................................................9

Fed. R. Bankr. P. 1007 ...............................................................9

## OTHER MATERIALS

1 Jam., ch. 15, §§ 10, 17 (1604) (Eng.) ...................................................18

34 & 35 Hen. 8, ch. 4 (1542-1543) (Eng.) (as reproduced in 2 Statutes
    at Large 331-35 (London 1770)) ...................................................18

An Act for the Relief of Insolvent Debtors, ch. 34, 9th Sess.,
    1786 N.Y. Laws (passed April 13, 1786), repealed by
    Act of Feb. 8, 1788, ch. 29, 11th Sess., 1788 N.Y. Laws ...................... 20-21

Bankrupts Act of 1731, 5 Geo. 2, ch. 30 (1732) (Eng.)...........................................19

2 William Blackstone, *Commentaries* (1766)...........................................................19

Ralph Brubaker:

    *Mass Torts, The Bankruptcy Power, and Constitutional Limits
    on Mandatory No-Opt-Outs Settlements*, 23 Fla. St. U. Bus.
    Rev. (forthcoming 2024), *available at* https://ssrn.com/
    abstract_id=4892178 ..................................................................29

    *The Texas Two-Step and Mandatory Non-Opt-Out Settlement
    Powers*, Harvard Law School Bankruptcy Roundtable (July
    2022) ......................................................................................29

Peter J. Coleman:

    *Debtors and Creditors in America:  Insolvency, Imprisonment
    for Debt, and Bankruptcy, 1607-1900* (1974) ...................................20, 21, 22

    *The Insolvent Debtor in Rhode Island 1745-1828*, 22 Wm. &
    Mary Q. 413 (1965) ..................................................................22

1 *Collier on Bankruptcy* (16th ed. 2024) .................................................................19

Charles G. Hallinan, *The "Fresh Start" Policy in Consumer
    Bankruptcy:  A Historical Inventory and An Interpretive
    Theory*, 21 U. Rich. L. Rev. 49 (1986)...........................................20

Edward J. Janger, *Aggregation and Abuse:  Mass Torts in Bankruptcy*,
    91 Fordham L. Rev. 361 (2022).....................................................42

1 Samuel Johnson, *Dictionary of the English Language* (1755) .............................23

*Official Comm. of Asbestos Claimants v. Bestwall LLC*, No. 23-675
(U.S.):

Amicus Brief of North Carolina et al. (Jan. 22, 2024) ..................................32

Brief of Members of Congress as Amici Curiae in Support of
Petitioner (Jan. 22, 2024)...............................................................................44

William Perry, *The Royal Standard English Dictionary* (1777) ....................... 22-23

Thomas E. Plank, *The Constitutional Limits of Bankruptcy*,
63 Tenn. L. Rev. 487 (1996) ........................................................18, 19, 22, 23

1 Thomas Sheridan, *Dictionary of the English Language* (4th ed. 1797)..............23

2 Joseph Story, *Commentaries on the Constitution* (Thomas M. Cooley
ed., 4th ed. 1873) ............................................................................................25

Charles J. Tabb, *The Bankruptcy Clause, the Fifth Amendment, and the
Limited Rights of Secured Creditors in Bankruptcy*, 2015 U. Ill.
L. Rev. 766.....................................................................................................26

## INTRODUCTION

The Constitution's Bankruptcy Clause circumscribes the scope of a proper "[b]ankruptc[y]." Art. I, § 8, cl. 4. The history of the Bankruptcy Clause, as well as subsequent interpretations by both courts and Congress, confirms that "[b]ankruptc[y]" is reserved for actually "[b]ankrupt[ ]" debtors. *Id.* At the Founding, the various bankruptcy systems in England and America regulated the relationship between creditors and two types of debtors: those who refused to pay (commonly viewed as fraudsters) and those who could not pay because of financial misfortune. Both types of bankrupt debtors shared the defining feature of those who failed to meet their financial obligations. Supreme Court decisions over more than a century confirm that meaning. Founding-era dictionary definitions match that historical understanding, as does Congress's post-ratification legislation. From adoption of the Constitution, bankruptcy law has developed within this framework.

Bestwall is no such debtor. A corporation with billions of dollars in assets, Bestwall seeks bankruptcy protection on the explicit premise that it remains willing and able to pay its current and future debts in full without difficulty. Bestwall was created by Georgia-Pacific LLC ("Georgia-Pacific") through a controversial scheme, now commonly called the "Texas Two-Step," to shield Georgia-Pacific from civil liability for exposing people to asbestos. First, Georgia-Pacific

separated into two new entities:  New GP, which received most of the profitable assets and business operations; and Bestwall, which received the asbestos liabilities, minimal assets, and a contract right entitling it to receive funding from New GP to resolve asbestos liabilities.  Next, Bestwall declared bankruptcy and obtained an injunction halting all asbestos lawsuits against itself, New GP, and its other affiliated companies purposely left outside bankruptcy.  Through this scheme, Georgia-Pacific's corporate shell game sought to isolate its profitable business from bankruptcy-court oversight and thereby deprive asbestos victims of their civil remedies.  State law may allow Georgia-Pacific to recreate a corporate entity, but the federal Constitution does not permit Georgia-Pacific and Bestwall to concoct jurisdiction that exceeds the Bankruptcy Clause's limits.

Georgia-Pacific's manufactured bankruptcy was intended to seek leverage over its asbestos victims by making them wait years for any recovery and by using the unique relief available in bankruptcy to cap its liability.  While Georgia-Pacific in its new guise has made huge profits, its asbestos victims have received nothing for their injuries caused by Georgia-Pacific.  Those victims (and their families) lost critical monetary support during their painful demise and the opportunity to confront the corporate tortfeasor that caused their fatal illnesses.

The decision below improperly deprives the victims of essential constitutionally guaranteed rights.  It also unnecessarily interferes with the States'

ability to enforce and develop their state tort laws, in contravention of bedrock principles of federalism. Bankruptcy serves as a justification for interfering with these constitutional and States' rights when it achieves an overriding federal objective, such as equitable distribution of limited assets. That interest is absent here. Georgia-Pacific is a wealthy entity without financial threat seeking to use bankruptcy for its own financial gain.

The bankruptcy court impermissibly expanded the scope of its jurisdiction by mis-analyzing the historical record and decades of Supreme Court precedent. Congress conferred bankruptcy-court jurisdiction over Chapter 11 "cases" and "proceedings" under 28 U.S.C. § 1334. But a bankruptcy court's jurisdiction is not so limitless—the Constitution circumscribes Congress's grant of jurisdiction. The case brought by a putative debtor must fit within the Bankruptcy Clause's delineation of a "bankrupt" entity. Because Bestwall is not a bankrupt debtor, jurisdiction is lacking.

The bankruptcy court's conclusion undervalues constitutional-avoidance principles. Under that doctrine, the Court must interpret Section 1334 harmoniously with the Bankruptcy Clause's requirements to avoid ascribing to Congress an unconstitutional intent. So construed, Section 1334 did not give the bankruptcy court jurisdiction over this case. The Court should reverse.

3

## JURISDICTIONAL STATEMENT

The bankruptcy court entered its Order denying the Motion To Dismiss of the Official Committee of Asbestos Claimants (the "Committee") on February 21, 2024 (the "Order") (reported at 658 B.R. 348 (Bankr. W.D.N.C. 2024)). JA1863-1921. While the Committee contests the bankruptcy court's subject-matter jurisdiction over this case, the court had independent jurisdiction to hear the Committee's request for certification under 28 U.S.C. § 158(d)(2)(B). The bankruptcy court certified the Order on April 3, 2024. JA2203-2204. This Court granted permission for direct appeal on May 31, 2024. JA2205. This Court has jurisdiction under 28 U.S.C. § 158.

## STATEMENT OF THE ISSUES

Do the Constitution's Bankruptcy Clause (Art. I, § 8, cl. 4) and the jurisdiction-conferring statute implementing it (28 U.S.C. § 1334) allow a bankruptcy court, by referral from the district court, to exercise jurisdiction over a voluntary petition filed by a well-funded, financially viable entity that is not actually bankrupt, as "bankruptcy" was understood at the time of the Founding?

## STATEMENT OF THE CASE

**1.** Founded almost 100 years ago, Georgia-Pacific is a multi-billion-dollar corporation that manufactures and sells pulp, paper, tissue, packages, building products, and chemicals. JA600, JA603 (Debtor's Submission in Lieu

of Live Testimony ("Debtor's Submission") ¶¶ 5, 10).  Some of its more famous

brands include Brawny, Angel Soft, Quilted Northern, and Dixie.  JA647-651

(Debtor's Submission Ex. C).  There is no debate that certain of Georgia-Pacific's

products and operations exposed individuals to asbestos over decades.

　　　As a result, the victims of that exposure pursued recompense and justice

against Georgia-Pacific.  Most of Georgia-Pacific's asbestos liability is to victims

of mesothelioma, a fatal disease associated with asbestos exposure.

　　　Georgia-Pacific's asbestos-related expenditures never approached a level

that would jeopardize its overall financial health and viability.  In the months and

years before the 2017 bankruptcy filing, Georgia-Pacific easily paid its asbestos

indemnity and defense costs, as well as substantial dividends to its equity holders.

*See* JA1688 (Decl. of Tyler L. Woolson ¶ 7 (Jan. 19, 2022)) ("New GP's practice

with respect to paying special dividends to Koch has not changed since November

2, 2017 (the 'Petition Date') and is consistent with the practice of the former

Georgia-Pacific LLC ('Old GP'), the predecessor to the Debtor and New GP.

