No. 24-1493

# In the United States Court of Appeals
## FOR THE FOURTH CIRCUIT

IN RE: BESTWALL LLC,
*Debtor,*

THE OFFICIAL COMMITTEE OF ASBESTOS CLAIMANTS OF BESTWALL LLC,
*Appellant,*

*v.*

BESTWALL LLC,
*Appellee.*

On Direct Appeal from the United States Bankruptcy Court
for the Western District of North Carolina
Case No. 17-31795 (LTB), Hon. Laura T. Beyer

**BRIEF OF *AMICUS CURIAE* CHAMBER OF COMMERCE OF
THE UNITED STATES OF AMERICA IN SUPPORT OF
APPELLEE AND AFFIRMANCE**

ROBERT E. DUNN
 *Counsel of Record*
EIMER STAHL LLP
1999 S. Bascom Ave., Ste. 1025
Campbell, CA 95008
(408) 889-1690
rdunn@eimerstahl.com

JAMES E. BARRETT
EIMER STAHL LLP
224 S. Michigan Ave., Ste. 1100
Chicago, IL 60604

*Counsel for Amicus Curiae*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __24-1493__      Caption: __IN RE: BESTWALL LLC__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA__
(name of party/amicus)


 who is _____AMICUS CURIAE_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?     ☐YES ☑NO


2.     Does party/amicus have any parent corporations?     ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:


3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     ☐YES ☑NO
       If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation?                    ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐YES ☐NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?                     ☑YES ☐NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
     party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
     caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
     corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?     ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational
     victim of the criminal activity and (2) if an organizational victim is a corporation, the
     parent corporation and any publicly held corporation that owns 10% or more of the stock
     of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Robert E. Dunn                          Date:      11/8/2024

           Amicus Curiae Chamber of Commerce
Counsel for: of the United States of America

## TABLE OF CONTENTS

IDENTITY AND INTEREST OF *AMICUS CURIAE* ..............................1

INTRODUCTION AND SUMMARY OF ARGUMENT ...........................2

ARGUMENT ...................................................................................4

   I.  MASS-TORT-DRIVEN BANKRUPTCIES WORK BETTER WITH DIVISIONAL MERGERS THAN WITHOUT THEM. .....................................4

     A. Mass-tort litigation often drags on for decades, drains company resources, and largely results in massive payouts to plaintiffs' attorneys..................................................5

     B. One of Congress's purposes for the Bankruptcy Code is to rescue companies buried in endless mass-tort litigation............9

     C. In the mass-tort context, combining bankruptcy with a divisional merger makes the process more efficient, which benefits claimants, the debtor, and the courts..........................15

  II.  THE COMMITTEE'S PROPOSED LIMIT ON CONGRESS'S BANKRUPTCY POWER HAS NO GROUNDING IN THE CONSTITUTION AND IS DESIGNED TO BAN DIVISIONAL MERGERS, BENEFITING ONLY PLAINTIFFS' ATTORNEYS. ..................................................................18

     A. The Committee's novel and unfounded rule is reverse engineered to ban two-step bankruptcies and little else. .........18

     B. Congress is not limited to enacting bankruptcy laws that reflect historical bankruptcy practice. ....................................22

     C. This Court should reject the Committee's attempt to bypass Congress and amend the Bankruptcy Code through the courts. .................................................................................27

CONCLUSION ...................................................................................29

# TABLE OF AUTHORITIES

## **Cases**

*Adair v. Bank of Am. Nat. Tr. & Sav. Ass'n*,
  303 U.S. 350 (1938) ............................................................... 26

*Apple Inc. v. Pepper*,
  587 U.S. 273 (2019) ............................................................... 19

*Cent. Virginia Cmty. Coll. v. Katz*,
  546 U.S. 356 (2006) ............................................................... 25

*Gonzales v. Raich*,
  545 U.S. 1 (2005) ............................................................. 25, 26

*Hanover Nat'l Bank v. Moyses*,
  186 U.S. 181 (1902) ............................................................... 22

*Harrington v. Purdue Pharma L.P.*,
  144 S. Ct. 2071 (2024) ................................... 2, 9, 11, 22, 28

*Hernandez v. Mesa*,
  589 U.S. 93 (2020) ........................................................... 27, 28

*Humphrey v. Humphrey*,
  593 S.W.2d 824 (Tex. Civ. App. 1980) ............................... 17

*In re 3M Combat Arms Earplug Prods. Liab. Litig.*,
  No. 3:19-MD-2885, Doc. 3188 (N.D. Fla. June 10, 2022) ..................... 7

*In re Advance Press & Litho, Inc.*,
  46 B.R. 700 (Bankr. D. Colo. 1984) ................................... 13

*In re Bestwall LLC*,
  71 F.4th 168 (4th Cir. 2023) ................................. 5, 8, 14, 18

*In re Drexel Burnham Lambert Group, Inc.*,
  960 F.2d 285 (2d Cir. 1992) ................................................. 11

*In re Dow Corning Corp.*,
  280 F.3d 648 (6th Cir. 2002) ............................................... 11

*In re Glob. Indus. Techs., Inc.*,
　645 F.3d 201 (3d Cir. 2011) ................................................................ 11

*In re Kaiser Gypsum Co.*,
　60 F.4th 73 (4th Cir. 2023) ................................................................ 12

*In re LTL Mgmt., LLC*,
　64 F.4th 84 (3d Cir. 2023) ............................................................. 9, 13

*In re Plant Insulation Co.*,
　734 F.3d 900 (9th Cir. 2013) ............................................................. 28

*In re SGL Carbon Corp.*,
　200 F.3d 154 (3d Cir. 1999) ............................................................. 10

*In re W.R. Grace & Co.*,
　900 F.3d 126 (3d Cir. 2018) ............................................................. 12

*Ingham v. Johnson & Johnson*,
　608 S.W.3d 663 (Mo. Ct. App. 2020) .................................................. 6