For example, in 2016, Old GP paid a $2 billion special dividend to Koch given

its financial performance and other factors described above.").

　　　**2.**　　Though the costs of litigating and settling asbestos claims remained

well within Georgia-Pacific's vast means, the company contrived a scheme, now

commonly called the "Texas Two-Step," to separate its asbestos liabilities from its

5

business assets and to isolate those liabilities in bankruptcy. JA604-606 (Debtor's Submission ¶ 14); *In re Bestwall LLC*, 71 F.4th 168, 173-74 (4th Cir. 2023), *cert. denied*, Nos. 23-675 & 23-702 (U.S. May 13, 2024). Rather than enter bankruptcy, Georgia-Pacific "moved" itself to Texas and split itself into two new entities: New GP, which continued to own almost all of the assets and maintain almost all of the operations of Georgia-Pacific ("Old GP"), and Bestwall, which received Old GP's asbestos liabilities and minimal assets. However, Bestwall was provided with one additional valuable asset that provides protection from its newly assigned asbestos liabilities.

As a part of the Texas Two-Step, Bestwall received a Funding Agreement pursuant to which New GP agreed to fund Bestwall's asbestos liabilities. Within bankruptcy, the Funding Agreement requires New GP to pay all costs of the bankruptcy and whatever is needed to fund a Section 524(g) bankruptcy trust (with the intention of effectively capping the fund available for payment of the victims). In the absence of bankruptcy, the Funding Agreement requires New GP to pay all amounts needed to satisfy Bestwall's asbestos liabilities, as well as any costs incurred in connection with Bestwall's defense or resolution of those liabilities. With or without bankruptcy, therefore, Bestwall can draw on New GP's assets under the Funding Agreement. JA437 (Funding Agreement § 1 (definition of "Permitted Funding Use") (Nov. 2, 2017)).

6

**3.**      The Funding Agreement grants Bestwall full access to the total value

of New GP's assets—now at least $28.3 billion[1]—and guarantees Bestwall's

ability to pay all its debts and cover all its liabilities regardless of whether Bestwall

remains in bankruptcy or resumes defending asbestos claims outside of bankruptcy.

Bestwall has admitted its continued financial viability notwithstanding the status of

the bankruptcy case and repeatedly has assured the bankruptcy court of its ability

to satisfy all liabilities in full.  *See* JA607 (Debtor's Submission ¶ 16); *see also*

JA500 (Nov. 7, 2017 Hr'g Tr. 33:5-8) ("We believe with the funding agreement,

we have the capability of doing that [paying all the claims in full].");  JA791

(Mem. Op. & Order Denying Committee's Mot. for Dismissal at 5 (July 29, 2019)

("July 29, 2019 Op.")) ("Bestwall has the full ability to meet all of its obligations

(whatever they may be) through its assets and New GP's assets, which are

available through the Funding Agreement"); JA1736-1737 (Debtor's Opp. to Third

Motion To Dismiss Chapter 11 Case ¶ 34 (Mar. 8, 2023)) (Bestwall, through the

Funding Agreement, "has the full ability to meet all of its obligations").

Simple calculations demonstrate Bestwall's ability to pay all asbestos

liabilities.  In the last year before bankruptcy, Georgia-Pacific spent $200 million

responding to asbestos claims (some of which were defense costs, not payments

---

[1] JA2157 (Decl. of Julie A. Anderson ¶ 10 (Mar. 11, 2024) ("Anderson
Decl.")).

to victims).  JA458 (Informational Brief of Bestwall LLC at 5).  Assuming that

claims will continue to arise for the next 25 years, and Bestwall continued to

expend $200 million a year, that would total $5 billion, less than New GP has paid

out to its private owners in the 6 years and 9 months since Bestwall's bankruptcy

case was filed.  Even liabilities twice that total would be only one-third of the

present value of New GP, which was, according to New GP, approximately

$28.3 billion at the end of 2023.  JA2157 (Anderson Decl. ¶ 10).

4.     When its bankruptcy case was filed, Bestwall represented that there

were approximately 22,000 active claims pending against it, with another

approximately 13,300 claims on inactive dockets.  JA460 (Informational Brief of

Bestwall LLC at 7).  Bestwall's case has been pending for 6 years and 9 months.

The Committee estimates that approximately 21,300 newly diagnosed individual

claimants would have pursued compensation from Bestwall, but for the bankruptcy

stay.  In almost 7 years, not even one of the approximately 22,100 active pending

claimants, 13,300 inactive pending claimants, or 21,300 stayed claimants—more

than 56,000 individuals—has been able to pursue claims against Bestwall for

causing their asbestos disease.  None of the more than 56,000 has received any

compensation from Bestwall for their injuries.

5.     In contrast, all of Old GP's other creditors have continued to be

paid in the ordinary course, and New GP's ultimate parent has received annual

dividends in the hundreds of millions of dollars, along with special dividends, aggregating in excess of $5 billion, and has realized an increase of approximately $7.6 billion in shareholder equity.  JA2157 (Anderson Decl. ¶ 10).  By declining to file for bankruptcy itself, Georgia-Pacific escaped the basic bankruptcy requirements of submitting to the bankruptcy court's control, publicly disclosing its financial dealings, and restricting equity owners' ability to extract money before paying creditors.  *See*, *e.g.*, 11 U.S.C. §§ 363(b)-(c), 1129(b)(2); Fed. R. Bankr. P. 1007; 28 C.F.R. § 58.8.

**6.**    Moreover, the Committee conservatively estimates that more than 25,000 individuals who had pending claims against, or would have asserted claims against, Bestwall but for the bankruptcy stay have died while Bestwall and Georgia-Pacific have enjoyed the protections of bankruptcy.  Of these 25,000, the Committee estimates that more than 17,000 are individuals who were alive and had pending claims at the time that Bestwall filed for bankruptcy, and another estimated 8,800 are individuals who were diagnosed after Bestwall filed its case and died while it was pending.

The Committee further estimates that 10,000 or more of the 25,000 are individuals who lost their lives to mesothelioma.  Mesothelioma is almost always fatal within 18 months to 2 years of diagnosis.  Most of the diagnosed mesothelioma claimants alive at the start of this case—approximately 6,600—have died while it

has been pending, including all 6 of the living claimants appointed to the Committee. Extrapolating from epidemiology, the Committee further estimates that approximately 10,200 individuals would have filed claims against Bestwall based on mesothelioma but for the bankruptcy stay. Approximately 4,200 of those individuals have died from mesothelioma during the pendency of the bankruptcy.

These individuals have forever lost the opportunity to seek to hold their tortfeasor liable before their deaths.

7. In addition, none of these involuntary creditors has been able to seek compensation from New GP over the past 6 years and 9 months. On the day Bestwall filed for bankruptcy, it also initiated an adversary proceeding in the bankruptcy court and obtained a preliminary injunction under 11 U.S.C. § 105(a) barring all current and future asbestos plaintiffs from litigating against non-debtor New GP and its affiliates. *See In re Bestwall LLC*, 606 B.R. 243 (Bankr. W.D.N.C. 2019). The district court affirmed, *see In re Bestwall LLC*, 2022 WL 67469 (W.D.N.C. Jan. 6, 2022), and this Court affirmed in a divided opinion, *see In re Bestwall LLC*, 71 F.4th 168 (4th Cir. 2023). The Court denied en banc review, with eight judges voting to deny rehearing and five voting to grant. *See In re Bestwall LLC*, No. 22-1127, Dkt. 82 (4th Cir. Aug. 7, 2023). As a result, all asbestos litigation against the profitable New GP enterprise has remained enjoined for nearly seven years and counting.

**8.** Shortly after Bestwall filed for bankruptcy, in August 2018, the Committee moved to dismiss Bestwall's petition on the ground that it was filed in bad faith. *See* 11 U.S.C. § 1112(b)(1) (authorizing bankruptcy courts to dismiss petitions for "cause"). In 2019, the bankruptcy court denied the motion. JA787-796 (July 29, 2019 Op.). The court found that "Bestwall has the full ability to meet all of its obligations (whatever they may be) through its assets and New GP's assets, which are available through the Funding Agreement." JA791; *see also* JA792-793 ("[T]he Funding Agreement . . . permits Bestwall to draw from New GP an uncapped amount of money to pay the costs of this Chapter 11 case and fund Bestwall's liabilities to the extent that its assets are insufficient to do so."). The court also found that "Bestwall has substantial assets, owns ongoing active businesses, and receives substantial cash flow." JA791; *see* JA792 ("Even outside of the Funding Agreement, Bestwall owns substantial assets and operating businesses that produce cash flow," it is "not a 'defunct company,'" and it "has the ability to make future payments"). Applying this Court's *Carolin* test,[2] the bankruptcy court concluded that Bestwall's financial wherewithal meant that its bankruptcy case was not objectively futile and therefore denied dismissal. The court expressly did not reach the issue of subjective bad faith. Following this Court's denial of the Committee's petition for direct appeal, JA1530, the district

---

[2] *See Carolin Corp. v. Miller*, 886 F.2d 693 (4th Cir. 1989).

11

court ruled that appeal from a denial of dismissal was an interlocutory order and denied leave to appeal, JA1852-1862.

**9.**    The Committee filed the present motion to dismiss for lack of subject-matter jurisdiction in March 2023.  The bankruptcy court once again recognized that Bestwall has always been "able to pay any conceivable liabilities now and in the foreseeable future (and [Bestwall] does not argue to the contrary)."  JA1906 (Order ¶ 51).  However, the court rejected the Committee's argument that more than 200 years of constitutional history required an entity to face a threat to its economic viability, necessitating bankruptcy, and instead incorrectly ruled that the Bankruptcy Clause imposed no limits on who could file for bankruptcy.  JA1918-1919 (*Id.* ¶ 60).  The court certified its ruling on the constitutional issue for direct appeal, and this Court granted review.