*N.L.R.B. v. Bildisco & Bildisco*,
　465 U.S. 513 (1984) ..................................................................... 14–15

*Siegel v. Fitzgerald*,
　596 U.S. 464 (2022) ..................................................................... 3, 22

*Town of Greece v. Galloway*,
　572 U.S. 565 (2014) ......................................................................... 24

*Truck Ins. Exch. v. Kaiser Gypsum Co.*,
　602 U.S. 268 (2024) ..................................................................... 9, 12

*United States v. Comstock*,
　560 U.S. 126 (2010) ......................................................................... 26

*United States v. Rahimi*,
　144 S. Ct. 1889 (2024) ............................................................. 3, 23, 24

*Wright v. Union Central Life Ins. Co.*,
　304 U.S. 502 (1938) ......................................................................... 22

**Statutes**

11 U.S.C. § 524(g) ............................................................. 12–14

11 U.S.C. § 548 ....................................................................17

11 U.S.C. § 1112(b)(3).........................................................21

Bankruptcy Act of 1867,
    14 Stat. 517 (1867) ........................................................28

Bankruptcy Act of 1898,
    30 Stat. 544 (1898) ........................................................23

Bankruptcy Reform Act,
    92 Stat. 2657 (1978) ......................................................28

**Other Authorities**

Alan N. Resnick, *Bankruptcy as a Vehicle for Resolving Enterprise-Threatening Mass Tort Liability*,
    148 U. Pa. L. Rev. 2045 (2000)......................................10

Andrew D. Bradt et al., *Dissonance and Distress in Bankruptcy and Mass Torts*,
    91 Fordham L. Rev. 309 (2022)...............................5, 6, 13

Anthony J. Casey & Joshua C. Macey, *In Defense of Chapter 11 for Mass Torts*,
    90 U. Chi. L. Rev. 973 (2023) ............... 8, 10, 13, 15–17, 20, 21

C. Anne Malik, *Unlocking the Code: The Value of Bankruptcy to Resolve Mass Torts*, U.S. Chamber of Commerce Institute for Legal Reform
    (Dec. 2022) ................................... 5–8, 10, 12, 14, 16

D. Theodore Rave, *Multidistrict Litigation and the Field of Dreams*,
    101 Tex. L. Rev. 1595 (2023)............................................8

J. Maria Glover, *Due Process Discontents in Mass-Tort Bankruptcy*,
    72 DePaul L. Rev. 535 (2023).....................................13, 16

Press Release, Senator Sheldon Whitehouse*, Whitehouse, Hawley, Sykes, Gooden Introduce Bipartisan Legislation to Deter 'Texas Two-Step' Bankruptcy Trick* (July 23, 2024) ............................................. 29

Robert Jones, *The Manville Bankruptcy: Treating Mass Tort Claims in Chapter 11 Proceedings*, 96 Harv. L. Rev. 1121 (1982–1983) ...................................................... 12

Tina Bellon, *Jury orders J&J to pay $4.7 billion in Missouri asbestos cancer case*, Reuters (July 12, 2018) .................................... 6–7

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

The Chamber of Commerce of the United States of America (the "Chamber") is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

The Chamber and its members have a strong interest in ensuring that the bankruptcy process remains free of arbitrary restraints that would prevent companies from efficiently resolving mass-tort claims. The Committee's proposed rule would impede companies from using state-authorized divisional-merger mechanisms and the congressionally established bankruptcy process to manage mass-tort claims fairly and efficiently. As the brief explains, this Court should reject the Committee's attempt to undermine Congress's lawful decision to permit corporations to resolve mass-tort claims through bankruptcy.

---

[1] No party's counsel authored this brief in whole or in part, and no entity or person, aside from *amicus curiae*, its members, or its counsel, contributed any money to fund the preparation or submission of this brief. All parties have consented to the filing of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Congress has provided an escape hatch for companies trapped in endless, sprawling mass-tort litigation: it authorized them to file for bankruptcy. Through bankruptcy a company may gather all the mass-tort claims it faces, sometimes even future claims, and resolve them once and for all. That efficient process benefits everyone. Without bankruptcy, tort litigation often drags on for decades, wasting resources and benefiting only plaintiffs' attorneys. But with bankruptcy, claims can be resolved, and a claims-paying trust can be established, in a fraction of the time, at lower cost, and with fairer results for claimants. It's a "simple bargain" that produces results. *Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071, 2077 (2024).

One crucial tool that companies use to resolve mass-tort claims efficiently through bankruptcy is the divisional merger. Using state corporate law, a company can separate its profitable operations from its mass-tort liabilities, which allows the entity handling the tort liability to file bankruptcy without the complications inherent in a traditional corporate bankruptcy. That simplifying process allows the company to resolve mass-tort claims in a streamlined proceeding without needlessly involving all its other creditors and complicating its ongoing operations. And the process benefits claimants by paying them sooner.

But plaintiffs' attorneys often resist bankruptcy, because they prefer the inefficiencies of complicated, mass-tort proceedings which they depend on to justify large contingency fees. The Committee here has thus attempted a new theory to block companies from using bankruptcy: it argues that the Constitution's Bankruptcy Clause restricts Congress from enacting any bankruptcy law that lacks a historical antecedent and contends that Founding-era bankruptcy statutes would not have permitted a bankruptcy filing following a divisional merger because, as they define the terms, the debtor entity is not "bankrupt." Comm. Br. at 3.