## SUMMARY OF ARGUMENT

The bankruptcy court lacks jurisdiction over this "bankruptcy" case because the Constitution does not extend to entities like Bestwall that are not actually bankrupt.  The relevant jurisdiction-conferring statute, 28 U.S.C. § 1334, cannot expand on the Constitution's limitations to confer authority to provide bankruptcy relief to debtors that are not actually bankrupt.

**I.A.**    The Bankruptcy Clause authorizes Congress to enact "uniform Laws on the subject of Bankruptcies."  Art. I, § 8, cl. 4.  The original meaning of the term "the subject of Bankruptcies" does not contemplate wealthy tortfeasors who

12

are not actually bankrupt. Founding-era laws regulated the relationship between creditors and debtors failing to satisfy their obligations—because they were either unwilling or unable to pay their debts. Founding-era dictionary definitions similarly define "bankruptcy" as concerning actually bankrupt debtors who cannot pay their debts. Post-ratification legislation and Supreme Court precedent confirm this historical understanding. Although Congress gradually expanded the scope of bankruptcy law to a wide class of debtors, those laws all regulated actually bankrupt debtors—that is, debtors either unwilling to pay or unable to pay and in need of a fresh start. According to all the historical evidence, the Founders did not intend the Constitution to authorize a non-bankrupt debtor like Bestwall to obtain any bankruptcy relief.

**B.** The constitutional restriction of bankruptcy to debtors that are actually bankrupt promotes important constitutional principles. Tort claimants enjoy due-process and jury-trial rights under the Constitution. Because mass-tort resolution in bankruptcy impinges on those rights, it can be justified only where a debtor's limited assets are insufficient to pay all creditor claims. Similarly, federal law can supersede state law only when consistent with the Constitution's respect for federalism. The justification necessary to trump these constitutional principles does not exist where, as here, Bestwall (the putative debtor) is a financially viable entity with access to unlimited funds to timely and fully pay all of its current and future creditors, created to shield a corporate enterprise from state tort liability.

13

**C.** Bestwall is not a bankrupt debtor within the meaning of the Bankruptcy Clause. Bestwall is a debtor that purports to be willing to pay Georgia-Pacific's debts and that admits it is "able to pay any conceivable liabilities now and in the foreseeable future." JA1906 (Order ¶ 51). Because no Founding-era bankruptcy system allowed a similarly situated petitioner to obtain bankruptcy relief, Bestwall transgresses the constitutional limit.

**D.** Congress conferred bankruptcy-court jurisdiction over Chapter 11 "cases" and "proceedings" under 28 U.S.C. § 1334. The scope of the statute is circumscribed by the Bankruptcy Clause's limits and the history and tradition that define those limits. This Court must decline to ascribe to it an unconstitutional intent. Under the doctrine of constitutional avoidance, Section 1334 must be interpreted consistent with the Bankruptcy Clause's requirement that an actually bankrupt debtor file for bankruptcy.

**II.** The bankruptcy court correctly concluded that the question whether this case falls under "the subject of Bankruptcies" implicates the scope of its jurisdiction. JA1886-1887 (Order ¶ 29). But it incorrectly expanded Congress's grant of jurisdiction by concluding that the Bankruptcy Clause imposes no limitations based on the financial condition and funding abilities of the debtor. In reaching that conclusion, the court misconstrued history and Supreme Court precedent, conflated the absence of a statutory requirement of insolvency with the

14

Constitution's requirement that a debtor be bankrupt, and ignored constitutional-avoidance principles.[3]

## STANDARD OF REVIEW

This Court reviews de novo whether subject-matter jurisdiction exists. *See New Horizon of NY LLC v. Jacobs*, 231 F.3d 143, 150 (4th Cir. 2000). It reviews the bankruptcy court's factual findings for clear error and legal conclusions de novo. *See In re Kirkland*, 600 F.3d 310, 314 (4th Cir. 2010).

## ARGUMENT

## I. THE BANKRUPTCY CLAUSE OF THE CONSTITUTION DOES NOT PROVIDE SUBJECT-MATTER JURISDICTION TO THE BANKRUPTCY COURT OVER THIS CASE

The Bankruptcy Clause grants Congress authority to enact "uniform Laws on the subject of Bankruptcies." Art. I, § 8, cl. 4. The original meaning of the term "[b]ankruptc[y]"—plus decades of Supreme Court precedent and other constitutional provisions—limits "bankruptcy" jurisdiction to debtors who are actually bankrupt. At the Founding, bankruptcy regulated creditors' relationship with two types of actually bankrupt debtors: (1) debtors who were unwilling to

---

[3] Affirming the bankruptcy court's decision could have implications far beyond asbestos mass tort cases. Provisions of the Bankruptcy Code similarly alter the legal rights a creditor would have outside of bankruptcy, including, *e.g.*, the limitation on lease-rejection damages under Section 502(b)(6) and the right to seek to subordinate a claim, debt, or lien under Section 510. These rights exist for the purpose of attempting equitably to distribute limited assets and to balance the rights of a bankrupt and its creditors.

pay their creditors (commonly viewed as fraudsters), and (2) debtors willing but financially unable pay their debts.  A debtor like Bestwall—one that says it is willing and also able to pay all conceivable liabilities—falls under neither category and therefore is not within "the subject of Bankruptcies."  *Id.*

Federal subject-matter jurisdiction is limited and must be conferred by Congress "'[w]ithin constitutional bounds.'"  *United States v. Denedo*, 556 U.S. 904, 912 (2009) (quoting *Bowles v. Russell*, 551 U.S. 205, 212 (2007)).  The bankruptcy court accepted this principle, stating:  "The Bankruptcy Clause of the Constitution determines the limits of constitutional subject matter jurisdiction for bankruptcy."  JA1884 (Order ¶ 26).  Congress conferred bankruptcy-court jurisdiction over Chapter 11 "cases" and "proceedings."  28 U.S.C. § 1334.  The doctrine of constitutional avoidance requires that courts decline to "ascribe to legislatures an unconstitutional intent" and reasonably presume that Congress does not enact unconstitutional laws.  *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 177 (4th Cir. 2010).  Under that doctrine, the Court should interpret Section 1334 consistent with the Bankruptcy Clause's substantive limitations.

## A. The Original Meaning Of The Bankruptcy Clause Is Limited To Actually Bankrupt Debtors

The Constitution circumscribes the bankruptcy court's jurisdiction to "the subject of Bankruptcies."  Art. I, § 8, cl. 4.  The Court must interpret the meaning of this term by looking at "[t]he history of the Bankruptcy Clause, the reasons it

was inserted in the Constitution, and the legislation both proposed and enacted

under its auspices immediately following ratification of the Constitution." *Central

Virginia Cmty. Coll. v. Katz*, 546 U.S. 356, 362-63 (2006).  This bankruptcy case

falls outside the constitutional limitations of the Bankruptcy Clause because

Bestwall does not resemble any Founding-era concept of a bankrupt debtor.

Nor, as later discussed (*infra* pp. 43-45), does Bestwall meet the standard for an

accepted proper debtor in the two centuries to follow.

> ### 1. Pre-ratification laws regulated the relationship between creditors and actually bankrupt debtors who either refused to pay or struggled to pay their debts

In assessing the original meaning of the Bankruptcy Clause, the Court

"presume[s] that the Framers of the Constitution were familiar with the

contemporary legal context when they adopted the Bankruptcy Clause." *Katz*, 546

U.S. at 362.  That is "not meant to suggest a law trapped in amber." *United States

v. Rahimi*, 144 S. Ct. 1889, 1897 (2024).  Rather, the Court "must ascertain

whether the [current] law is 'relevantly similar' to laws that our tradition is

understood to permit." *Id.* at 1898 (citation omitted).  Although modern law

"need not be a 'dead ringer' or a 'historical twin,'" it still must be "consistent

with the principles that underpin our regulatory tradition." *Id.*

The Framers were broadly familiar with two types of bankruptcy systems

at the time of the Constitutional Convention:  (1) involuntary bankruptcies, which

allowed creditors to trigger proceedings (often resulting in imprisonment) for

debtors unwilling to pay their debts; and (2) procedures that allowed debtors who struggled to pay their debts to seek discharge from prison and, sometimes, the discharge of their debts. This bankruptcy case is relevantly similar to neither.

a.     The English bankruptcy system largely was limited to involuntary bankruptcy proceedings brought by creditors against "merchant" debtors failing to pay their debts. *See* Thomas E. Plank, *The Constitutional Limits of Bankruptcy*, 63 Tenn. L. Rev. 487, 507-10 (1996). The term "merchant" generally encompassed "middlemen who neither owned land nor produced tangible goods" to generate wealth. *Id.* at 507.

"The English law of bankruptcy, as it existed at the time of the adoption of the Constitution, was conceived wholly in the interest of the creditor and proceeded upon the assumption that the debtor was necessarily to be dealt with as an offender." *Continental Illinois Nat'l Bank & Tr. Co. of Chicago v. Chicago, R.I. & P. Ry. Co.*, 294 U.S. 648, 668 (1935). That is, it grew out of the perception that a debtor who refused to pay his debts was "someone who committed fraud." Plank, 63 Tenn. L. Rev. at 502. To that end, the preamble of the first bankruptcy acts stated that the statutes were aimed at "offenders" who obtained debt and "suddenly fle[d] to Parts unknown, or ke[pt] their Houses where they could avoid service of process, not minding to pay" their creditors. *Id.* at 502 n.76 (quoting 34 & 35 Hen. 8, ch. 4 (1542-1543) (Eng.) (as reproduced in 2 Statutes at Large 331-35 (London 1770)) & 1 Jam., ch. 15, §§ 10, 17 (1604) (Eng.)) (cleaned up).