That is wrong. Congress is not limited to reenacting historical bankruptcy laws. The Committee relies on *United States v. Rahimi*, which explains that historical laws limiting the exercise of a constitutional right illuminate the limits of the original meaning of that right. 144 S. Ct. 1889, 1897–98 (2024). But the Supreme Court has never applied that rights-based test to restrict the scope of Congress's enumerated powers. Congress is not required to identify a historical analog when it regulates commerce, passes an immigration law, or amends the Bankruptcy Code. Instead, as the Supreme Court has long made clear, Congress has broad discretion when enacting bankruptcy laws to craft novel remedies to address unforeseen economic problems. *Siegel v. Fitzgerald*, 596 U.S. 464, 473–74 (2022). This Court should deny

the Committee's attempt to shackle Congress's ability to innovate when amending the Bankruptcy Code. Congress designed the bankruptcy process as an effective tool for resolving mass-tort liabilities, and if the Committee dislikes it, they must convince Congress to change it.

## ARGUMENT

### I.  MASS-TORT-DRIVEN BANKRUPTCIES WORK BETTER WITH DIVISIONAL MERGERS THAN WITHOUT THEM.

Mass-tort litigation is notoriously inefficient, and Congress specifically tackled that problem in the Bankruptcy Code. At a general level, bankruptcy allows a debtor to resolve mass-tort claims along with its other debts. For companies facing asbestos mass-tort claims, bankruptcy provides a complete restart by allowing them to resolve even future claims. Many companies further optimize the bankruptcy process by combining it with the state-law divisional merger process, which benefits claimants and debtor alike by minimizing impact on the debtor's operations (thus reducing unnecessary financial losses) and streamlining the bankruptcy process itself. This dual use of state and federal law is far more efficient than traditional mass-tort litigation, benefiting companies, claimants, and courts.

**A. Mass-tort litigation often drags on for decades, drains company resources, and largely results in massive payouts to plaintiffs' attorneys.**

Although neither the plaintiffs nor the defendant benefits when mass-tort litigation drags on indefinitely and burns through resources, that is the frustrating reality. Mass-tort scenarios often trigger tens of thousands of lawsuits that linger for years, if not decades. Marginal new claims are easy to file and extremely difficult to resolve, so "the pace of filings typically far exceeds the pace of resolution." C. Anne Malik, *Unlocking the Code: The Value of Bankruptcy to Resolve Mass Torts*, U.S. Chamber of Commerce Institute for Legal Reform 6 (Dec. 2022) (*Unlocking the Code*). In this case, for example, "when Bestwall filed for bankruptcy in 2017, of the 64,000 pending asbestos-related claims, seventy-five percent had been pending for ten years or more, and fifty-five percent had been pending for fifteen years or more." *In re Bestwall LLC*, 71 F.4th 168, 183 (4th Cir. 2023). Drawn-out litigation imposes "a big, slowly accruing transaction cost that siphons off resources that could have either gone to the creditors (tort victims and others) or perhaps might have been preserved for the debtor." Andrew D. Bradt et al., *Dissonance and Distress in Bankruptcy and Mass Torts*, 91 Fordham L. Rev. 309, 315 (2022) (*Distress in Bankruptcy*).

To plaintiffs' lawyers, that delay is the point, because "'clogged' mass tort dockets and overwhelmed courts" give them "settlement leverage."

- 5 -

*Unlocking the Code*, *supra*, at 7. And mass-tort cases have only gotten more complicated: courts now face litigation on all sorts of new issues, including "sports-related concussions, opioids, talcum powder, earplugs, antacids, [and] weed killers." *Id.* at 2. The plaintiffs' bar has leveraged digital advertising to multiply the number of claimants they can recruit for mass-tort cases, and third-party investors have created litigation-funding entities that provide plaintiffs' firms the cash they need to ride out decades-long litigation. *Id.*

Another problem with tort litigation is that it catalyzes a first-come, first-served approach, because recovery in mass-tort cases can be wildly unpredictable. If a small number of early claimants obtain massive awards—perhaps because their juries seek to punish the defendants and are unaware of the number of other potential claimants—a company's assets can be drained before even a fraction of the potential claimants receive any recovery. For example, one jury awarded around $4.69 billion—which included $4.14 billion in punitive damages—to 22 plaintiffs who sued one company for injuries related to the company's baby powder, though the award was reduced on appeal to $2.24 billion to 20 plaintiffs. *See Ingham v. Johnson & Johnson*, 608 S.W.3d 663 (Mo. Ct. App. 2020), *cert. denied*, 141 S. Ct. 2716 (2021). Even a small number of such awards could have stripped the company of its ability to pay in the 9,000 similar cases it was battling at the time of the verdict. *See* Tina

- 6 -

Bellon, *Jury orders J&J to pay $4.7 billion in Missouri asbestos cancer case*, Reuters (July 12, 2018), https://tinyurl.com/mr227y4u.

The current non-bankruptcy approach to taming unwieldly litigation is to consolidate cases into a single court for multidistrict litigation (MDL), with the hope that it might encourage settlement and resolve as many of the overlapping issues as possible. *Unlocking the Code*, *supra*, at 8–9. But even then, the waste of resources and strain on the court system remain enormous. For one, it is often easy to add meritless claims into an MDL, and those "masses of unvetted claims" falsely inflate settlement predictions, which "precludes any reasonable settlement." *Id.* at 10 (citation omitted). For another, if a major mass-tort multidistrict litigation does end, then tens (if not hundreds) of thousands of cases are remanded for trial, swamping courts around the country. *See, e.g.*, *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, No. 3:19-MD-2885, Doc. 3188 at 2 (N.D. Fla. June 10, 2022) (noting that the unresolved cases "average[] to approximately 2,500 cases being remanded for trial to each of the 94 districts nationwide" and that "the amount of judicial resources required to handle this number of cases is staggering"). That threat is not coincidental. Plaintiffs' attorneys leverage it to force settlements, in the process maximizing their own fee awards.