18

Later statutes similarly focused on preventing such "fraud" by debtors.  *See*, *e.g.*, Bankrupts Act of 1731, 5 Geo. 2, ch. 30 (1732) (Eng.) ("An Act to prevent the Committing of Frauds by Bankrupts").  A debtor was the subject of bankruptcy if he was "a trader, who secretes himself, or does certain other acts, tending to defraud his creditors."  2 William Blackstone, *Commentaries* 471 (1766).  Those acts included "withdraw[ing] himself from the jurisdiction . . . to defraud his creditors," absconding "with intent to secrete himself," "[m]aking any fraudulent conveyance" to avoid payment, and "procrastinat[ing] the time of payment."  *Id.* at 478.

Imprisonment was the primary "creditor collection device" and "reflected a common belief that the refusal to pay debts was willful."  Plank, 63 Tenn. L. Rev. at 506 n.98.  It was perceived "to provide an incentive for debtors who owned property which could not be reached by the legal process of the day, such as real estate and certain types of personal property, or property that the debtor had moved beyond the jurisdiction or fraudulently conveyed to others, to liquidate it to pay debts."  *Id.*

**b.**    The early American jurisdictions, by contrast, began experimenting with systems that limited imprisonment as a means of debt collection.  These systems focused on the "impecunious debtor" who was imprisoned "because of an inability to pay a debt."  1 *Collier on Bankruptcy* ¶ 20.01[1] (16th ed. 2024).

Under those systems, a debtor generally could petition for his release from confinement by executing either "an oath of impoverishment" or "a conveyance of all his nonexempt property to a trustee or assignee for the benefit of his creditors." Charles G. Hallinan, *The "Fresh Start" Policy in Consumer Bankruptcy: A Historical Inventory and An Interpretive Theory*, 21 U. Rich. L. Rev. 49, 55 (1986). Massachusetts, for example, enacted "an Act for the Relief and Release of Poor Prisoners for Debt," under which "most debtors could take the oath of poverty and request to be released." Peter J. Coleman, *Debtors and Creditors in America: Insolvency, Imprisonment for Debt, and Bankruptcy, 1607-1900*, at 40 (1974) (hereinafter "Coleman") (cited in *Katz*, 546 U.S. at 366). New Hampshire, too, allowed "any prisoner who swore the poor debtor's oath"—that "he had no more than three pounds worth of property," excluding clothing—to be released from prison unless creditors paid for his support. *Id.* at 56.

American jurisdictions similarly experimented with various "insolvency" laws, focused on debtors struggling financially to repay their debts, that allowed debtors to petition for release from prison upon an assignment of property or future service. Specific approaches varied from colony to colony. New York adopted one such system, targeting debtors who "by losses & other Misfortunes," though willing to make "the utmost satisfaction" of their debts, remained imprisoned. *Id.* at 107; *see*, *e.g.*, An Act for the Relief of Insolvent Debtors, ch. 34, 9th Sess.,

1786 N.Y. Laws (passed April 13, 1786), repealed by Act of Feb. 8, 1788, ch. 29, 11th Sess., 1788 N.Y. Laws.  Such "unhappy Debtors," New York declared, "have always been Deemed the proper objects of publick [sic] compassion."  Coleman at 107.  Connecticut similarly adopted variations of this approach.  *See id.* at 78-79.

A few jurisdictions went further and discharged not just the debtor's person, but also the debtor's debts.  These laws were designed for the benefit of "poor, distressed, and insolvent prisoners for debt."  *Id.* at 182-83.  South Carolina, for example, enacted such legislation.  *See State v. Gee*, 1 Bay 163, 163 (S.C. Ct. Com. Pl. 1791) (interpreting 1759 statute as an "insolvent debtor's law . . . intended only for the benefit of those who by accident, losses, or other misfortunes, are rendered incapable of paying their debts, and by that means had become objects of compassion").  Rhode Island also adopted a voluntary system that discharged debts upon a property assignment.  *See* Coleman at 91-92; *see also Mason v. Haile*, 25 U.S. (12 Wheat.) 370, 375-76 (1827) (noting that Rhode Island's 1756 act was "entitled[ ] 'an act for the relief of insolvent debtors'").  The Rhode Island legislature recognized that "honest" debtors were "reduced by Misfortune (notwithstanding their utmost Care and Diligence) and thrown into Prison."  Coleman at 87.  And it enacted the law after debtors "declared themselves 'utterly incapable' of repaying their debts and willing 'to strip themselves of every thing upon the face of the earth could they but enjoy their liberty.'"  *Id.* at 91.  By

1798, Rhode Island officially adopted the concept of a "poor debtor's oath," under which debtors could be released from prison upon an oath of impoverishment. *Id.* at 88.

These insolvency actions generally followed debilitating life events that rendered debtors financially "powerless" to repay their debts. *Id.* at 82-83. Petitioners often "recited a standard formula of 'inevitable and unforeseen misfortune'" and detailed the causes of that misfortune as encompassing repayment difficulties arising from war losses, assumption of debts by defaulting relatives, illness and high medical bills, severe weather such as storms, accidents such as shipwrecks and fires, bad market conditions, poor management, and thefts. *Id.* at 97-98. Whatever the reasoning, these petitioners typically thought their impending economic collapse "a grim inevitability." *Id.* at 98; *see* Peter J. Coleman, *The Insolvent Debtor in Rhode Island 1745-1828*, 22 Wm. & Mary Q. 413, 434 (1965) (similar).

In sum, the English and American approaches shared a common trait: "They all provided for a collective proceeding" involving "debtors who demonstrated an inability or . . . an unwillingness to repay their creditors. They did not apply to debtors who repaid their debts." Plank, 63 Tenn. L. Rev. at 526.

**c.** Founding-era dictionaries similarly defined a "bankrupt" debtor as one "who cannot pay his debts." William Perry, *The Royal Standard English*

*Dictionary* 51 (1777) (definitions of "bankrupt" and "bankruptcy"); *see* 1 Thomas

Sheridan, *Dictionary of the English Language* (4th ed. 1797) (unpaginated)

(definitions of "bankrupt" and "bankruptcy":  "The state of a man" who is "[i]n

debt beyond the power of payment"); 1 Samuel Johnson, *Dictionary of the English*

*Language* (1755) (unpaginated) (definitions of "bankrupt" and "bankruptcy":

"The state of a man" "in debt beyond the power of payment").  This definition

remained constant after ratification.  *See* Plank, 63 Tenn. L. Rev. at 529-30 (noting

that subsequent editions of Johnson's *Dictionary*, through and including the 1799

eighth edition, "contained the same or substantially the same definitions"); *Kunzler*

*v. Kohaus*, 5 Hill 317, 319-21 (N.Y. 1843) ("We say a man is bankrupt when he is

unable to pay his debts . . . .  Looking thus at the uniform popular acceptation of

the word from the earliest times and in all English countries . . . I read the

constitution thus:  'Congress shall have power to establish uniform laws on the

subject of *any person's general inability to pay his debts* . . . .'") (emphasis added).

These understandings are illuminating.  The ordinary meaning of words at

the time of the Constitutional Convention is critical to understanding the intent of

the drafters.  This Court should be "guided by the principle that '[t]he Constitution

was written to be understood by the voters; its words and phrases were used in

their normal and ordinary as distinguished from technical meaning.'"  *District of*

*Columbia v. Heller*, 554 U.S. 570, 576 (2008) (quoting *United States v. Sprague*,

23

282 U.S. 716, 731 (1931)) (brackets in *Heller*); *accord NLRB v. Noel Canning*, 573 U.S. 513, 527 (2014) (using Founding-era dictionary definition to ascertain original meaning); *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 813-14 (2015) (similar).

**d.**    As the bankruptcy court pointed out, the Constitutional Convention proceedings and the Federalist Papers "shed little light" on what the Framers intended by "the subject of Bankruptcies."  JA1890 (Order ¶ 32).  Yet the Supreme Court has recognized that the Bankruptcy Clause empowered Congress to create a "uniform" system of "Bankruptcies" (Art. I, § 8, cl. 4) to address "[t]he difficulties posed by th[e] patchwork of insolvency and bankruptcy laws" adopted by "the American Colonies, and later the several States."  *Katz*, 546 U.S. at 365-66. Those challenges arose because the various "[i]nsolvent laws" were not always considered by the States "as binding out of the limits of the State that made them." *James v. Allen*, 1 U.S. (1 Dall.) 188, 191 (Pa. Com. Pl. 1786).  Uniform enforceability was "a primary motivation" of the Bankruptcy Clause.  *Katz*, 546 U.S. at 370; *see also Ogden v. Saunders*, 25 U.S. (12 Wheat.) 213, 355 (1827) (Chief Justice Marshall observing the "mischief" of state legislatures in bankruptcy before the Constitution).

When the Framers conferred this power on Congress, they contemplated a uniform system broadly regulating the kinds of bankrupt debtors at issue during the

Founding era: those who refused to pay and those unable to pay. As Justice Story summarized it:

> Perhaps as satisfactory a description of a bankrupt law as can be framed, is, that it is a law for the benefit and relief of creditors and their debtors, in cases in which the latter are *unable or unwilling to pay their debts*. And a law on the subject of bankruptcies, in the sense of the Constitution, is a law making provisions for cases of persons *failing to pay their debts*.