Multidistrict litigation also "allows plaintiffs and their lawyers to take advantage of economies of scale" as "the cost of adding new claims is

essentially fixed—the more claims a lawyer brings, the more money that lawyer stands to make in contingency fees." D. Theodore Rave, *Multidistrict Litigation and the Field of Dreams*, 101 Tex. L. Rev. 1595, 1600–01 (2023). And even if a company does manage to find some global solution through multidistrict litigation or global settlement, that resolution itself may induce future claimants to materialize, exposing the company to additional and potentially crippling liability. Beyond that, the more often a company settles, the easier it becomes for holdouts to demand more. *See* Anthony J. Casey & Joshua C. Macey, *In Defense of Chapter 11 for Mass Torts*, 90 U. Chi. L. Rev. 973, 981 (2023) (*In Defense of Chapter 11*).

In the end, the only beneficiaries when tens of thousands of mass-tort claims linger for decades are the plaintiffs' attorneys. Injured plaintiffs fail to receive "meaningful, timely relief" when they are forced to sit on the sidelines while their attorneys drag corporate defendants through years of litigation. *Unlocking the Code*, *supra*, at 2. Streamlining and simplifying the process for the benefit of injured plaintiffs would make it far more difficult for plaintiffs' attorneys to justify hefty contingency fees. But the fact that "aspirational greater fees … could be awarded to the claimants' counsel" in tort litigation "is not a valid reason to object to [proceeding in] bankruptcy." *In re Bestwall LLC*, 71 F.4th at 184. Those high transaction costs should be eliminated, not guaranteed.

**B. One of Congress's purposes for the Bankruptcy Code is to rescue companies buried in endless mass-tort litigation.**

Bankruptcy frees companies to put the past behind them and allows them to escape the costly and inefficient mass-tort morass. Although it involves "hundreds of interlocking rules about the relations between a debtor and its creditors," bankruptcy, at its core, offers "a simple bargain: A debtor can win a discharge of its debts if it proceeds with honesty and places [its] assets on the table for its creditors." *Harrington*, 144 S. Ct. at 2077–78 (citation omitted and alteration adopted). Through bankruptcy, all manner of "individuals and businesses in financial distress" can secure "a fresh start." *Truck Ins. Exch. v. Kaiser Gypsum Co.*, 602 U.S. 268, 272 (2024).

Mass-tort liability often triggers financial distress. Companies that manufacture anything from baby powder to automotive parts can find themselves profitable one day and facing tens of thousands of lawsuits and billions of dollars in liability the next. *See, e.g.*, *In re LTL Mgmt., LLC*, 64 F.4th 84, 94 (3d Cir. 2023). And because the harmful effects of certain products, such as asbestos, can take decades to manifest, mass-tort claims can haunt companies for decades after the product is taken off the market. *Id.*

That is where the "simple bargain" of bankruptcy comes in. Bankruptcy mitigates the otherwise inevitable frustration, delay, and

suffering imposed by widespread, endless litigation where "the costs [are] large and value destructive for all stakeholders." *In Defense of Chapter 11*, *supra*, at 977. By consolidating all claims into one proceeding, bankruptcy "provides tools for dealing with holdouts and future claimants that are unavailable in conventional class action or multidistrict litigation." *Id.*

That simple bargain works only because the debtor can resolve its liabilities proactively. The "drafters of the Bankruptcy Code understood the need for early access to bankruptcy relief to allow a debtor to rehabilitate its business before it is faced with a hopeless situation." *In re SGL Carbon Corp.*, 200 F.3d 154, 163 (3d Cir. 1999) (citing Alan N. Resnick, *Bankruptcy as a Vehicle for Resolving Enterprise-Threatening Mass Tort Liability*, 148 U. Pa. L. Rev. 2045, 2055 (2000) (*Bankruptcy as a Vehicle*)). In the mass-tort context, forcing a company to wait until every claim has been filed to resolve its liability may be fatal. *See In Defense of Chapter 11*, *supra*, at 990 n.61 ("the U.S. bankruptcy system … encourages debtors to seek protection early, which can preserve value"). And even if mass-tort liability does not always doom a company, at minimum the financial uncertainty of such protracted litigation weighs it down significantly, reducing its ability to pursue new opportunities. *See Unlocking the Code*, *supra*, at 15; *Bankruptcy as a Vehicle*, *supra*, at 2055 ("a company beginning to face a deluge of mass

tort litigation may seek Chapter 11 protection before its capital markets and trade credit disappear or the business is otherwise damaged"). Any new business ventures will be shadowed by the possibility that pending mass-tort claims could cripple the company at any moment.

Congress tackled that problem in the Bankruptcy Code by empowering companies burdened with mass-tort liability to channel present and future claims to a post-confirmation settlement trust funded by the debtor. *See In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 205 n.10 (3d Cir. 2011) ("several courts have concluded that trusts and channeling injunctions may be authorized under § 105(a) and § 1123(b)(6) … when they would play an important part in the debtor's reorganization plan" (citation omitted)). Together the channeling injunction and settlement trust benefit both the debtor (by resolving otherwise indeterminate mass-tort liability) and future potential claimants (by guaranteeing availability of relief regardless of the company's future business success).

Courts have confirmed channeling injunctions and settlement trusts in a wide range of situations, from securities class actions, *see In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 293 (2d Cir. 1992), to mass-tort litigation involving silicone breast implant claims, *In re Dow Corning Corp.*, 280 F.3d 648 (6th Cir. 2002), *abrogated on other grounds*, *Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071 (2024).

In the case of asbestos, Congress specifically accounted for the fact that the financial threat posed by mass-tort claims was exacerbated by the "long latency period of many asbestos-related diseases, which typically creates a large pool of future claimants whose disease has not yet manifested." *In re W.R. Grace & Co.*, 900 F.3d 126, 130 (3d Cir. 2018) (citation omitted); *In re Kaiser Gypsum Co.*, 60 F.4th 73, 78 (4th Cir. 2023), *rev'd on other grounds*, *Truck Ins. Exch. v. Kaiser Gypsum Co.*, 602 U.S. 268 (2024); 11 U.S.C. § 524(g). In providing that process, Congress directly rejected critics' assertions that companies facing mass-tort liability were in fact "healthy corporations" with "deep[] pocket[s]" that should be denied access to bankruptcy. Robert Jones, *The Manville Bankruptcy: Treating Mass Tort Claims in Chapter 11 Proceedings*, 96 Harv. L. Rev. 1121, 1121–22 (1982–1983). Instead, Congress provided an effective way for a wide range of companies to resolve financial risk associated with mass torts and "emerge from bankruptcy free of liability." *In re W.R. Grace & Co.*, 900 F.3d at 130.