2 Joseph Story, *Commentaries on the Constitution* § 1113, at 50 n.3 (Thomas M. Cooley ed., 4th ed. 1873) (emphases added).

### 2. Post-ratification developments confirm the historical understanding that bankruptcy is reserved for actually bankrupt debtors

Although early post-ratification legislation by Congress was styled after the English involuntary system, legislation later developed to include a voluntary system of bankruptcy encompassing a broad swath of debtors. But that development remained "consistent with the principles that underpin [historical] tradition." *Rahimi*, 144 S. Ct. at 1898. Mirroring the debtor-friendly understanding of bankruptcy at the Founding, Congress gradually extended voluntary bankruptcy relief to debtors struggling to pay their debts and in need of financial rehabilitation. That is, the first acts of Congress were premised on the view "that the bankrupt was dishonest," while "later acts proceeded upon the assumption that he might be honest but unfortunate." *Continental Illinois*, 294 U.S. at 670.

Decades of Supreme Court precedent recognize that, consistent with the debtor-friendly approaches of the early American jurisdictions, this development occurred in service of "relieving the honest debtor from *oppressive* indebtedness and permitting him to start afresh." *Wright v. Union Cent. Life Ins. Co.*, 304 U.S. 502, 514 (1938) (emphasis added). In *Continental Illinois*, for example, the Supreme Court upheld a provision of the Bankruptcy Act of 1898 extending bankruptcy relief to a railroad corporation "unable to meet its debts as they mature" as a law "on the subject of bankruptcies" that concerned "a failing debtor's obligations." 294 U.S. at 672-73. Similarly, in *Hanover National Bank v. Moyses*, the Court upheld legislation that did not resemble the "laws of England" insofar as the debtor was not a "merchant," when the debtor was defaulting and "adjudged bankrupt[]." 186 U.S. 181, 187 (1902); *see also Railway Lab. Executives' Ass'n v. Gibbons*, 455 U.S. 457, 466 (1982) ("Congress' power under the Bankruptcy Clause 'contemplates an adjustment of a failing debtor's obligations.'") (citation omitted; cleaned up). In other words, the Supreme Court "has uniformly upheld" laws challenged on the basis that they fall outside the scope of "the subject of Bankruptcies . . . with the only requirement being that the law deal with the relations between a debtor and its creditors, *when the debtor is having difficulty paying its debts*." Charles J. Tabb, *The Bankruptcy Clause, the Fifth Amendment, and the Limited Rights of Secured Creditors in Bankruptcy*, 2015 U. Ill. L. Rev. 766, 767 (emphasis added).

26

Other courts interpreting post-ratification legislation similarly recognized that the Bankruptcy Clause is limited to actually bankrupt debtors. In analyzing the new elements of the Bankruptcy Act of 1841, for example, the court in *Kunzler v. Kohaus* concluded that a law on "the subject of Bankruptcies" is a law "on the subject of any person's general inabilities to pay his debts." 5 Hill at 321. In *In re Reiman*, 20 F. Cas. 490 (S.D.N.Y. 1874) (No. 11,673), a seminal case concerning a dispute over the Bankruptcy Act of 1867, the court held that "the subject of Bankruptcies" is "not, properly, anything less than the subject of the relations between an insolvent or non-paying or fraudulent debtor, and his creditors, extending to his and their relief." *Id*. at 496. This reading of the scope of the Clause has echoed through the years in Supreme Court and Fourth Circuit law. *See*, *e.g.*, *Wright*, 304 U.S. at 513-14; *Gibbons*, 455 U.S. at 466; *Katz*, 546 U.S. at 370-71; *Campbell v. Alleghany Corp.*, 75 F.2d 947, 952 (4th Cir. 1935); *see also Harrington v. Purdue Pharma L. P.*, 144 S. Ct. 2071, 2077 (2024) (citing *Wright*, 304 U.S. at 513-14).

In sum, the changes in bankruptcy law over time expanded the categories of persons and entities to whom relief was made available. But they did not change the longstanding requirement that debtors be actually "bankrupt."

**B.      The Limitation Of The Bankruptcy Power Accords With Other Constitutional Rights And Protections**

The Bankruptcy Clause is subject to restrictions imposed by constitutional rights of mass-tort claimants and federalism principles.  Those constitutional limitations confirm that "the subject of Bankruptcies" does not include entities like Bestwall and that the bankruptcy court lacks jurisdiction over this case.

**1.      Asbestos victims' constitutional rights require interpreting the Bankruptcy Clause as excluding jurisdiction over debtors like Bestwall**

Asbestos tort victims enjoy due-process and jury-trial rights that require interpreting the Bankruptcy Clause to exclude debtors who are not actually bankrupt.

**a.**      A tort claimant's "'cause of action is a species of property'" that is "deserving of due process protections." *Tulsa Pro. Collection Servs., Inc. v. Pope*, 485 U.S. 478, 485 (1988) (quoting *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982)).  Similarly, tort claimants have a due-process right to "opt out" of the class and pursue their "day in court." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809, 812 (1985).

Under normal circumstances, a debtor's financial condition might justify a mass-tort bankruptcy impinging on these due-process rights:  "the inadequacy of the [assets] to pay all the claims" requires "limit[ing] . . . an early feast to avoid a later famine." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 838 (1999).  While *Ortiz*

28

arose in the class-action context, the Supreme Court made clear that the existence of a limited fund was crucial to allowing the impairment of victim claims. *See id.* at 830 ("[t]he nub of this case is the certification of the class . . . on a limited fund rationale"); *see also id.* at 845 ("constitutional concerns that come with any attempt to aggregate individual tort claims on a limited fund rationale").[4]  That justification does not exist where a financially viable and wealthy tortfeasor with no current or foreseeable inability to pay its debts devises a scheme to insulate its profitable business from the traditional tort system.  For those debtors, bankruptcy serves only to deprive claimants unfairly of their day in court.

**b.**     Consistent with our "deep-rooted historic tradition that everyone should have his own day in court," *Martin v. Wilks*, 490 U.S. 755, 762 (1989), the Seventh Amendment guarantees claimants' constitutional right to a jury trial in litigation conducted in federal court.  *See*, *e.g.*, *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989); *Schoenthal v. Irving Trust Co.*, 287 U.S. 92, 94 (1932).  Those

---

[4] Professor Brubaker, a leading scholar on bankruptcy law, observed that the Supreme Court made clear in *Oritz* that, "if a mass-tort defendant's resources do *not* constitute a limited fund that is insufficient to fully satisfy its mass-tort obligations, individual claimants retain an absolute constitutional right to opt out of any aggregate resolution process, as part of their due process property rights in their individual claims."  Ralph Brubaker, *The Texas Two-Step and Mandatory Non-Opt-Out Settlement Powers*, Harvard Law School Bankruptcy Roundtable 7 (July 2022); *accord* Ralph Brubaker, *Mass Torts, The Bankruptcy Power, and Constitutional Limits on Mandatory No-Opt-Outs Settlements*, 23 Fla. St. U. Bus. Rev. (forthcoming 2024) (manuscript at 8), *available at* https://ssrn.com/abstract_id=4892178.

with disputed legal claims, triable to a jury in the absence of a bankruptcy proceeding, in most cases have no constitutional jury-trial right if the defendant files for bankruptcy and those same claims are made against the defendant's bankruptcy estate. *See* 11 U.S.C. §§ 362(a), 524(a)(1)-(2), 541(a)(1); *see also Granfinanciera*, 492 U.S. at 59 n.14 (once a defendant files bankruptcy, plaintiffs "lack an alternative forum to the bankruptcy court in which to pursue their claims").

As the Supreme Court recently reaffirmed, "[t]he right to trial by jury is 'of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right' has always been and 'should be scrutinized with the utmost care.'" *SEC v. Jarkesy*, 144 S. Ct. 2117, 2128 (2024) (quoting *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935)). "'[E]very encroachment upon it has been watched with great jealousy.'" *Id*. (quoting *Parsons v. Bedford*, 28 U.S. (3 Pet.) 433, 446 (1830)); *see also id*. at 2128 ("The Framers . . . 'embedded' the [Seventh Amendment] right [to a jury trial] in the Constitution, securing it 'against the passing demands of expediency or convenience.'") (quoting *Reid v. Covert*, 354 U.S. 1, 10 (1957) (plurality)). Encroachment upon those rights might be justified where creditors are forced to share pro rata in a limited *res*. *See id.* at 2135. But there is no justification for forcing claimants to forfeit their jury-trial rights when the debtor-defendant is not actually bankrupt and does not pose any threat to full payment of all creditors.

There is a jury-right exception in bankruptcy for personal-injury and wrongful-death claims. *See* 28 U.S.C. §§ 157(b)(5), 1411. Unfortunately, in practice, that exception is not a real protection of the victims' rights. As commonly occurs in mass-tort cases, the Bestwall bankruptcy court has denied the motions for relief from stay, finding that to grant such motions would open the floodgates to litigation that will defeat the debtor's intention to deal with the claims in mass. *See* Order Denying Wilson Buckingham and Angelika Weiss' Motion for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362(d), No. 17-31795 (LTB), Dkt. 3290 (Bankr. W.D.N.C. Feb. 26, 2024); Order Denying Richard and Joann Dale's Motion for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362(d), No. 17-31795 (LTB), Dkt. 3218 (Bankr. W.D.N.C. Dec. 13, 2023).