Another helpful aspect of bankruptcy is that it aggregates mass-tort claims in one forum. Rather than duplicate work and unnecessarily burden thousands of courts across the country, bankruptcy allows a debtor to consolidate all claims of all parties and reach a single, final resolution. *Unlocking the Code*, *supra*, at 12. This prevents rogue holdouts from preventing the rest of the claimants from securing

recovery. *In Defense of Chapter* 11, *supra*, at 977 & n.17. And, by eliminating duplicate work, the use of bankruptcy also reduces administrative costs. *Id.* at 996.

To be sure, bankruptcy is onerous, so companies do not undertake it lightly. Bankruptcy can cost millions of dollars a month for a large company. *Distress in Bankruptcy*, *supra*, at 318 (citation omitted). Bankruptcy not only "chills [the] debtor's credit [and] sources of supply" but it also "can scare away [its] customers. It leaves a permanent scar." *In re Advance Press & Litho, Inc.*, 46 B.R. 700, 702 (Bankr. D. Colo. 1984). The alternative, however, is often worse, because a company facing mass-tort claims can easily spend billions of dollars in litigation costs and damages awards. *See, e.g.*, *In re LTL Mgmt., LLC*, 64 F.4th at 108. Thus, although bankruptcy comes with significant costs, it provides a vital pathway to resolving mass-tort claims.

Not only does bankruptcy allow the debtor to resolve mass-tort claims and move forward, but it also provides built-in protections for mass-tort claimants. That is especially true in the asbestos context. Section 524(g) was "meticulously crafted" to "safeguard the due process rights of claimants" by "imposing a number of limitations on its use to ensure claimant consent and representation." J. Maria Glover, *Due Process Discontents in Mass-Tort Bankruptcy*, 72 DePaul L. Rev. 535, 556 (2023) (*Due Process Discontents*). For example, a bankruptcy court must appoint

a representative to represent the future claimants' interests, 11 U.S.C. § 524(g)(4)(B)(i), and a mass-tort trust cannot be approved unless 75% of covered claimants approve the plan, *id.* § 524(g)(2)(B)(ii)(IV)(bb). That means any "bankruptcy plan of reorganization under Section 524(g) represents a negotiated settlement between the debtors [and] legal representatives of both current and future claimants." *Unlocking the Code*, *supra*, at 14.

Bankruptcy benefits claimants because claims are resolved faster, and the results are fairer and more predictable. As discussed already, outside of bankruptcy, claims often linger in litigation for decades. *In re Bestwall LLC*, 71 F.4th at 183. In bankruptcy, tools like channeling injunctions and properly funded trusts allow claimants to efficiently submit claims without the burdensome costs of litigation. A more cost-effective process also means that more eligible claimants can recover, particularly those with injuries that are more difficult to prove or that have lower value. *See Unlocking the Code, supra*, at 15–16.

The fact that bankruptcy imposes limits and obligations that prevent parties from unfairly extracting value at the expense of others is a feature, not a bug. A company facing mass-tort liability cannot be rehabilitated without balancing the interests of various parties, including creditors (which includes both present and future mass-tort claimants), employees, and even the debtor itself. *N.L.R.B. v. Bildisco &*

*Bildisco*, 465 U.S. 513, 527 (1984). For example, present mass-tort claimants might prefer to drag a company through costly litigation in the hope of extracting larger settlements or damages awards, even though such awards might come at the expense of future claimants and other stakeholders. The bankruptcy process that Congress thoughtfully designed prevents any party from engaging in such value-destroying behavior.

### C. In the mass-tort context, combining bankruptcy with a divisional merger makes the process more efficient, which benefits claimants, the debtor, and the courts.

The benefits of using bankruptcy to resolve mass-tort claims are multiplied when combined with a divisional merger. To complete a divisional merger, a company uses state corporate law to separate its primary assets and operations into one entity and its potential mass-tort liability into another. *In Defense of Chapter 11*, *supra*, at 988–89. The operating entity provides the entity holding the liabilities with a funding agreement that fully covers the mass-tort liability. *Id.* The entity carrying the mass-tort claims can then resolve them by filing for bankruptcy. The added step of a divisional merger benefits all parties involved.

To start, the two-step process increases creditors' likelihood of recovery by streamlining the bankruptcy process. "[B]ankruptcy

proceedings are costly and disruptive" for any large company because they force its "operations, and its tens of thousands of employees, and all of its counterparties into the court proceedings." *Id.* at 988. Bankruptcy proceedings affect every corner of a company, complicating the thousands of transactions it must execute to keep the business running smoothly. *Id.* Creditors of all stripes rush in, "demand[ing] information about the company's operations, petition[ing] for protective orders, and even challeng[ing] management's business decisions." *Id.* at 1007. When a company's financial distress is caused by mass-tort liability unrelated to its ongoing operations, dragging the rest of the company through bankruptcy needlessly reduces the company's value and, at least temporarily, arrests its ability to pursue new opportunities. In short, the costs of a traditional bankruptcy "leave less money to pay everyone, including the tort claimants." *Id.* at 1008.