### 2. Courts cannot construe legislation to empower them to hear bankruptcy cases that go beyond the federalism limits imposed by the Constitution

In the bankruptcy context, principles of "federalism . . . must influence [the court's] interpretation of" congressional acts. *Kelly v. Robinson*, 479 U.S. 36, 49 (1986). It is a "principle of bankruptcy jurisprudence . . . that federal law supersedes state law only to the extent necessary to further federal objectives." *In re Village Props., Ltd.*, 723 F.2d 441, 446 (5th Cir. 1984) (ellipsis in original).[5]

---

[5] Bankruptcy-court jurisdiction is referred by the district courts, whose limited subject-matter jurisdiction serves to protect the federalism values at the core of Article III. All federal courts have a "virtually unflagging obligation" to

Bestwall's bankruptcy petition exceeded federalism limits because the core purpose was to allow Georgia-Pacific to resolve a large number of present and future state tort lawsuits by asbestos victims outside of the tort system, and without corresponding state-law rights and procedures. *See*, *e.g.*, JA454-455 (Informational Brief of Bestwall LLC at 1-2); JA407-408 (Decl. of Tyler L. Woolson in Support of First Day Pleadings ¶ 16 (Nov. 2, 2017)). Had Bestwall not filed bankruptcy, the victims of Georgia-Pacific's asbestos-containing products would have significantly different substantive rights depending on the specific state law applied in individual cases in the court system. The substantive law of the 50 States varies materially on issues such as comparative fault, the availability and quantification of punitive damages, the viability and limitations of wrongful-death actions, and limitations periods. *See also* Amicus Brief of North Carolina et al. at 8-9, *Official Comm. of Asbestos Claimants v. Bestwall LLC*, No. 23-675 (U.S. Jan. 22, 2024) ("States have inherent sovereign authority to enforce their own regulatory laws in their state courts" and a "sovereign interest in the timely resolution of claims against corporate wrongdoers").

---

exercise only the jurisdiction given to them by Congress. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). This obligation is core to our judicial system, as federal courts have "no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821).

While these differences are commonly disregarded in other asbestos bankruptcies, where the Bankruptcy Clause of the Constitution properly provides justification for the deprivation of some rights provided by state law, there is no constitutional justification for depriving claimants of these fundamental rights here.

### C.     Bestwall Is Not An Actually Bankrupt Debtor Under The Meaning Of The Bankruptcy Clause

Even under the broadest articulation of the Bankruptcy Clause, Bestwall transgresses the constitutional limit.  Bestwall is a debtor that purports not to be a fraudster even though it contrived this bankruptcy to deprive tort victims of their rights through a convoluted chain of transactions.  Instead, it voluntarily filed for bankruptcy, supposedly willing to pay Georgia-Pacific's debts for causing deadly diseases.  But it is not an "unfortunate" debtor struggling to pay its debts or facing grim inevitability about its economic prospects.  *Continental Illinois*, 294 U.S. at 670.  Rather, through "its access to the funding agreement, and, therefore, Georgia-Pacific's assets," it is "able to pay any conceivable liabilities now and in the foreseeable future (and [Bestwall] does not argue to the contrary)."  JA1906 (Order ¶ 51); *see also* JA791 (July 29, 2019 Op.) (bankruptcy court finding that "Bestwall has the full ability to meet all of its obligations (whatever they may be) through its assets and New GP's assets, which are available through the Funding Agreement").  No Founding-era bankruptcy system, either in England or in America, allowed a

similarly situated petitioner to obtain bankruptcy relief. That understanding applies doubly to a multi-billion-dollar tortfeasor corporation seeking the kind of extraordinary relief Bestwall has requested in this case.

### D. The Court Must Read 28 U.S.C. § 1334 Consistent With The Bankruptcy Clause's Substantive Limits

Congress conferred bankruptcy-court jurisdiction over Chapter 11 "cases" and "proceedings" under 28 U.S.C. § 1334. Because history and tradition circumscribe the scope of a proper "[b]ankruptc[y]" under the Bankruptcy Clause, Art. I, § 8, cl.4, they also circumscribe the types of "cases" Congress authorized the bankruptcy court to entertain. *Cf. TransUnion LLC v. Ramirez*, 594 U.S. 413, 424-26 (2021) ("history and tradition," not just "Congress's say-so," inform "the types of cases that Article III empowers federal courts to consider"). As the bankruptcy court correctly recognized, the Bankruptcy Clause determines the limits of bankruptcy subject-matter jurisdiction. JA1884 (Order ¶ 26).

This Court must construe the statute consistent with substantive constitutional limits under the doctrine of constitutional avoidance. "Federal statutes are to be so construed as to avoid serious doubt of their constitutionality." *International Ass'n of Machinists v. Street*, 367 U.S. 740, 749 (1961). This canon of statutory construction "reflects the prudential concern that constitutional issues not be needlessly confronted" and that "Congress, like this Court, is bound by and swears an oath to uphold the Constitution." *Edward J. DeBartolo Corp. v. Florida*

*Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988).  It "has for so long been applied by th[e] [Supreme] Court that it is beyond debate."  *Id.*; *see, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) (reading "implicit limitation" into immigration statute to avoid invalidation under Due Process Clause); *United States v. Hansen*, 599 U.S. 762, 781 (2023) (declining to invalidate statute as overbroad under First Amendment by adopting narrow construction, noting that, "[w]hen legislation and the Constitution brush up against each other, [the Court's] task is to seek harmony, not to manufacture conflict"); *see also Ward*, 595 F.3d at 177 (declining to "ascribe to legislature[] an unconstitutional intent" by reasonably presuming it does not enact unconstitutional laws); *Mary Helen Coal Corp. v. Hudson*, 235 F.3d 207, 214 (4th Cir. 2000) (similar).

Under that doctrine, the Court should interpret Congress's jurisdiction-conferring statute in "harmony" with the Bankruptcy Clause's substantive limitations.  *Hansen*, 599 U.S. at 781.  Those limitations require that bankruptcy cases be brought by an actually bankrupt debtor.  *See supra* pp. 16-27.

## II.    THE BANKRUPTCY COURT'S REASONS FOR EXERCISING JURISDICTION ARE UNFOUNDED

The bankruptcy court correctly concluded that the question whether this case falls under "the subject of Bankruptcies" implicates the scope of its jurisdiction.  JA1886-1887 (Order ¶ 29).  But it incorrectly expanded Congress's grant of

jurisdiction by concluding that the Bankruptcy Clause imposes no limitations based on the financial condition and funding abilities of the debtor.

### A. The Bankruptcy Court Misconstrued The Historical Record And Improperly Relied On Policy

The bankruptcy court employed the wrong analytical framework and misconstrued key historical evidence. Although the court addressed the constitutional history of the Bankruptcy Clause, the conclusions that it drew were not supported by that history.

1. The bankruptcy court's interpretation of the Bankruptcy Clause failed to give proper weight to pre-ratification evidence. It reasoned that materials from the Constitutional Convention and the Federalist Papers "did not give [it] much with which to work" to ascertain the meaning of the Bankruptcy Clause because the Framers did not heavily debate it. JA1890 (Order ¶ 32). From there, it incorrectly concluded that there is "no direct evidence" of what "concept of bankruptcy [the Framers had] in mind." *Id.* The court found that "the Framers' intent [i]s not of utmost importance" because "the Framers could not have foreseen the ways that American bankruptcy would change" after ratification. JA1891 (Order ¶ 33). The court therefore focused on analyzing the subsequent "liberalization of bankruptcy law." *Id.*

The Supreme Court, however, has made clear that, when ascertaining the original meaning of the Constitution, courts must look to history and tradition. *See*

36

*Katz*, 546 U.S. at 362; *see also*, *e.g.*, *Rahimi*, 144 S. Ct. at 1912 (Kavanaugh, J., concurring) (when interpreting vague constitutional text, "[h]istory, not policy, is the proper guide"); *cf. TransUnion*, 594 U.S. at 424-25 (while assessing Article III standing "does not require an exact duplicate in American history and tradition," "contemporary, evolving beliefs about what kinds of suits should be hearing in federal court" do not suffice).  The bankruptcy court's reasoning departed from that command because the court did not properly analyze Founding-era definitions and materials.

**2.**      The bankruptcy court also misconstrued the import of post-ratification sources.  The court sought to justify its reading of the Bankruptcy Clause by noting that Congress progressively "liberaliz[ed]" the Bankruptcy Code by expanding its reach beyond the scope of the involuntary English bankruptcy system.  JA1891 (Order ¶ 33).  But post-ratification laws did not go beyond the limit of congressional power to regulate the relationship between actually bankrupt debtors and their creditors.  *See supra* pp. 25-27.  *Continental Illinois* and Supreme Court precedent interpreting those post-ratification developments acknowledge the limits of the bankruptcy power.  *See id.*

**3.**      The bankruptcy court improperly allocated the burden of establishing jurisdiction to the Committee.  Bestwall, as the party invoking bankruptcy, has the burden of proving jurisdiction.  *See Demetres v. East West Constr., Inc.*, 776 F.3d

37

271, 272 (4th Cir. 2015).  In reviewing the historical evidence, the court focused on the supposed absence of evidence in support of the Committee's position that Bestwall falls outside the scope of "the subject of Bankruptcies."  The burden was on Bestwall, however, to establish it can access the bankruptcy courtroom door. Bestwall failed to point to any historical evidence that a non-bankrupt debtor can avail itself of bankruptcy protection, precisely because none exists.  Nor did Bestwall point to any case where a court has adopted the sweeping view that a similarly situated entity capable of paying all its debts falls within the meaning of the Bankruptcy Clause.  The bankruptcy court therefore failed to hold Bestwall to its burden of proof.