By contrast, allowing the operating entity to conduct its business unhampered by bankruptcy restrictions will increase the funds available to cover present and future claims and thus lead to more "equitable treatment among claimants." *Due Process Discontents*, *supra*, at 559. Moreover, the divisional merger helps streamline the bankruptcy process by keeping the focus on resolving the company's tort liability. *See, e.g.*, *Unlocking the Code*, *supra*, at 15 (describing how company finalized $610 million asbestos trust within two years of divisional merger and

- 16 -

bankruptcy). A faster bankruptcy benefits the debtor by resolving the remaining uncertainty about the scope of its mass-tort liability, and it benefits claimants by allowing them to be paid sooner.

Contrary to the Committee's suggestion, a divisional merger does not hamper tort claimants' ability to recover from the debtor. In fact, the "divisional merger has no effect itself on tort liability or recoveries because of the funding agreement" between the debtor and the operating entity. *In Defense of Chapter 11*, *supra*, at 1009. Any attempt by the operating company to underfund the debtor entity and thus withhold recovery from tort claimants would be a "classic example of a fraudulent transfer," which is prohibited by the Bankruptcy Code, *id.* (citing 11 U.S.C. § 548), and state corporate law, *see, e.g.*, *Humphrey v. Humphrey*, 593 S.W.2d 824, 826 (Tex. Civ. App. 1980) ("legal fiction of corporate entity may be disregarded [when] used to perpetrat[e] fraud").

In short, Congress has created an efficient and fair process for companies saddled with enormous and uncertain mass-tort liability to obtain a fresh start while ensuring that injured claimants receive prompt and fair compensation, and a pre-bankruptcy divisional merger can streamline that process and make it even more efficient.

- 17 -

## II.    THE COMMITTEE'S PROPOSED LIMIT ON CONGRESS'S BANKRUPTCY POWER HAS NO GROUNDING IN THE CONSTITUTION AND IS DESIGNED TO BAN DIVISIONAL MERGERS, BENEFITING ONLY PLAINTIFFS' ATTORNEYS.

When a company resolves mass-tort claims in bankruptcy, it threatens to eliminate the "aspirational greater fees that could be awarded to the claimants' counsel" after decades of nationwide tort litigation. *In re Bestwall LLC*, 71 F.4th at 184. Here, as elsewhere, the Committee's counsel has proposed a rule that would avoid that result. *See* JA1865. They argue that the Bankruptcy Clause in Article I of the Constitution prohibits Congress from passing bankruptcy laws that cover non-"bankrupt" entities (a term they have difficulty defining). *See* Comm. Br. at 33. That rule would prohibit the use of divisional mergers prior to filing for bankruptcy, as the point of the divisional merger is to ensure that the entity holding the liabilities has sufficient assets to pay the claims. The Committee's novel rule has no basis in the Constitution, Supreme Court precedent, or sound policy.

### A. The Committee's novel and unfounded rule is reverse engineered to ban two-step bankruptcies and little else.

The Committee's proposed rule is hard to pin down. Sometimes the Committee says that bankruptcy should be available only when a debtor cannot pay their creditors. Comm. Br. at 13. But at other times it disclaims any intent to impose an insolvency requirement. *Id.* at 40. In

the end, the Committee all but admits that its rule is hand-tailored to prohibit companies from engaging in pre-bankruptcy divisional mergers. In this Court, its only articulation of how the rule works is to declare that companies that undergo a divisional merger are constitutionally prohibited from filing for bankruptcy because the entity holding the liabilities also has a funding agreement enabling it to pay those liabilities in full. *Id.* at 33. Beyond the desired ban on divisional mergers, the Committee presents no workable rule for analyzing whether a debtor is "bankrupt."

The Committee did not even attempt to define the contours of its rule in the bankruptcy court. As the court pointed out, "the Committee is not concerned with a standard for the determination" of "whether a debtor is in financial distress" because "it asserts that this case is not a close call." JA1911. The Committee's failure to identify a workable rule rooted in historical bankruptcy practice highlights that its definition of "bankrupt" is entirely of its own making. Indeed, the rule "does not make a lot of sense other than as a way to gerrymander [Bestwall] out of this [bankruptcy proceeding]" and ban the modern state-corporate-law practice of divisional mergers. *Apple Inc. v. Pepper*, 587 U.S. 273, 283 (2019).

Tellingly, only through the modern practice of a divisional merger and funding agreement will a company filing for bankruptcy *necessarily* be

solvent. After all, the whole point of the funding agreement between the entity handling the company's operations and the entity handling the mass-tort liability is to render the second entity as financially capable of paying all present and future claims as the original entity. *See In Defense of Chapter 11*, *supra*, at 988–89. The Committee makes this point expressly: Bestwall is not "bankrupt," it argues, because "through its access to the funding agreement [with] Georgia Pacific … it is able to pay any conceivable liabilities now and in the foreseeable future." Comm. Br. at 33. The Committee's rule is thus perfectly—and unsurprisingly—tailored to ban companies that have completed a divisional merger from filing for bankruptcy.

The Committee's rule that only entities with insufficient assets to pay creditors may reorganize under Chapter 11 has little (or perhaps no) other utility. In every other situation where a company might rationally contemplate bankruptcy, it would be a nightmare to apply. For example, determining whether a profitable company like Georgia Pacific faced with enormous and uncertain future mass tort liabilities can pay its debts would be a massively complex undertaking. Assessing such a company's "financial distress" would require complicated calculations and predictions about a debtor's ability to pay its current debts, its projected income streams, its expected future value, pending and future liabilities (such as mass-tort liability), and so on. *See* JA1912.

- 20 -

That puts the cart before the horse. Under the Bankruptcy Code, initial questions about whether Chapter 11 relief is available are supposed to be decided quickly, before the court delves into the actual reorganization process. *See, e.g.*, 11 U.S.C. § 1112(b)(3) (court usually must rule on motion to dismiss within 45 days). But the Committee's proposed rule would make that impossible. The threshold dispute over whether the company is "bankrupt" and thus may file for Chapter 11 relief under the Committee's rule would spin off into its own ancillary litigation replete with extensive discovery, expert testimony, and motions practice—all before the actual bankruptcy process even begins.