### B.    The Court Misconstrued Supreme Court Precedent

The bankruptcy court suggested that the Supreme Court has interpreted the Bankruptcy Clause as granting Congress such "broad" and "plenary" power that it can confer jurisdiction without limitation over any type of debtor, regardless of their financial condition or ability to pay debts.  JA1896-1897 (Order ¶¶ 42-43). But that is not what those cases say.  They instead recognize that the Constitution limits Congress's legislative power on the subject of bankruptcy to actually bankrupt debtors.  *See supra* pp. 25-27; *Gibbons*, 455 U.S. at 466 (recognizing "bankruptcy" as the "subject of the relations between an insolvent or nonpaying or fraudulent debtor and his creditors") (cleaned up); *Wright*, 304 U.S. at 513-14 (same); *Continental Illinois*, 294 U.S. at 669 (rejecting the proposition that

Congress's power to craft bankruptcy law "has no limitations"); *see also Reiman*, 20 F. Cas. at 496 ("'[T]he subject of bankruptcies'" is "properly . . . the subject of the relations between an insolvent or non-paying or fraudulent debtor, and his creditors, extending to his and their relief."); *Campbell*, 75 F.2d at 952 ("relationship between a debtor financially embarrassed and his creditors are brought under the control of Congress by the constitutional grant of power" to promulgate laws on "the subject of Bankruptcies").

The Supreme Court has not endorsed the bankruptcy court's expansive conception of its own jurisdiction. Indeed, "the most telling indication of the severe constitutional problem" presented by Bestwall's novel bankruptcy petition "is the lack of historical precedent." *Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 505-06 (2010).

## C.    The Court Conflated Statutory Insolvency With The Constitutional Requirement Of Actual Bankruptcy

Lacking support in Supreme Court precedent, the bankruptcy court relied heavily on *In re Marshall*, 300 B.R. 507 (Bankr. C.D. Cal. 2003), *aff'd*, 403 B.R. 668 (C.D. Cal. 2009), *aff'd*, 721 F.3d 1032 (9th Cir. 2013), an out-of-circuit case not binding on this Court. But *Marshall* does not support the bankruptcy court's expansive constitutional pronouncement. *Marshall* explicitly invoked and applied the Supreme Court's constitutional limitation for an actually bankrupt debtor as a determinative component of the holding in the case. *See id.* at 521 (citing *Gibbons*

and *Wright*), *aff'd*, 403 B.R. at 687 ("This 'insolvent, nonpaying, or fraudulent debtor' formulation is a common thread throughout the Supreme Court's bankruptcy jurisprudence."), *aff'd*, 721 F.3d at 1045 ("we adopt the bankruptcy court's opinion on [the] constitutional claims").  Considering the history of the Bankruptcy Clause and Supreme Court law, *Marshall* merely held that "neither balance sheet insolvency nor liquidity insolvency is required for the constitutional invocation of federal bankruptcy jurisdiction."  300 B.R. at 510.  But it recognized that "Congress is not free to define the contours of bankruptcy without any limitations:  the bankruptcy terrain clearly must have some boundaries."  *Id.* And it concluded that "[t]he limits on the application of the Bankruptcy Clause lie elsewhere, not in balance sheet insolvency."  *Id.*[6]

As the bankruptcy court recognized, the constitutional requirement at issue here is "a different concept."  JA1908 (Order ¶ 52).  The Bankruptcy Clause's requirement that a debtor be actually bankrupt does not compel Bestwall to meet the different, statutory concept of balance-sheet or liquidity insolvency to file for Chapter 11 bankruptcy.

---

[6] The bankruptcy court also cited *United States v. Huebner*, 48 F.3d 376 (9th Cir. 1994) (per curiam); *Rudd v. Laughlin*, 866 F.2d 1040 (8th Cir. 1989); and *In re Zarnel*, 619 F.3d 156 (2d Cir. 2010), as providing "some indication" for its constitutional ruling.  JA1906-1907, JA1918-1919 (Order ¶¶ 51, 60).  But none addressed the constitutional question here.  *Huebner* is an inapposite criminal case involving tax fraud, and *Rudd* and *Zarnel* are statutory cases involving provisions of the Bankruptcy Code.

"It is not uncommon for debtors to be solvent under the balance sheet test, and yet to have severe financial problems." *Marshall*, 300 B.R. at 512. This Court's decision in *In re A.H. Robins Co.*, 880 F.2d 709 (4th Cir. 1989), exemplifies the distinction. That case involved a solvent but economically threatened company that could meet the constitutional requirements for bankruptcy jurisdiction without necessarily meeting the statutory test of insolvency:

> The costs of defense, the disruption that all the individual trials was placing on its executive force, and the expense of discharging some of the judgments were putting great financial strain on Robins. Its funds had been so depleted by the suits that its unrestricted funds had been reduced to $5 million and "financial institutions were unwilling to lend it money." It had actually experienced considerable difficulty in collateralizing as a condition of appeal the judgment in the case where the plaintiffs had recovered in early 1985 a $9.1 million judgment. Faced with its obvious financial deterioration, a deterioration which gave every indication of accelerating, Robins felt its only avenue for paying equitably and fairly all the claims was through a Chapter 11 proceeding.

*Id.* at 717.

Another example of a case involving a solvent but actually bankrupt company is *In re Johns-Manville Corp.*, 36 B.R. 727, 741 (Bankr. S.D.N.Y. 1984). That case involved Johns-Manville, a wealthy Fortune 500 company that faced significant asbestos-related liability and risked "economic dismemberment, liquidation, and chaos." *Id.* at 740. "When Johns-Manville filed for bankruptcy . . . critics claimed that it was not insolvent, and the firm itself emphasized that it planned to remain in business," but the bankruptcy "case went forward because

41

there were serious concerns about the company's ability to honor all the ongoing asbestos claims while staying in business." Edward J. Janger, *Aggregation and Abuse: Mass Torts in Bankruptcy*, 91 Fordham L. Rev. 361, 376-77 (2022).

Bestwall does not face the economic threats of either A.H. Robins or Johns-Manville. It has access to billions of dollars under the Funding Agreement—far more than its asbestos liabilities now or in the future. *See supra* pp. 33-34. It is neither insolvent nor actually bankrupt. *See id.* The bankruptcy court erred in blurring the lines so thoroughly to allow Bestwall to proceed in bankruptcy.

### D.    The Court's Ruling Contravenes Constitutional-Avoidance Principles

The bankruptcy court expanded the scope of its jurisdiction by reading 28 U.S.C. § 1334, Congress's jurisdiction-conferring statute, too broadly. Ignoring constitutional-avoidance principles, the court improperly adopted a sweeping constitutional rule and ascribed to Congress an unconstitutional intent. *See supra* pp. 34-35.

The bankruptcy court's expansive reading of the Constitution was necessitated by its broad statutory ruling under 11 U.S.C. § 1112(b) earlier in the litigation. As the court recognized, "[t]here is no need for a harsh new jurisdictional rule" when courts have statutory means to dismiss cases brought by improper debtors. JA1916 (Order ¶ 59). Section 1112(b), which authorizes bankruptcy courts to dismiss Chapter 11 cases for "cause," provides such statutory means.

42

Section 1112(b) provides a statutory ground for dismissal, which has been used to dismiss cases when a debtor is *not* actually bankrupt within the meaning of the Constitution.  In *Carolin Corp. v. Miller*, 886 F.2d 693 (4th Cir. 1989), this Court joined its sister circuits in interpreting Section 1112(b) to include a "good faith filing requirement."  *Id.* at 698.  The Court adopted a two-pronged inquiry to assess bad faith that considers "objective futility" and "subjective bad faith."  *Id.* at 700-01.  Consistent with the requirements of the Bankruptcy Clause, the Court explained that "[t]he objective futility inquiry is designed to insure that there is embodied in the petition 'some relation to the statutory objective of resuscitating *a financially troubled debtor*.'"  *Id.* at 701 (emphasis added; citation omitted; cleaned up).  "It should therefore concentrate on assessing whether 'there is no going concern to preserve and no hope of rehabilitation, except according to the debtor's 'terminal euphoria.'"  *Id.* at 701-02 (citation omitted; cleaned up).  Similarly, "[t]he subjective bad faith inquiry is designed to insure that the petitioner actually intends 'to use the provisions of Chapter 11 to reorganize or rehabilitate an existing enterprise, or to preserve going concern values of a viable or existing business.'"  *Id.* at 702 (citation omitted; cleaned up).  Other circuits similarly employ statutory bad-faith dismissals as a means to ensure that bankruptcy is limited to debtors who are actually bankrupt.  *See*, *e.g.*, *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986) ("Determining whether the debtor's filing for relief is in good faith depends largely upon the bankruptcy

43

court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities.").

Consistent with historical understandings, the Supreme Court has recognized that "[t]he principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor.'" *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 367 (2007) (quoting *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991)). Properly understood, bad-faith dismissals under *Carolin* further this core tenet of Chapter 11 bankruptcy—they ensure bankruptcy is reserved for the financially troubled debtor in need of "rehabilitation" to maximize debt collection. *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 527 (1984). By contrast, a reading of *Carolin* that allows a non-bankrupt debtor with no need of financial rehabilitation to avail itself of bankruptcy is contrary to the Bankruptcy Clause's original meaning and Congress's intent "when it created bankruptcy." Brief of Members of Congress as Amici Curiae in Support of Petitioner at 15, *Official Comm. of Asbestos Claimants v. Bestwall LLC*, No. 23-675 (U.S. Jan. 22, 2024). That reading of *Carolin* "fuel[s] abuses that are already transforming a system of last resort into a 'corporate shell game'" and "allows fully solvent corporations 'to evade accountability for any harm caused by their products' and deny 'tens of thousands of people their day in court.'" *Id.* (cleaned up).