That long delay would undermine the whole purpose of bankruptcy, which is to enable a company to file and secure protections before it is too late for the company to recover. *See In Defense of Chapter 11*, *supra*, at 990 n.61. As the court noted below, "Congress saw the benefit in incentivizing Chapter 11 debtors to file their cases in time to maintain the value of their estates and avoid liquidation." JA1912–13. The Committee's rule would penalize debtors who file in a timely manner, because any creditor that stands to benefit from avoiding bankruptcy will be incentivized to use this threshold analysis as a stall tactic to prevent the company from entering bankruptcy. In most cases the rule would impose unnecessary costs and years-long delay as the decision goes up on

appeal, preventing the company from obtaining the crucial protections of
the bankruptcy process.

### B. Congress is not limited to enacting bankruptcy laws that reflect historical bankruptcy practice.

Beyond being hopelessly impractical, the Committee's proposed rule
narrowing Congress's authority to amend the Bankruptcy Code has no
grounding in the text of the Bankruptcy Clause or Supreme Court
precedent. The Supreme Court has consistently declared that Congress's
power to enact "laws on the subject of Bankruptcies" is "broad"—so broad,
in fact, that it "is incapable of final definition." *Siegel*, 596 U.S. at 473–
74. For more than a century, the consistent grounding principle of the
Bankruptcy Clause has remained that Congress holds plenary power to
legislate on "the subject of the relations between [a] debtor and his
creditors," regardless of whether the debtor is "insolvent or nonpaying or
fraudulent." *Wright v. Union Central Life Ins. Co.*, 304 U.S. 502, 513–514
(1938); *see Harrington*, 144 S. Ct. at 2077; *Hanover Nat'l Bank v. Moyses*,
186 U.S. 181, 186–88 (1902).

Disregarding this unbroken line of precedent, the Committee contends
that the Bankruptcy Clause does not extend "to the subject of the
relations between [a] debtor and his creditors" unless the debtor is
"bankrupt" or its "assets are insufficient to pay all creditor claims."
Comm. Br. at 13. It thus asserts that Congress cannot exercise its

"bankruptcy" power over relations between a debtor and its creditors, unless the debtor is "bankrupt." *Id.* at 27. But that theory is wrong, twice over.

First, the Committee merely begs the question. To say that one cannot file for bankruptcy unless one is bankrupt is no test at all. As the 1898 Bankruptcy Code, which stood for 80 years, makes clear, a "bankrupt" is a person who is subject to "an involuntary [bankruptcy] petition" or has "filed a voluntary [bankruptcy] petition." 30 Stat. 544, 544 (1898). Put another way, "bankrupt" describes a person in bankruptcy proceedings. So, the Committee's circular assertion that "debtors [must] be actually 'bankrupt'" before filing for bankruptcy provides no meaningful guidance as to which entities may file for Chapter 11 protection.

Worse still, the Committee improperly seeks to apply an interpretive canon used to determine the scope of individual constitutional *rights* to impose a freestanding limit on Congress's Article I *authority*. In its view, Congress may only enact bankruptcy laws for which it can identify sufficiently similar historical analogs. Relying on *United States v. Rahimi*, 144 S. Ct. 1889 (2024), the Committee argues that this Court, when assessing whether Congress properly exercised its enumerated powers, "must ascertain whether the current law is relevantly similar to laws that our tradition is understood to permit." Comm. Br. at 17. That is wrong. *Rahimi* is a Second Amendment case, and principles that apply

when interpreting constitutional rights—*i.e.*, when interpreting constitutional provisions that expressly *limit* congressional authority—cannot be imported wholesale when interpreting constitutional provisions that *grant* Congress authority to legislate. In fact, importing the *Rahimi* framework to the Bankruptcy Clause gets the approach completely backwards.

When determining the limits of a constitutional right, Founding-era historical regulations can "help delineate the contours of the right" by demonstrating that the right was not originally construed to protect certain conduct. *Rahimi*, 144 S. Ct. at 1897. For example, a "historical tradition of firearm regulation" in a certain area can indicate that people at the time of the ratification did not consider the Second Amendment to protect the regulated conduct. *Id.* This principle applies to other constitutional provisions that impose *limits* on congressional power, such as the Establishment Clause, which "must be interpreted by reference to historical practices and understandings." *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014). If certain types of government action were unobjectionable at the Founding—such as legislative prayer, for example—the Constitution should not be interpreted to prohibit such action today.

By contrast, when interpreting Congress's Article I powers, the Supreme Court has not looked to historical analogs to determine the

scope of Congress's authority. The Court's interpretation of the Commerce Clause, which, like the Bankruptcy Clause, grants Congress broad power, is instructive. Indeed, the two clauses had similar origins. The Bankruptcy Clause was written to solve the "difficulties posed by [the] patchwork of [state] insolvency and bankruptcy laws." *Cent. Virginia Cmty. Coll. v. Katz*, 546 U.S. 356, 365–66 (2006). Likewise, the Commerce Clause was the Framers' response to the problems caused by incompatible state regimes developed in "the absence of any federal commerce power." *Gonzales v. Raich*, 545 U.S. 1, 16 (2005). When exercising its commerce power, Congress is not restricted to enacting laws that mirror or map onto pre-ratification laws. Instead, Congress has broad power to "regulate the channels of interstate commerce," "regulate and protect the instrumentalities of interstate commerce … and persons or things in interstate commerce," and "regulate activities that substantially affect interstate commerce." *Id.* at 16–17. So too when it enacts bankruptcy laws. The bankruptcy laws enacted by Parliament or in the pre-Founding era do not represent the universe of permissible legislation under the Bankruptcy Clause.