Earlier in this litigation, the bankruptcy court interpreted *Carolin* so broadly as to permit debtors like Bestwall—those who admit to being "able to pay any

conceivable liabilities now and in the foreseeable future," JA1906 (Order ¶ 51), and who did not file for bankruptcy to reorganize a failing business—to file for bankruptcy for the sole reason that they face a large volume of "asbestos claims." JA1876 (Order ¶ 16). Rationalizing this prior, broad statutory ruling required the court to adopt an even broader and unprecedented constitutional rule. Respecting constitutional-avoidance principles, the court properly should have limited its statutory ruling to the Bankruptcy Clause's limitations and avoided its sweeping constitutional pronouncement. *See Escambia Cnty. v. McMillan*, 466 U.S. 48, 51 (1984) (per curiam) ("It is a well established principle governing the prudent exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case."); *In re LTL Mgmt., LLC*, 64 F.4th 84, 99 n.11 (3d Cir. 2023) (dismissal on bad-faith statutory basis "obviate[d] the need" to address jurisdictional challenge).

\* \* \*

With access to billions of dollars though the Funding Agreement, Bestwall fails to meet the basic constitutional requirement of being actually bankrupt. Bestwall's gambit conflicts with constitutional limits on the subject of bankruptcy that have existed since the Founding. The bankruptcy court erred in finding that it had jurisdiction in these circumstances. That erroneous ruling precludes thousands of suffering victims—and the families of those who did not survive this

unreasonable detour into bankruptcy—from vindicating their rights in the civil justice system.

## CONCLUSION

The judgment of the bankruptcy court should be reversed.

## REQUEST FOR ORAL ARGUMENT

Because this appeal involves complex issues of law and fact, the Committee respectfully requests oral argument.

Respectfully submitted,

/s/ *David C. Frederick*

| | |
|---|---|
| Natalie D. Ramsey | David C. Frederick |
| Davis Lee Wright | Joshua D. Branson |
| ROBINSON & COLE LLP | Alejandra Ávila |
| 1201 North Market Street | KELLOGG, HANSEN, TODD, |
| Suite 1406 | FIGEL & FREDERICK, P.L.L.C. |
| Wilmington, Delaware 19801 | 1615 M Street, N.W., Suite 400 |
| (302) 516-1700 | Washington, D.C. 20036 |
| nramsey@rc.com | (202) 326-7900 |
| dwright@rc.com | dfrederick@kellogghansen.com |
| | jbranson@kellogghansen.com |
| Thomas J. Donlon | aavila@kellogghansen.com |
| ROBINSON & COLE LLP | |
| 1055 Washington Boulevard | Mark Kutny |
| 9th Floor | Robert A. Cox, Jr. |
| Stamford, Connecticut 06901 | HAMILTON STEPHENS STEEL |
| (203) 462-7500 | + MARTIN, PLLC |
| tdonlon@rc.com | 525 North Tryon Street, Suite 1400 |
| | Charlotte, North Carolina 28202 |
| | (704) 344-1117 |
| | mkutny@lawhssm.com |
| August 26, 2024 | rcox@lawhssm.com |

*Counsel for Appellant Official Committee of Asbestos Claimants of Bestwall LLC*

46

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

No. ___24-1493___     **Caption:** In Re: Bestwall LLC

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✔] this brief or other document contains ___10,665___ [*state number of*] words

[ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✔] this brief or other document has been prepared in a proportionally spaced typeface using
Microsoft Office Word 365 [*identify word processing program*] in
14 point Times New Roman [*identify font size and type style*]; **or**

[ ] this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) David C. Frederick

Party Name Off. Comm. of Asbestos Claimants

Dated: August 26, 2024

**ATTACHMENT TO**
**CERTIFICATE OF COMPLIANCE**

1.     The foregoing Brief for Appellant complies with the type-volume

limitations of Federal Rule of Appellate Procedure 32(a)(7)(B)(i), because this

Brief contains 10,665 words, excluding the parts of the Brief exempted by Federal

Rule of Appellate Procedure 32(f).

2.     The foregoing Brief for Appellant complies with the typeface

requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style

requirements of Federal Rule of Appellate Procedure 32(a)(6) because this Brief

has been prepared in proportionally spaced typeface using Microsoft Office Word

365 in 14 point Times New Roman.


Dated:  August 26, 2024              By:     /s/ *David C. Frederick*
                                             David C. Frederick

## CERTIFICATE OF SERVICE

I hereby certify that, on August 26, 2024, I electronically filed the foregoing Brief for Appellant with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ *David C. Frederick*
David C. Frederick

# ADDENDUM

# TABLE OF CONTENTS

Page

U.S. Const. art. I, § 8, cl. 4 (Bankruptcy Clause) .............................................Add. 1

11 U.S.C. § 1112 ................................................................................................Add. 1

28 U.S.C. § 1334 ................................................................................................Add. 4

## CONSTITUTIONAL AND STATUTORY ADDENDUM

1.      The Bankruptcy Clause of the United States Constitution, Art. I, § 8,

cl. 4, provides:

> The Congress shall have Power . . . [t]o establish . . . uniform Laws on
> the subject of Bankruptcies throughout the United States[.]

2.      Section 1112 of the Bankruptcy Code, 11 U.S.C. § 1112, provides:

**§ 1112.  Conversion or dismissal**

**(a)** The debtor may convert a case under this chapter to a case under chapter
7 of this title unless—

>      **(1)** the debtor is not a debtor in possession;

>      **(2)** the case originally was commenced as an involuntary case under
> this chapter; or

>      **(3)** the case was converted to a case under this chapter other than on
> the debtor's request.

**(b)(1)** Except as provided in paragraph (2) and subsection (c), on request
of a party in interest, and after notice and a hearing, the court shall convert a case
under this chapter to a case under chapter 7 or dismiss a case under this chapter,
whichever is in the best interests of creditors and the estate, for cause unless the
court determines that the appointment under section 1104(a) of a trustee or an
examiner is in the best interests of creditors and the estate.

**(2)** The court may not convert a case under this chapter to a case under
chapter 7 or dismiss a case under this chapter if the court finds and specifically
identifies unusual circumstances establishing that converting or dismissing the
case is not in the best interests of creditors and the estate, and the debtor or any
other party in interest establishes that—

**(A)** there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and

**(B)** the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A)—

**(i)** for which there exists a reasonable justification for the act or omission; and

**(ii)** that will be cured within a reasonable period of time fixed by the court.

**(3)** The court shall commence the hearing on a motion under this subsection not later than 30 days after filing of the motion, and shall decide the motion not later than 15 days after commencement of such hearing, unless the movant expressly consents to a continuance for a specific period of time or compelling circumstances prevent the court from meeting the time limits established by this paragraph.

**(4)** For purposes of this subsection, the term "cause" includes—

**(A)** substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;

**(B)** gross mismanagement of the estate;

**(C)** failure to maintain appropriate insurance that poses a risk to the estate or to the public;

**(D)** unauthorized use of cash collateral substantially harmful to 1 or more creditors;

**(E)** failure to comply with an order of the court;

**(F)** unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;

**(G)** failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor;

**(H)** failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any);

**(I)** failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief;

**(J)** failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court;

**(K)** failure to pay any fees or charges required under chapter 123 of title 28;

**(L)** revocation of an order of confirmation under section 1144;

**(M)** inability to effectuate substantial consummation of a confirmed plan;

**(N)** material default by the debtor with respect to a confirmed plan;

**(O)** termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and

**(P)** failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

**(c)** The court may not convert a case under this chapter to a case under chapter 7 of this title if the debtor is a farmer or a corporation that is not a moneyed, business, or commercial corporation, unless the debtor requests such conversion.

**(d)** The court may convert a case under this chapter to a case under chapter 12 or 13 of this title only if—

**(1)** the debtor requests such conversion;

Add. 3

    **(2)** the debtor has not been discharged under section 1141(d) of this title; and

    **(3)** if the debtor requests conversion to chapter 12 of this title, such conversion is equitable.

  **(e)** Except as provided in subsections (c) and (f), the court, on request of the United States trustee, may convert a case under this chapter to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate if the debtor in a voluntary case fails to file, within fifteen days after the filing of the petition commencing such case or such additional time as the court may allow, the information required by paragraph (1) of section 521(a), including a list containing the names and addresses of the holders of the twenty largest unsecured claims (or of all unsecured claims if there are fewer than twenty unsecured claims), and the approximate dollar amounts of each of such claims.

  **(f)** Notwithstanding any other provision of this section, a case may not be converted to a case under another chapter of this title unless the debtor may be a debtor under such chapter.

    3.    Section 1334 of Title 28 provides:

## § 1334. Bankruptcy cases and proceedings

  **(a)** Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11.

  **(b)** Except as provided in subsection (e)(2), and notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

  **(c)(1)** Except with respect to a case under chapter 15 of title 11, nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

**(2)** Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

**(d)** Any decision to abstain or not to abstain made under subsection (c) (other than a decision not to abstain in a proceeding described in subsection (c)(2)) is not reviewable by appeal or otherwise by the court of appeals under section 158(d), 1291, or 1292 of this title or by the Supreme Court of the United States under section 1254 of this title. Subsection (c) and this subsection shall not be construed to limit the applicability of the stay provided for by section 362 of title 11, United States Code, as such section applies to an action affecting the property of the estate in bankruptcy.

**(e)** The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction—

**(1)** of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate; and

**(2)** over all claims or causes of action that involve construction of section 327 of title 11, United States Code, or rules relating to disclosure requirements under section 327.