Instead, the Constitution's grant of legislative power permits Congress to enact creative legislation to address modern challenges that could not have been anticipated at the Founding. The breadth of Congress's power is confirmed by the Necessary and Proper Clause,

- 25 -

which authorizes Congress to enact laws "necessary to make a regulation [enacted under Article I] effective." *Id.* at 35 (Scalia, J., concurring). The Necessary and Proper Clause gives Congress authority to pass laws that are "rationally related to the implementation of a constitutionally enumerated power," which includes the power to regulate the subject of bankruptcies. *United States v. Comstock*, 560 U.S. 126, 134 (2010).

For this reason, the Supreme Court has consistently respected Congress's authority when interpreting the Bankruptcy Clause. In fact, the Supreme Court has directly rejected the argument the Committee makes here. More than 80 years ago, the Court held that "[t]he powers granted by the bankruptcy clause of the Constitution are not limited to the bankruptcy law and practice in force in England or the States at the time of its adoption." *Adair v. Bank of Am. Nat. Tr. & Sav. Ass'n*, 303 U.S. 350, 354 (1938) (citation omitted). Nor has the Supreme Court ever invalidated a statute on the ground that it exceeded Congress's authority over "the subject of Bankruptcies."

Besides, even if the Committee were right about the historical-analogy requirement, its own proposed rule fails that test. The Committee admits that bankruptcy historically extended beyond debtors who *could not* pay and included those who *would not* pay. Comm. Br. at 24–25. But recalcitrant debtors are not "bankrupt" under the Committee's definition because they are capable of paying their debts. Under the Committee's

- 26 -

own history, then, bankruptcy did extend to the relations between financially viable debtors and their creditors. *See* Bestwall Br. at 43–44.

In sum, the Committee's attempt to rework *Rahimi* into a freestanding limit on Congress's enumerated powers should be soundly rejected. Congress is not obligated to put forward a historical analog every time it amends the Bankruptcy Code.

### C. This Court should reject the Committee's attempt to bypass Congress and amend the Bankruptcy Code through the courts.

If the Committee wishes to propose policy-based changes to the Bankruptcy Code, it should look to Congress, not the federal courts. This Court should thus reject the Committee's attempt to end run the legislative process.

Because the Constitution vests Congress with broad authority over federal bankruptcy law, when courts consider imposing new constitutional limitations on the Bankruptcy Code, "the most important question is who should decide … Congress or the courts?" *Hernandez v. Mesa*, 589 U.S. 93, 114 (2020) (reiterating in the *Bivens* context that judicial decisions amount to improper legislation when intruding on areas reserved to Congress). In *Hernandez*, the Court made clear that it is inappropriate to usurp authority that the Constitution has specifically vested in Congress. Thus, when a question arises about who should

determine the scope of the federal Bankruptcy Code, "the correct answer most often will be Congress." *Id.* at 114. The Bankruptcy Clause's broad language—combined with the flexibility afforded by the Necessary and Proper Clause—gives Congress ample leeway to amend the Bankruptcy Code to fit new situations. *Harrington*, 144 S. Ct. at 2077.

That is precisely what Congress has done. For example, in the 1980s, companies facing mass-tort liability related to asbestos realized that because of "the lengthy latency period of asbestos-related diseases," they had "no way [to] resolve or even effectively estimate their exposure" outside of bankruptcy. *In re Plant Insulation Co.*, 734 F.3d 900, 906 (9th Cir. 2013). They also recognized that mass-tort litigation failed to ensure that future asbestos claimants would be able to recover for their injuries. *Id.* The Johns-Manville company pioneered the bankruptcy approach of creating a bankruptcy trust to handle the claims. *Id.* And Congress endorsed that innovative process through Section 524(g). Nor is that the first time Congress modified the Bankruptcy Code to account for changing conditions. For example, corporations could not declare bankruptcy until 1867, *see* Bankruptcy Act of 1867, 14 Stat. 517, 534–35, and bankruptcy courts did not exist until 1978, *see* Bankruptcy Reform Act, 92 Stat. 2657, 2657 (1978).

It is thus Congress that must decide whether to modify the Bankruptcy Code to ensure that appropriate procedures are in place to

handle the complexities of mass-tort-driven bankruptcies. Unsurprisingly, some members of Congress have already considered the Committee's arguments and proposed amendments to cabin the use of bankruptcy by companies facing mass-tort liability. *E.g.*, Press Release, Senator Sheldon Whitehouse, *Whitehouse, Hawley, Sykes, Gooden Introduce Bipartisan Legislation to Deter 'Texas Two-Step' Bankruptcy Trick* (July 23, 2024), https://tinyurl.com/59h67pzm. Those attempts may not succeed given the strong policy arguments supporting the current practice. *See supra*, Part I.B–C. But regardless of how those debates unfold, it is Congress, not the federal courts, that must decide whether and how to limit companies' use of the bankruptcy process to resolve mass torts.

## CONCLUSION

The Court should affirm and hold that the Bankruptcy Clause does not prohibit Congress from allowing a person to file for bankruptcy without first proving "financial distress."

Dated: November 8, 2024

Respectfully Submitted,

/s/ *Robert E. Dunn*
ROBERT E. DUNN
   *Counsel of Record*
EIMER STAHL LLP

- 29 -

1999 South Bascom Avenue
Suite 1025
Campbell, CA 95008
(408) 889-1690
rdunn@eimerstahl.com

JAMES E. BARRETT
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604

*Counsel for Amicus Curiae*

- 30 -

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify the following:

This Brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 6,407 words, excluding the parts of the Brief exempted by Federal Rule of Appellate Procedure 32(f).

This Brief complies with all typeface and type style requirements of Federal Rules of Appellate Procedure 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

Dated: November 8, 2024.

/s/ *Robert E. Dunn*
ROBERT E. DUNN

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of November 2024, I filed the foregoing Brief with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

Dated: November 8, 2024

/s/ *Robert E. Dunn*

ROBERT E. DUNN