**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 24-1493**

───────────────

BESTWALL LLC, f/k/a Georgia-Pacific LLC, a Texas limited liability company and a
North Carolina limited liability company,

Debtor – Appellee,

v.

THE OFFICIAL COMMITTEE OF ASBESTOS CLAIMANTS OF BESTWALL, LLC,

Creditor – Appellant.

------------------------------

AMERICAN ASSOCIATION FOR JUSTICE; CLAIMANTS; THE OFFICIAL
COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS IN IN RE
ALDRICH PUMP LLC AND IN RE MURRAY BOILER LLC,

Amici Supporting Appellant.

ANTHONY J. CASEY; BROOK E. GOTBERG; JOSHUA C. MACEY; JOSEPH W.
GRIER, III, Future Asbestos Claimants Representative appointed in *In re Aldrich Pump
LLC, et al*.; TRANE TECHNOLOGIES COMPANY LLC; TRANE U.S. INC.;
CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA,

Amici Supporting Appellee.

───────────────

Appeal from the United States Bankruptcy Court for the Western District of North
Carolina, at Charlotte. Laura Turner Beyer, Chief Bankruptcy Judge. (17-31795)

───────────────

Argued:  May 8, 2025                    Decided:  August 1, 2025

───────────────

Before KING, AGEE, and QUATTLEBAUM, Circuit Judges.

_____

Affirmed by published opinion. Judge Quattlebaum wrote the opinion, in which Judge Agee joined. Judge Agee wrote a concurring opinion. Judge King wrote a dissenting opinion.

_____

**ARGUED:** David Charles Frederick, KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C., Washington, D.C., for Appellant. Noel John Francisco, JONES DAY, Washington, D.C., for Appellee. **ON BRIEF:** Natalie D. Ramsey, Davis Lee Wright, Wilmington, Delaware, Thomas J. Donlon, ROBINSON & COLE LLP, Stamford, Connecticut; Joshua D. Branson, Alejandra Ávila, KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C., Washington, D.C.; Mark Kutny, Robert A. Cox, Jr., HAMILTON STEPHENS STEEL + MARTIN, PLLC, Charlotte, North Carolina, for Appellant. Gregory M. Gordon, Dallas, Texas, Jeffrey B. Ellman, Atlanta Georgia, Sarah Welch, Cleveland, Ohio, C. Kevin Marshall, Megan Lacy Owen, Caleb P. Redmond, JONES DAY, Washington, D.C.; Garland S. Cassada, Richard C. Worf, Jr., ROBINSON, BRADSHAW & HINSON, P.A., for Charlotte, North Carolina, for Appellee. Lori Andrus, President, Jeffrey R. White, AMERICAN ASSOCIATION FOR JUSTICE, Washington, D.C., for Amicus American Association for Justice. Jonathan Ruckdeschel, THE RUCKDESCHEL LAW FIRM, LLC, Ellicott City, Maryland; Clayton L. Thompson, John L. Steffan, MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC, New York, New York; Thomas W. Waldrep, Jr., Jennifer B. Lyday, Ciara L. Rogers, Chris W. Haaf, Diana Santos Johnson, WALDREP WALL BABCOCK & BAILEY PLLC, Winston-Salem, North Carolina, for Amici Claimants. Elizabeth A. Kiernan, Dallas, Texas, Jonathan C. Bond, David W. Casazza, Lavi M. Ben Dor, Zach Young, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Amici Professors Anthony J. Casey, Brook E. Gotberg, and Joshua C. Macey. Jonathan P. Guy, Debra L. Felder, Washington, D.C., Michael Rosenberg, Chicago, Illinois, Daniel B. Carnie, ORRICK, HERRINGTON & SUTCLIFFE LLP, Washington, D.C., for Amici Future Claimants' Representative of In Re Aldrich Pump, LLC, et al. K. Elizabeth Sieg, J. Stephen Tagert, Richmond, Virginia, Bradley R. Kutrow, Charlotte, North Carolina, Jonathan Y. Ellis, MCGUIREWOODS LLP, Raleigh, North Carolina; Gregory J. Mascitti, Anthony Bartell, MCCARTER & ENGLISH, LLP, New York, New York, for Amici Trane Technologies Company LLC and Trane U.S. Inc. Robert E. Dunn, Campbell, California, James E. Barrett, EIMER STAHL LLP, Chicago, Illinois, for Amicus Chamber of Commerce of the United States of America. Kevin C. Maclay, Todd E. Phillips, Jeffrey A. Liesemer, CAPLIN & DRYSDALE, CHARTERED, Washington, D.C.; Elizabeth J. Ireland, Charlotte, North Carolina, David Neier, Carrie V. Hardman, WINSTON & STRAWN LLP, New York, New York, for Amicus Official Committee of Asbestos Personal Injury Claimants in In re Aldrich Pump LLC and In re Murray Boiler LLC.

2

QUATTLEBAUM, Circuit Judge:

The question we must answer in this appeal is whether federal courts have subject-matter jurisdiction over bankruptcy cases involving solvent debtors? At least as framed here, we answer yes. We do so not because a debtor's financial condition is irrelevant under the Bankruptcy Code. It may be relevant in a number of contexts. Instead, we answer yes because the Constitution grants Article III judicial power over all cases arising under the laws of the United States. The Bankruptcy Code is a law of the United States. So, petitions for relief under the Bankruptcy Code—even those filed by solvent debtors—arise under the laws of the United States. Thus, we affirm the bankruptcy court's denial of the motion to dismiss for lack of subject-matter jurisdiction.

## I.

Founded in 1927, Georgia-Pacific LLC is a multibillion-dollar corporation that operates primarily in the pulp and paper industry.[1] In 1965, Georgia-Pacific bought and then merged with Bestwall Gypsum Co., which manufactured wallboard, joint compound products and industrial plasters. But with its assets came its liabilities, including the asbestos claims against it, which plagued Georgia-Pacific for decades. *See In re Bestwall LLC*, 605 B.R. 43, 47 (Bankr. W.D.N.C. 2019). From 2014 to 2017, for example, Bestwall paid $558 million in defense and indemnity costs for asbestos litigation.

---

[1] Unsurprisingly, Georgia-Pacific's corporate history is complicated, even before the events at issue in this case. But that is not relevant here. So, we do not detail that history and, for convenience, refer to the entity as Georgia-Pacific regardless of its specific legal name at the time.

3

In 2017, Bestwall faced around 64,000 pending asbestos claims, with tens of thousands more anticipated through at least 2050. So, Georgia-Pacific sought to deal with these asbestos claims through a divisional merger that has been labeled the Texas two-step—named for Texas' Business Organizations Code § 1.002(55)(A) (the statutory vehicle for the divisional merger) and that state's beloved country dance.[2] This maneuver "splits a legal entity into two, divides its assets and liabilities between the two new entities, and terminates the original entity." *In re LTL Mgmt., LLC*, 64 F.4th 84, 96 (3d Cir. 2023). The lion's share of assets—and indeed many liabilities—go into a new company, while the asbestos liabilities fall into a separate company, whose primary purpose is to resolve the asbestos claims.[3]

The company holding the asbestos liabilities then files for bankruptcy. The bankruptcy court issues an injunction channeling all asbestos-related claims into a personal injury trust, known as an 11 U.S.C. § 524(g) trust. *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 234 (3d Cir. 2004), *as amended* (Feb. 23, 2005). This "allows a debtor to address

---

[2] Originally dubbed the "valse a deux temps" ("waltz two times"), the Texas two-step mixed elements of the waltz, the Foxtrot and the polka. The popular dance style got its moniker in early 20th century Texas dance halls. *See* Scott Sosebee, *Dancin' Texas Style: The Origin of the Texas Two-Step*, THE DAILY SENTINEL (January 18, 2025), https://www.dailysentinel.com/life_and_entertainment/features/dancin-texas-style-the-origin-of-the-texas-two-step/article_dd470e3a-d9d7-5197-9948-bb377cec79e9.html [https://perma.cc/HZ7M-2V4D].

[3] That said, nothing inherent to the two-step requires the tort liabilities to be asbestos-related. *See, e.g., In re Aearo Techs. LLC*, No. 22-02890-JJG-11, 2023 WL 3938436 (Bankr. S.D. Ind. June 9, 2023), *appeal dismissed*, No. 22-2606, 2024 WL 5277357 (7th Cir. July 11, 2024) (using a bankruptcy maneuver closely related to the Texas two-step to address tort claims regarding defective earplugs).

in one forum all potential asbestos claims against it, both current and future, as well as current and potential future claims against third parties alleged to be liable on account of asbestos claims against the debtor." *In re Bestwall LLC*, 606 B.R. 243, 249 (Bankr. W.D.N.C. 2019), *aff'd,* No. 3:20-cv-103-RJC, 2022 WL 67469 (W.D.N.C. Jan. 6, 2022), *aff'd,* 71 F.4th 168 (4th Cir. 2023); *see generally* Michael A. Francus, *Texas Two-Stepping Out of Bankruptcy*, 120 MICH. L. REV. ONLINE 38 (2022).[4]

Implementing this strategy, on July 31, 2017, Georgia-Pacific split into two entities, which, for convenience, we will refer to as Georgia-Pacific and Bestwall.[5] Georgia-Pacific received most of the $28.3 billion company. Bestwall received:

(a) three bank accounts containing approximately $32 million in cash;

(b) all contracts of the old Georgia-Pacific related to its asbestos-related litigation;

(c) certain real estate;

(d) 100% of a separate company that manufactures and sells gypsum plaster products. It was projected to generate cash flow of approximately $18 million per year, and was valued at approximately $145 million in 2017; and

---

[4] Section 524(g) asbestos trusts trace back to the Johns-Manville bankruptcy, in which Judge Lifland pioneered this solution to the tricky timing problem presented by the long latency periods of asbestos-related diseases. *See In re Johns-Manville Corp.*, 68 B.R. 618 (Bankr. S.D.N.Y.1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom*, *Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988). Congress codified the innovation by adding § 524(g) to the Bankruptcy Code via the Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, § 111, 108 Stat. 4106, 4113–17.

[5] The legal names of the entities are Georgia-Pacific LLC and Bestwall LLC.

(e) an agreement from Georgia-Pacific to pay for Bestwall's expenses incurred in the normal course of business; administration expenses if Bestwall declared bankruptcy; and a § 524(g) asbestos trust in the amount required by a confirmed reorganization plan if Bestwall couldn't fund the trust.

On November 2, 2017, Bestwall petitioned for relief under Chapter 11 of the Bankruptcy Code in the Western District of North Carolina. It simultaneously filed an adversary proceeding, in which it moved for an injunction prohibiting asbestos claimants from filing or prosecuting asbestos claims against Bestwall or Georgia-Pacific. *See Bestwall*, 606 B.R. at 246–47. The Official Committee of Asbestos Claimants—formed after Bestwall filed bankruptcy to represent the interests of individuals with personal injury claims for exposure to asbestos manufactured by Bestwall—opposed the injunction. The bankruptcy court granted Bestwall's motion.[6]

The Committee also moved to dismiss the bankruptcy case, arguing it was filed in bad faith because Bestwall wasn't really bankrupt. The same day the bankruptcy court

---

[6] The Committee argued that the bankruptcy court did not have jurisdiction to issue an injunction prohibiting suits against Georgia-Pacific, since it did not file for bankruptcy. The court rejected this argument, holding it had subject-matter jurisdiction to enjoin the claims against Georgia-Pacific because the injunction "related to" Bestwall's bankruptcy under 28 U.S.C. § 1334(b). *Bestwall*, 606 B.R. at 249. When the Committee appealed, the district court affirmed. *See In re Bestwall LLC*, No. 3:20-cv-103-RJC, 2022 WL 67469 (W.D.N.C. Jan. 6, 2022). It agreed the bankruptcy court had subject-matter jurisdiction given its "related-to" jurisdiction over the claimants' asbestos claims. *Id*. at *5. The court also held the bankruptcy court did not abuse its discretion in granting Bestwall's motion for a preliminary injunction. *Id*. at *7–9. In a split decision, we affirmed. *See In re Bestwall LLC*, 71 F.4th 168 (4th Cir. 2023).

granted the motion for an injunction, it denied the Committee's motion. *See In re Bestwall LLC*, 605 B.R. 43, 54 (Bankr. W.D.N.C. 2019). The court held that "[a]ttempting to resolve asbestos claims through 11 U.S.C. § 524(g) is a valid reorganizational purpose, and filing for Chapter 11, especially in the context of an asbestos or mass tort case, need not be due to insolvency."[7] *Id*. at 49.

Several years later, the Committee moved to dismiss again, this time for lack of subject-matter jurisdiction. It is the bankruptcy court's ruling on this motion that is currently before us. The Committee noted that the Constitution gives Congress the power to establish "uniform Laws on the subject of Bankruptcies throughout the United States." U.S. CONST. art. I, § 8, cl. 4. The Committee then argued that Bestwall was not "bankrupt" according to a founding-era understanding of the word. For that reason, it maintained that the bankruptcy court had no legitimate subject-matter jurisdiction over Bestwall. This constitutional requirement for jurisdiction, the Committee insisted, precedes any statutory requirements for debtors.

---

[7] The bankruptcy court noted that the "Fourth Circuit standard for dismissal of a Chapter 11 case as a bad faith filing is one of the most stringent articulated by the federal courts." *Id*. at 49 (citing *In re Dunes Hotel Assocs.*, 188 B.R. 162, 168 (Bankr. D.S.C. 1995)). That standard permits a court to dismiss a Chapter 11 filing for bad faith only when the bankruptcy reorganization is both (i) objectively futile and (ii) filed in subjective bad faith. *See Carolin Corp. v. Miller*, 886 F.2d 693, 700–01 (4th Cir. 1989). The Committee sought leave to appeal, but the bankruptcy court denied its request. The Committee then moved for certification of direct appeal to the Fourth Circuit under 28 U.S.C. § 158(d)(2). Holding that certification would materially advance the case on a matter of public importance, the bankruptcy court certified the Committee's appeal. However, we denied the petition. *See Off. Comm. of Asbestos Claimants of Bestwall, LLC v. Bestwall LLC*, No. 19-408, 2019 WL 13512209 (4th Cir. Nov. 14, 2019).

The Committee claimed that its motion was a "new and distinct argument from any previously raised." J.A. 1773. And since the motion attacked the court's subject-matter jurisdiction, the court's previous denial of its motion to dismiss for bad faith did not bar it; subject-matter jurisdiction, the Committee noted, may be challenged at any time. *See Plyler v. Moore*, 129 F.3d 728, 731 n.6 (4th Cir. 1997).

The bankruptcy court agreed that subject-matter jurisdiction arguments "may be resurrected at any point in the litigation." *In re Bestwall LLC*, 658 B.R. 348, 361 (Bankr. W.D.N.C. 2024) (quoting *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012)). And it considered the Committee's argument that the bankruptcy court lacked subject-matter jurisdiction over a solvent debtor on the merits. The bankruptcy court observed that "Congress determines subject-matter jurisdiction within any limitations imposed by the Constitution[,]" and in turn, that the "Bankruptcy Clause of the Constitution determines the limits of constitutional subject-matter jurisdiction for bankruptcy." *Id.* at 362. But because the history of bankruptcy legislation has been one of liberalizing bankruptcy access, and Congress enjoys substantial deference in defining bankruptcy, the bankruptcy court ultimately rejected the Committee's argument that Congress cannot open bankruptcy to debtors who aren't in financial distress.[8] Therefore, it denied the Committee's motion.

When the Committee again moved for certification for direct appeal to us under 28 U.S.C. § 158(d)(2), the bankruptcy court once again granted it. This time, we granted the petition.

---

[8] The Committee proffers a vague concept of "financial distress" but never defines the term. Neither does the Constitution, the Bankruptcy Code or any court.

## II.

At the outset, we clarify what this appeal is and is not about. This appeal is not about the validity of the controversial Texas two-step maneuver. The Committee acknowledged this at oral argument, agreeing that its view of jurisdiction would affect all debtors, not just those who recently performed a divisional merger. *See Bestwall LLC v. The Off. Comm. of Asbestos Claimants of Bestwall, LLC*, No. 24-1493, Oral Arg. at 16:00–16:20 (4th Cir. Mar. 8, 2025). Nor is it about whether a debtor's ability to pay its debts is relevant in a bankruptcy case. That issue was considered in the Committee's motion to dismiss for bad faith and may come up at future junctures—at plan confirmation, for example. Instead, we face a narrow question—do federal courts have subject-matter jurisdiction over bankruptcy cases filed by debtors who may be able to pay their obligations?[9]

To answer this question, we start with the basics. The Constitution grants Article III judicial power over all cases arising under the laws of the United States. *See Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22, 26 (2025) ("'Arising under' jurisdiction—more often known as federal-question jurisdiction—enables federal courts to decide cases founded on federal law."). The Bankruptcy Code is a law of the United States. Bestwall petitioned to reorganize under Chapter 11 of the Code. So, that petition is a case arising under the laws of the United States. Seems straightforward.

---

[9] We review such questions de novo. *See Capitol Broad. Co. v. City of Raleigh, N.C.*, 104 F.4th 536, 539 (4th Cir. 2024). We review the bankruptcy court's legal conclusions de novo and its factual findings for clear error. *See In re White*, 487 F.3d 199, 204 (4th Cir. 2007).

The Committee insists it's not that simple. It claims, correctly, that Congress only has the power to enact laws pertaining to bankruptcy that the Constitution grants. And though it acknowledges Article I, Section 8 authorizes Congress to "establish . . . uniform Laws on the subject of Bankruptcies throughout the United States," the Committee maintains the meaning of "bankruptcy" at the founding did not include those able to pay their debts. Any law that permits a company that could pay its debts to seek bankruptcy protection, according to the Committee, cannot confer "constitutional subject matter jurisdiction."[10] Committee Br. at 16 (quoting *In re Bestwall*, 658 B.R. at 362).

But that phrase sounds an awful lot like a standing challenge. Indeed, all the cases we have located that use that phrase use it as a synonym for Article III standing. *See, e.g., Norfolk S. Ry. Co. v. Guthrie*, 233 F.3d 532, 534 (7th Cir. 2000) ("NS argues that its complaint against Lakin and Snyder presents a case or controversy and thus should not

---

[10] Strictly speaking, the question isn't whether the bankruptcy court had subject-matter jurisdiction; it's whether the district court that referred the case to the bankruptcy court had subject-matter jurisdiction. As we have said, "since bankruptcy courts are not Article III courts, they do not wield the United States's judicial Power." *Kiviti v. Bhatt*, 80 F.4th 520, 532 (4th Cir. 2023). Accordingly, bankruptcy courts are not subject to Article III limitations. We held in *Kiviti* that bankruptcy courts can adjudicate cases that would be moot if they were heard by an Article III court. *See id.* By the same token, bankruptcy courts could, in theory, adjudicate cases that would lack subject-matter jurisdiction if they were heard by an Article III court. "Once a case is validly referred to the bankruptcy court, the Constitution does not require it be an Article III case or controversy for the bankruptcy court to act." *Id.* at 533. Granted, a bankruptcy case must satisfy Article III requirements at the bookends of the case's life. So, before a district court refers a bankruptcy case to a bankruptcy court, "a bankruptcy case must—at the start—be within the judicial Power." *Id.* at 532. For the same reason, "[s]o too must Article III be satisfied after the bankruptcy court acts and the case is returned to the district court[.]" *Id.* at 533. None of this changes the question before us. This point is only one of technical precision; the basic question presented of whether subject-matter jurisdiction exists remains just as pressing.

have been dismissed for lack of constitutional subject-matter jurisdiction."); *United States v. Hahn*, 359 F.3d 1315, 1322–24 (10th Cir. 2004) (analyzing the existence of an Article III case or controversy for purposes of "constitutional subject matter jurisdiction"); *Umanzor v. Lambert*, 782 F.2d 1299, 1301 n.2 (5th Cir. 1986) ("Whether there exists an Article III case or controversy, and thus Constitutional subject-matter jurisdiction, is analytically distinct from whether a habeas corpus statute] confer[s] statutory subject-matter jurisdiction"). Yet the Committee does not argue that Bestwall's restructuring doesn't satisfy Article III's standing requirements.

What the Committee's argument really does is convert a challenge to the Bankruptcy Code's constitutionality into a jurisdictional question. But that can't be right. Following the Committee's logic, challenges to Congress's Commerce Clause power ought to be about jurisdiction too. But they aren't. Consider *United States v. Lopez*, 514 U.S. 549 (1995). There, the Supreme Court struck down a criminal conviction for violating 18 U.S.C. § 922(q)(1)(A), which criminalized possessing a gun in school zones. *Id.* at 551. The Court held that Congress lacked authority under the Commerce Clause to make such laws. *Id*. at 567–68. But not because the district court had no subject-matter jurisdiction over the case. Instead, the Court affirmed the Fifth Circuit's decision that "reversed respondent's conviction." *Id*. at 552. If Congress' lack of constitutional authority stripped subject-matter jurisdiction, the Court would have said so. *See Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 778 n.8 (2000) (explaining "the validity of *qui tam* suits under [Article II is not] a jurisdictional issue that we must resolve here"); *see also City of Boerne v. Flores*, 521 U.S. 507, 512 (1997) (saying nothing about jurisdiction and merely

reversing the Fifth Circuit after holding that RFRA "exceeded the scope of [Congress'] enforcement power under § 5 of the Fourteenth Amendment"). Plainly, federal courts have subject-matter jurisdiction over constitutional challenges to Congressional enactments.

This is not to say bankruptcy courts are immune to questions of subject-matter jurisdiction. But that jurisdiction is determined by statute. 28 U.S.C. § 1334 vests district courts with "original and exclusive jurisdiction of all cases under title 11 . . . or arising in or related to cases under title 11." 28 U.S.C. § 1334(a)–(b). "Whether a bankruptcy court may exercise subject-matter jurisdiction over a proceeding is determined by reference to 28 U.S.C. § 1334." *Valley Historic Ltd. P'ship v. Bank of N.Y.*, 486 F.3d 831, 839 n.3 (4th Cir. 2007); *see In re Kirkland*, 600 F.3d 310, 315 (4th Cir. 2010) ("[S]ubject matter jurisdiction is determined by § 1334."). "Only Congress may determine a lower federal court's subject-matter jurisdiction." *Kontrick v. Ryan*, 540 U.S. 443, 452 (2004).[11]

Granted, § 1334 must remain within constitutional limits. *See Kline v. Burke Constr. Co.*, 260 U.S. 226, 234 (1922) (holding Congress "may give, withhold or restrict such

---

[11] Relatedly, 28 U.S.C. § 157 permits district courts to channel that jurisdiction to bankruptcy courts. "Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district." 28 U.S.C. § 157(a). This raises an interesting delegation issue—can Article III power be delegated by Article III courts (United States District Courts) to non-Article III courts (Bankruptcy Courts)? But that thorny issue is not before us, so we need not delve into it. *See generally* Kevin H. Kim, *A Constitutional Tango of Judicial Interpretation: The Instability of Bankruptcy Court Authority under Article III*, 34 EMORY BANKR. DEV. J. 561 (2018); Troy A. McKenzie, *Judicial Independence, Autonomy, and the Bankruptcy Courts*, 62 STAN. L. REV. 747 (2010); Anthony J. Casey & Aziz Z. Huq, *The Article III Problem in Bankruptcy*, 82 U. CHI. L. REV. 1155 (2015).

jurisdiction at its discretion, provided it be not extended beyond the boundaries fixed by the Constitution"); *Kiviti*, 80 F.4th at 533 ("Bankruptcy courts, as statutory creatures, have whatever power Congress *lawfully* gives them." (emphasis added)). So, a party like the Committee can certainly argue that Congress exceeded its powers in giving the bankruptcy court jurisdiction over a company that can pay its debts. But that question really is about Congress's power under Article I of the Constitution to make parties eligible for bankruptcy protection.[12] It's not a question of subject-matter jurisdiction.

Indeed, no court has ever adopted the Committee's view. As the bankruptcy court pointed out, "[t]here are simply no cases at any level (of which this court is aware) that explicitly endorse the proposition that bankruptcy courts do not have subject-matter jurisdiction unless a debtor has a sufficient degree of financial distress." *Bestwall*, 658 B.R. at 371. Even the *In re LTL Management* court didn't decide the case on subject-matter jurisdiction grounds. *See* 64 F.4th 84 (3d Cir. 2023). There, the Third Circuit determined that LTL—the company formed to own and resolve Johnson & Johnson's talc liabilities— was not in financial distress. *See id.* at 106–10. So, it dismissed LTL's bankruptcy petition as a bad faith filing. *See id.* at 110. Importantly, the court determined that it had jurisdiction of the appeal under 28 U.S.C. § 158(d)(2)(A) and that the bankruptcy court had jurisdiction

---

[12] The parties here advance policy reasons for and against the idea that only insolvent debtors should file for bankruptcy protection. But those arguments are best left for Congress. We traffic in law, not policy.

under § 157(a) and § 1334(a). *See id.* at 99. It said nothing about the Constitution or its bearing on subject-matter jurisdiction over bankruptcies.[13]

Perhaps the Committee's best authority is *Reid v. Covert*, 354 U.S. 1 (1957). There, the Supreme Court held that wives of military members could not be court-martialed but were instead entitled to regular civilian criminal jury trials. *Id.* at 18–19. It analyzed Article 2(11) of the Uniform Code of Military Justice, which lists whom the Code covers. *Id.* at 16. The Court determined that the Fifth and Sixth Amendments require criminal prosecutions to proceed in regular civilian jury trials, except for the "very limited and extraordinary jurisdiction" of military tribunals. *Id.* at 21. Thus, the Court held that the court-martial had no jurisdiction over civilians. *Id.* at 39–40.

But *Reid* never used the phrase "subject-matter jurisdiction." Indeed, the opinion seems to instead be concerned with *personal* jurisdiction. Perhaps *Reid* is a vestige of an

---

[13] Relatedly, at least five other circuits have rejected the argument that a debtor's ineligibility for bankruptcy is jurisdictional, and no court has ever accepted it. In *In re Zarnel*, 619 F.3d 156, 158 (2d Cir. 2010), the Second Circuit addressed whether a debtor who doesn't satisfy credit counseling requirements per 11 U.S.C. § 109(h) can commence a bankruptcy proceeding. The court held that "the restrictions of § 301 and § 109(h) are not jurisdictional, but rather elements that must be established to sustain a voluntary bankruptcy proceeding." *Id.* at 169. According to the court, "[r]estricting whether an individual may be a debtor either under the Bankruptcy Code in general or under a given chapter does not speak in jurisdictional terms or invoke the jurisdiction of the district court, delineated in 28 U.S.C. § 1344." *Id.*; *see also In re Trusted Net Media Holdings, LLC*, 550 F.3d 1035, 1046 (11th Cir. 2008) (en banc) (holding that the Bankruptcy Code's sections on involuntary cases do not implicate subject-matter jurisdiction); *In re McCloy*, 296 F.3d 370, 375 (5th Cir. 2002) (debtor eligibility under §§ 109(g) and 303(a) & (h) is not jurisdictional); *In re Marlar*, 432 F.3d 813, 815 (8th Cir. 2005) (failing to satisfy § 303(a) does not strip the court of subject-matter jurisdiction); *In re Hamilton Creek Metro. Dist.*, 143 F.3d 1381, 1385 n.2 (10th Cir. 1998) ("[N]one of the § 109(c) criteria is jurisdictional in nature.").

14

era in which jurisdictional arguments and phrases were used more liberally than they are today. Since then, the Supreme Court has warned against the overuse of jurisdictional labels. "Because the consequences that attach to the jurisdictional label may be so drastic, we have tried in recent cases to bring some discipline to the use of this term." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435 (2011); *see Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013) ("Tardy jurisdictional objections can [] result in a waste of adjudicatory resources and can disturbingly disarm litigants."); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125–27 (2014) (repudiating the "prudential standing" doctrine as a misnomer that has nothing to do with Article III standing). What *Reid* really seems to concern itself with is violations of the Fifth and Sixth Amendments.[14] *See* 354 U.S. at 19. It therefore shines little light on this appeal.

Our colleague in dissent writes passionately about his disagreement with the Texas two-step bankruptcy maneuver, citing his views on both policy and law. In fact, he insists we approve that maneuver in this opinion. But while his arguments address the merits of

---

[14] To be sure, the Committee raises Seventh Amendment challenges to the use of a § 524(g) trust. Bestwall responds that, under the Bankruptcy Code, a plan with a § 524(g) trust must be approved by 75% of the asbestos claimants. 11 U.S.C. § 524(g)(2)(B)(ii)((IV)(bb). It also points out that, under the Code, any personal injury claimant can opt out and pursue his claim outside of bankruptcy. 28 U.S.C. § 157(b)(5) ("The district court shall order that personal injury tort and wrongful death claims shall be tried in the district court in which the bankruptcy case is pending."); 28 U.S.C. § 1411(a) ("[T]his chapter and title 11 do not affect any right to trial by jury that an individual has under applicable nonbankruptcy law with regard to a personal injury or wrongful death tort claim."). This opinion should not be construed to resolve this question. Rather, this opinion merely explains that question is not one of subject-matter jurisdiction.

whether solvent debtors may seek bankruptcy protection, ours do not. And while ours address subject-matter jurisdiction, his do not.

The Committee has already had an opportunity to argue that solvent debtors are not entitled to bankruptcy protection. It lost that argument before the bankruptcy court. The Committee may have another chance to renew that argument—at plan confirmation. If it doesn't like the result, it will then have a final order to appeal. But as we have explained, challenges about a debtor's eligibility for bankruptcy protection are not jurisdictional, even when those challenges are constitutional. For that reason, now is not the time for these arguments. We repeat that this appeal presents only one narrow question—do federal courts have subject-matter jurisdiction over bankruptcy cases filed by debtors who may be able to pay their obligations? We have answered yes.

**III**.

For all these reasons, the opinion of the bankruptcy court is,

*AFFIRMED*.

AGEE, Circuit Judge, concurring:

I am pleased to concur fully in Judge Quattlebaum's opinion. I write separately to outline some of the errors in the dissent's discussion of bankruptcy precedent and the ramifications of its conclusion.

At the outset, I completely agree with Judge Quattlebaum's conclusion that this case is not "about whether a debtor's ability to pay its debts is relevant in a bankruptcy case," but rather whether "federal courts have subject-matter jurisdiction over bankruptcy cases filed by debtors who may be able to pay their obligations?" Maj. Op. at 9. Our friend in dissent views it differently, asserting that the majority's decision to rely on Section 1334 is an attempt to "sidestep th[e] constitutional issue," i.e., whether Congress exceeded its authority under the Bankruptcy Clause in crafting Section 1334. Diss. Op. at 30. As Judge Quattlebaum correctly explains, "that question really is about Congress's power under Article I of the Constitution to make parties eligible for bankruptcy protection," which is "not a question of subject-matter jurisdiction." Maj. Op. at 13. The dissent's view, however, goes beyond being an outlier and is based on neither historical fact nor precedent.

Our colleague in dissent argues that the majority fails to view "the meaning of the Framers' words . . . against the backdrop of history and tradition." Diss. Op. at 44. But the dissent's selective focus on out-of-context English and Colonial bankruptcy law is simply misplaced. The Supreme Court unequivocally explained nearly a century ago "that the power of Congress under the [B]ankruptcy [C]lause is not to be limited by the English or Colonial law in force when the Constitution was adopted." *Cont'l Ill. Nat. Bank & Tr. Co. of Chi. v. Chi., Rock Island & P. Ry. Co.*, 294 U.S. 648, 669 (1935). Instead, the Court

instructed that "the most satisfactory approach to the problem of interpretation . . . is to examine it in the light of the acts, and the history of the acts, of Congress which have from time to time been passed on the subject; for, like many other provisions of the Constitution, the nature of this power and the extent of it can best be fixed by the gradual process of historical and judicial inclusion and exclusion." *Id.* at 670 (cleaned up).

Through the Supreme Court's lens, the Official Committee of Asbestos Claimants' ("the Committee") read of the Bankruptcy Clause is not tenable. "From the beginning, the tendency of legislation and of judicial interpretation has been uniformly in the direction of progressive liberalization in respect of the operation of the bankruptcy power." *Id.* at 668. And directly to the point, the Supreme Court has recognized that "[t]he subject of bankruptcies is incapable of final definition. The concept changes." *Wright v. Union Cent. Life Ins. Co.*, 304 U.S. 502, 513 (1938). More recently, the Supreme Court reiterated that bankruptcy is difficult to define and includes "nothing less than 'the subject of the relations between [a] debtor and his creditors.'" *Siegel v. Fitzgerald*, 596 U.S. 464, 473–74 (2022) (quoting *Wright*, 304 U.S. at 513–14). Further, "[w]ithout purporting to define the full scope of the Clause," the Supreme Court "has interpreted the Clause to have granted plenary power to Congress over the whole subject of bankruptcies, and observed that the language used did not limit the scope of Congress' authority." *Id.* (cleaned up). So, the defining feature of "the subject of Bankruptcies" is its breadth. Against this backdrop, the dissent's myopic view of "the subject of Bankruptcies" is unsupported.

And even if we were to look to English and Colonial-era bankruptcy laws, we find little support for the dissent's construct. Under 18th-century "English law . . . it mattered

not whether the defendant was insolvent or otherwise" because involuntary proceedings were common and initiated by a creditor. *In re Klein*, 42 U.S. 277, 277 (1843); *cf.* Thomas E. Plank, *Bankruptcy & Federalism*, 71 Fordham L. Rev. 1063, 1094 (2002) (explaining that insolvency "was not always a direct condition to relief under . . . eighteenth-century bankruptcy legislation"). And at the dawn of our nation, "the American Colonies, and later the several States, had wildly divergent schemes for discharging debtors and their debts." *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 365 (2006). Nor does the Constitutional Convention provide any basis for the dissent's interpretation of the Bankruptcy Clause; the "Convention adopted the [Bankruptcy Clause] with very little debate," and Roger Sherman of Connecticut alone voted against it, "apparently because he was concerned that it would authorize Congress to impose upon American citizens the ultimate penalty for debt then in effect in England: death." *Id.* at 369. In sum, the "gradual process of historical and judicial inclusion and exclusion," which is our touchstone in this inquiry, plainly demonstrates that the Bankruptcy Clause was never intended to be restricted to those that are "actually bankrupt," whatever that undefined term purportedly means. *Cont. Ill. Nat'l Bank*, 94 U.S. at 670.

This highlights a significant concern with the dissent's conclusion because no one knows, including the dissent, what it means to be "actually bankrupt." As for the Committee, it fails to advance any concrete theory of the financial standard ostensibly required for debtors to be permitted to initiate a bankruptcy proceeding under its read of the Bankruptcy Clause. Throughout its briefing, the Committee uses constantly shifting terms to define a debtor who is not "actually bankrupt," none of which would enable

bankruptcy courts to adjudicate such a debtor with any specificity. *See* Opening Br. 17 (limiting it to debtors who "struggled to pay their debts"), 21 ("utterly incapable of repaying their debts"), 22 ("debtors who demonstrated an inability or . . . an unwillingness to repay their creditors"). Tellingly, it (and the dissent) *rejects* the one standard that is already well-known in bankruptcy law to gauge indebtedness: insolvency. *Id.* at 39. As the bankruptcy court below aptly pointed out, without "insolvency" as a touchstone, "determining whether a debtor is in financial distress would not be easy," and such a restrictive jurisdictional limitation is at odds with Congress's "policy decision to allow liberal access and encourage early filing" of bankruptcy petitions. *In re Bestwall LLC*, 658 B.R. 348, 376, 376–77 (Bankr. W.D.N.C. 2024).

No matter, according to the dissent. In its view, the definition is obvious; "debtors who [are] truly bankrupt" are "those unable or unwilling to pay their debts." Diss. Op. at 25. And yet the dissent fails to identify any historical precedent that—as a *jurisdictional* matter, lest we forget the question presented—applies to support its position. One would think in the 235 years of judicial precedent since the Founding there would be at least one case supporting the dissent's vague view; but there are none.[1]

Finally, the dissent attempts to differentiate Bestwall's bankruptcy proceeding from those it would deem appropriate for bankruptcy courts to hear. But the reality is that there are innumerable bankruptcy proceedings initiated by debtors who may not be "actually

---

[1] It bears repeating that the bankruptcy court already considered and denied the Committee's motion to dismiss for bad faith on the merits. *See In re Bestwall LLC*, 605 B.R. 43, 54 (Bankr. W.D.N.C. 2019).

bankrupt" under either the Committee's or the dissent's wide-ranging and ill-supported interpretations of the phrase.

First, based on the aforementioned discretion conferred through the Bankruptcy Clause, Congress has created various statutory bankruptcy schemes. While Chapter 9 bankruptcy requires insolvency, neither Chapter 7, Chapter 11, nor Chapter 13 includes such a requirement. *See* 11 U.S.C. § 109. Since 2020, over one million Chapter 11 and Chapter 13 bankruptcy cases have been filed. United States Courts, Bankruptcy Statistics Data Visualizations, https://www.uscourts.gov/data-news/reports/statistical-reports/bankruptcy-filing-statistics/bankruptcy-statistics-data-visualizations [https://perma.cc/8XL9-2L7D] (last visited July 23, 2025). Under the dissent's view, all of these would be unconstitutional and therefore void. Only the Chapter 9 proceedings for municipal bankruptcies would be constitutionally permissible. And Chapter 9 was only added to the Bankruptcy Code in 1978. Since 2020, only twenty-two Chapter 9 proceedings have been initiated. *Id.* Apparently these are the only bankruptcy proceedings that the dissent would deem constitutionally valid. Bankruptcy Reform Act of 1978, Pub. L. No. 95–598, § 201(a), 92 Stat. 2549, 2557 (1978) (codified as 28 U.S.C. § 151), *amended by* Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98–353, 98 Stat. 333 (1984) (current version at 28 U.S.C. § 151).

Second, in recent decades, many manufacturers of asbestos-containing products have faced overwhelming asbestos liability. In fact, by 1988, the problem was so widespread that Congress "allow[ed] a Chapter 11 debtor with substantial asbestos-related liability to establish and fund a trust that assumes the debtor's liability for 'damages

allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products.'" *Truck Ins. Exch. v. Kaiser Gypsum Co.*, 602 U.S. 268, 273 (2024) (quoting 11 U.S.C. § 524(g)(2)(B)(i)(I)). By 2011, sixty § 524(g) trusts had been established, paying about 3.3 million claims valued at a total of approximately $17.5 billion. U.S. Gov't Accountability Off., GAO-11-819, Asbestos Injury Compensation: The Role and Administration of Asbestos Trusts (2011). Since then, at least one more § 524(g) trust has been created: Bestwall's trust. Therefore, it is not accurate to characterize "Bestwall's bankruptcy filing [as] not at all typical." Diss. Op. at 28. In fact, it is akin to at least sixty other bankruptcy filings that resulted in § 524(g) trusts—which placed billions of dollars in the pockets of aggrieved plaintiffs. None of these cases have been challenged based on the dissent's newly-minted view, but all would be void under the dissent's construct and § 524(g) void ab initio.

The dissent simply disagrees with what has colloquially become known as the Texas Two-Step, which it characterizes as "a corporate sleight-of-hand maneuver." Diss. Op. at 24. Whatever the merits of that policy viewpoint, that is a matter within the province of the Congress, not the judiciary. Regardless, the Texas Two-Step's validity is irrelevant in evaluating whether federal courts have subject-matter jurisdiction over bankruptcy cases filed by debtors who may be able to pay their obligations. And, for the reasons ably explained by Judge Quattlebaum, the answer to that question is "no." I therefore fully concur in the majority opinion.[2]

---

[2] The dissent also chastises Bestwall for having filed a § 524(g) Chapter 11 proceeding and claims it has placed thousands of claimants at risk. Perhaps so. But in the

---

eight years this case has been pending, it is the Committee that has filed multiple challenges that have impeded progression to a plan and confirmation hearing. Namely, it has moved to dismiss the case as a bad faith filing under 11 U.S.C. § 1112(b) or, in the alternative, to transfer venue of the case to Delaware, which the bankruptcy court denied in full. And now—in the eleventh hour—the Committee moves to dismiss for lack of subject-matter jurisdiction. That begs the question, as we previously noted in *In re Bestwall LLC*, as to whether the delay relates to valid claims or the desire for perceived higher attorneys' fees should the claims be removed and be adjudicated outside of bankruptcy? 71 F.4th 168, 184 (4th Cir. 2023). Perhaps future review will answer that question.

KING, Circuit Judge, dissenting:

I respectfully dissent. Today, the majority approves a legal maneuver that fundamentally departs from the central purpose of our Nation's bankruptcy system, which has long been to provide a "fresh start" to the "honest but unfortunate debtor." *See Grogan v. Garner*, 498 U.S. 279, 286-87 (1991). Bestwall LLC — an entity manufactured in a corporate boardroom, rather than amid a genuine financial crisis — is no such debtor. It has access to billions of dollars in funding, and it has conceded on the record that it can satisfy all of its obligations in full. Yet it remains immune to tort liability while those harmed by its predecessor, Georgia-Pacific, must wait — some quite literally on borrowed time — for their tort claims to be heard and resolved.

Bestwall entered bankruptcy not because it was financially distressed, but because its parent corporation, Georgia-Pacific, sought to evade tort liability for harm caused by decades of manufacturing and selling dangerous products containing asbestos. Through a corporate sleight-of-hand maneuver known as the "Texas Two-Step," Georgia-Pacific restructured itself to isolate its asbestos liabilities into a newly created entity, Bestwall LLC. It then used that shell entity to file for Chapter 11 bankruptcy. As a result of Bestwall's bankruptcy proceedings, thousands of pending tort lawsuits, pursued by individuals dying from mesothelioma and other fatal diseases caused by its own products, have been halted. In effect, a financially healthy company has placed its tort liabilities to thousands of workers behind a wall of bankruptcy protection, without itself undergoing the scrutiny, transparency, or risk that bankruptcy typically entails.

24

Bestwall's entry into Chapter 11 was a strategic decision by lawyers and executives, designed to pause active tort litigation, consolidate those claims in a single forum, and extract favorable settlement terms from asbestos victims through delay. This is a far cry from the bankruptcy system that the Founders envisioned when they constitutionally authorized Congress to create "uniform Laws on the subject of Bankruptcies." *See* U.S. Const. art. I, § 8, cl. 4. At the time of the Founding, the protections of bankruptcy were available only to debtors who were truly bankrupt — that is, those unable or unwilling to pay their debts. Bankruptcy was meant to provide an orderly process for resolving financial distress, not a legal shield for solvent corporations seeking to escape liability. It was not meant to extend the protections of bankruptcy to profitable entities facing mass liability for tort claims. Indeed, nothing in the Constitution permits Congress, or the federal courts, to allow a bankruptcy to be wielded as a strategic weapon by the powerful to avoid accountability to the harmed, as Bestwall and Georgia-Pacific have done here.

I cannot join the majority in allowing this result. I would instead hold that the bankruptcy court lacked subject-matter jurisdiction to entertain Bestwall's bankruptcy petition, and would reverse its denial of the Committee's motion to dismiss. Anything less fails the thousands of asbestos victims whose claims remain frozen while the entity that should be responsible for their injuries continues to operate unencumbered.

## I.

The majority opinion has recited the lengthy history of Georgia-Pacific's various corporate maneuvers designed to insulate itself from serious tort liability. It is crucial,

however, to emphasize the very real cost of allowing our Nation's bankruptcy system to be weaponized against tort victims as a tool for delay and leverage. Indeed, the suffering of those victims must remain central to any honest assessment of what is at stake in this appeal.

Unlike in many Chapter 11 bankruptcy proceedings, the Claimants here are not corporate lenders or institutional creditors. They are ordinary Americans who have spent their working lives installing drywall, laying insulation, cutting pipe, and simply returning to their homes each day to family members who laundered the toxic fibers from their clothing. They are factory workers, veterans, tradespeople, and laborers. They are also widows, adult children, and family members of the deceased victims who now carry forward claims on behalf of loved ones who have died from asbestos-related diseases.[1]

Sadly, many of these Claimants suffer from mesothelioma — a rare, incurable cancer that is almost exclusively caused by asbestos exposure. Others have been diagnosed with asbestosis, lung cancer, or other severe respiratory diseases linked to asbestos fibers inhaled on the job, in their homes, or through second-hand contact. And while these individual Claimants are fighting the effects of horrific diseases caused by asbestos exposure, they have now been forced to fight through a legal process that has been

---

[1] The Official Committee of Asbestos Claimants (the "Committee") represents the injured parties (the "Claimants") in this appeal. The Committee includes personal representatives from across the country, each of whom is connected to a victim who suffered from, or died of, an asbestos-related illness. Notably, each of the six living Claimants appointed to the Committee have died while Bestwall's bankruptcy filing has been pending. Those Claimants are now represented by the administrators of, or successors to, the deceased individuals' estates.

indefinitely suspended by Bestwall's bankruptcy filing. Their right to pursue justice through the tort system of the civil courts — a right that is deeply rooted in the laws of our Nation and grounded in the most basic principles of accountability — has been put on hold by a solvent and profitable enterprise acting through a wholly manufactured bankruptcy proceeding.

The Claimants' fights began where I believe they should end — not in a bankruptcy court, but in the courts of our Nation's civil justice system. Faced with debilitating illnesses and premature deaths, the Claimants sought to bring their tort claims before a jury of their peers. As these individuals began to seek justice, Bestwall — along with its sister entity, Georgia-Pacific — faced a rising tide of asbestos-related lawsuits.[2] But at no point during this time did Bestwall's or Georgia-Pacific's financial health falter. Indeed, in the year before Bestwall's bankruptcy filing, Georgia-Pacific paid its parent company, Koch Industries, a 2 billion dollar dividend. That is hardly the conduct of a debtor in distress.

Nevertheless, in 2017, Georgia-Pacific undertook a corporate restructuring under Texas law. It split itself into two entities: a "new" Georgia-Pacific, which received virtually all of the profitable business assets, and Bestwall, which inherited all asbestos liabilities. Shortly after this restructuring, Bestwall filed for Chapter 11 bankruptcy. That bankruptcy filing brought with it a powerful legal shield — an automatic litigation stay — which halted

---

[2] When Bestwall filed for bankruptcy in 2017, there were about 22,000 active tort claims pending against it, plus an additional 13,300 inactive claims. The Committee also estimates that approximately 21,300 newly diagnosed individual claimants would have pursued compensation from Bestwall but for the bankruptcy stay.

all ongoing asbestos litigation in the various state and federal courts against Bestwall and Georgia-Pacific.

Bestwall's bankruptcy filing was not at all typical, in that it did not involve a business entity on the brink of financial ruin or insolvency. Bestwall entered bankruptcy with a financial safety net, in the form of a "Funding Agreement" with Georgia-Pacific that ensures Bestwall can continue to access Georgia-Pacific's very substantial assets. As part of the Funding Agreement, Georgia-Pacific agreed to foot the bill for all expenses related to Bestwall's bankruptcy and asbestos liability, including funding Bestwall's § 524(g) asbestos trust.[3]

At the time of Bestwall's bankruptcy filing, Georgia-Pacific's assets were estimated at more than 28.3 billion dollars. And today, Georgia-Pacific remains a multi-billion-dollar company with a long and stable record of profitability. It manufactures widely recognized consumer goods like Brawny paper towels, Angel Soft toilet paper, Dixie cups, and Quilted Northern tissues, among others, and also maintains extensive operations in pulp and paper products, building materials, and chemicals. It continues to generate substantial profits, wholly insulated from the asbestos liabilities it has offloaded onto Bestwall.

---

[3] The Bankruptcy Code allows a Chapter 11 debtor with significant asbestos liabilities to create a trust to resolve both current and future claims. *See* 11 U.S.C. § 524(g). Under this statutory provision, the debtor may fund a trust that assumes responsibility for asbestos-related damages. *Id.* § 524(g)(2)(B)(i). Once established, § 524(g) channels all such claims into the trust by "enjoin[ing] entities from taking legal action for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery" for claims "to be paid in whole or in part by [the] trust." *Id.* § 524(g)(1)(B). In short, § 524(g) bars asbestos claimants from pursuing separate legal actions to recover directly from the debtor.

This is not a case, then, in which bankruptcy was invoked to rescue a failing business enterprise. Nor is it a case in which asset preservation was necessary to ensure equitable distribution among creditors. On the contrary, Bestwall's entry into Chapter 11 bankruptcy was a strategic decision, designed to pause active litigation, consolidate claims in a single forum, and pressure tort victims into favorable settlements through delay. The effect — and the goal — has been to disempower the asbestos Claimants, forcing them to wait out the legal process while the debtor and its affiliates continue to amass record-setting profits outside the bankruptcy estate.

The human cost of this bankruptcy delay cannot be overstated. Asbestos-related diseases progress swiftly and painfully. The window for meaningful legal relief is, for many victims, heartbreakingly short. In the seven years since Bestwall filed for bankruptcy, about 25,000 Claimants have died without any resolution of their claims. Approximately 10,000 Claimants have died from mesothelioma — a harrowing disease that is nearly always fatal within 18 months to two years of diagnosis. Still others have seen their families saddled with medical debt and left without recourse. Indeed, not one of about 56,000 plaintiffs has been able to pursue his or her claims against Bestwall or Georgia-Pacific for causing asbestos-related diseases. Meanwhile, Bestwall and its sister corporation, Georgia-Pacific, have enjoyed the protections of bankruptcy alongside substantial and stable profits.

II.

The Claimants argue — correctly, in my view — that this case presents a fundamental threshold question of subject-matter jurisdiction. Their contentions warrant more than a passing glance, for they strike at the constitutional boundary between what Congress may regulate and what federal courts may adjudicate. Yet the majority declines to engage with the Claimants' jurisdictional contentions, instead labelling those arguments as a garden-variety challenge to a statute's constitutionality underpinned by "policy reasons." *See, e.g.*, *ante* at 13 n.12.

The central flaw, however, in the majority's reasoning is its assumption that Congress's broad grant of jurisdiction under 28 U.S.C. § 1334 can override the Constitution's more limited delegation of power under the Bankruptcy Clause. To be sure, Section 1334 grants jurisdiction over cases "under Title 11." *See* 28 U.S.C. § 1334(a). Crucially, this "authority is not freewheeling." *See Trump v. CASA, Inc.*, 606 U.S. ___, slip op. at *6 (June 27, 2025). Section 1334 does not — and cannot — independently determine what constitutes a "case" that Congress may authorize under Article I. Nor can the statute override the Constitution's limited delegation of power under the Bankruptcy Clause, which empowers Congress to enact "uniform Laws on the subject of Bankruptcies." *See Bowles v. Russell*, 551 U.S. 205, 212 (2007) ("Within constitutional bounds, Congress decides what cases the federal courts have jurisdiction to consider.").

The majority's decision to sidestep this constitutional issue has immediate and troubling implications. By declining to squarely address whether Bestwall's petition satisfies the Bankruptcy Clause's jurisdictional limits, the majority permits bankruptcy

jurisdiction to be extended to parties who are not actually bankrupt — and, in doing so, open the courthouse doors to a new kind of forum shopping by solvent corporations. Worse still, it allows the extraordinary powers of the bankruptcy court — including the automatic stay and the discharge of liabilities — to be deployed against injured individuals who have little say in how the process unfolds.

## III.

Bankruptcy has always been understood as an extraordinary remedy, reserved for those in genuine financial distress. At the time of the Founding, and for well over a century thereafter, bankruptcy was available only to those who could not pay their debts. It was not available to those who preferred not to satisfy those debts, or those whose financial resources remained vast but who sought a more favorable forum. It was against this backdrop that the Framers of the Constitution granted Congress the power, through the Bankruptcy Clause contained in Article I, to enact "uniform laws on the subject of Bankruptcies." *See* U.S. Const., art. I, § 8.

## A.

As the Supreme Court has instructed, our understanding of bankruptcy must "accord with history and faithfully reflect the understanding of the Founding Fathers." *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535-36 (2022) (internal quotation marks and alterations omitted). In exercising jurisdiction over a debtor — like Bestwall — that is not actually bankrupt, however, the bankruptcy court endorsed an unbounded reading of § 1334 that is inconsistent with the Constitution's text and our Nation's legal traditions.

31

And in affirming the bankruptcy court's decision today, the majority accepts that bankruptcy jurisdiction exists simply because Congress said so — that is, because 28 U.S.C. § 1334 confers jurisdiction over any case "arising under" or "related to" the Bankruptcy Code.

But "history and tradition," not "Congress's say-so," inform the scope of the Bankruptcy Clause, and therefore constrain Congress's authority to enact laws granting jurisdiction to the bankruptcy courts. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 424-26 (2021). And while Congress is entitled to create statutory jurisdictional provisions like § 1334, it cannot enlarge the substantive scope of the "subject of Bankruptcies" beyond the limits established under the Constitution. *See Bowles v. Russell*, 551 U.S. 205, 212 (2007) ("Within constitutional bounds, Congress decides what cases the federal courts have jurisdiction to consider.").

To discern those limits, we must first examine the relevant language of the Constitution itself and, more specifically, the Bankruptcy Clause. *See Food and Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024) ("[W]e begin as always with the precise text of the Constitution."); *see also Altman v. City of High Point*, 330 F.3d 194, 200 (4th Cir. 2003) ("[O]ur inquiry begins with the text of the Constitution."). Importantly, our reading of the Bankruptcy Clause must be informed by the very nature of the Constitution — that is, its status as a "written instrument" with provisions that carry meaning rooted in the historical moment in which they were adopted, as well as the legal and societal traditions that informed their drafting. *See South Carolina v. United States*, 199 U.S. 437, 448 (1905) ("The Constitution is a written instrument. As such, its meaning

does not alter. That which it meant when adopted, it means now."). Our role in its interpretation, then, is not to update or revise the Constitution to meet modern preferences, but to faithfully apply the meaning its provisions bore when it was ratified. *See Lewis v. Casey*, 518 U.S. 343, 367 (1996) (Thomas, J., concurring) (cautioning against courts "infusing the constitutional fabric with our own political views").

We are thus called upon to consider the ordinary public meaning of a phrase which is otherwise undefined in the text of the Constitution: "the subject of Bankruptcies." But, as Chief Justice Marshall put it two centuries ago, we must always recall that "the enlightened patriots who framed our constitution, and the people who adopted it, must be understood to have employed words in their natural sense[.]" *See Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 188 (1824). Thus, "[t]he proper course of constitutional interpretation is to give the text the meaning it was understood to have at the time of its adoption by the people." *See Boumediene v. Bush*, 553 U.S. 723, 843 (2008) (Scalia, J., dissenting).

At the time of the Founding, "bankruptcy" had a specific and well-understood legal meaning. Rooted in English law and early American practice, the term referred to a narrow legal framework that applied to merchants or traders who were unable or unwilling to pay their debts. The typical debtor in bankruptcy was financially distressed — indeed, insolvent — and bankruptcy provided an orderly process for liquidating assets and discharging debts. *See Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 185 (explaining that early bankruptcy provisions were directed at "unfortunate and meritorious debtors"). In that regard, bankruptcy was not a general-purpose tool for managing financial risk or

reorganizing a large corporation or business entity. It was instead an extraordinary remedy for situations of real economic distress.

B.

Crucially, when a word is "transplanted from another legal source," it "brings the old soil with it." *See Hall v. Hall*, 584 U.S. 59, 73 (2018) (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947)). Indeed, "the language of the [C]onstitution, as has been well said, [can]not be understood without reference to the common law." *See United States v. Wong Kim Ark*, 169 U.S. 649, 654 (1898). The Framers of the Constitution "were familiar with the contemporary legal context" — that is, the English bankruptcy system — "when they adopted the Bankruptcy Clause." *See Central Va. Comm. Coll. v. Katz*, 546 U.S. 356, 362 (2006). Thus, our interpretation and application of the Constitution's text "is necessarily influenced by the fact that its provisions are framed in the language of the English common law, and are to be read in the light of its history." *See Smith v. Alabama*, 124 U.S. 465, 478 (1888).

1.

We begin — just as our Founding Fathers did — with English bankruptcy law. From its inception, England's bankruptcy system treated debtors not as beneficiaries of equitable relief but as malefactors to be disciplined for misconduct. More specifically, the English bankruptcy system was limited to involuntary proceedings against merchants or traders who had committed "acts of bankruptcy" — that is, persons "who craftily obtaining into their hands great substance of other men's goods, do suddenly flee to parts unknown, or keep their houses, not minding to pay or restore to any of their creditors their debts and

34

duties[.]" *See* 34 & 35 Hen. 8, ch. 4 (1542-1543) (Eng.); *see also* 2 William Blackstone, Commentaries *474 (indicating that this citation was to "the first statute made concerning any English bankrupts"). In short, England's earliest bankruptcy statute targeted commercial fraud and absconding debtors, not any well-capitalized merchants or solvent actors.

Over time, the English system evolved to incorporate limited debtor protections, including an eventual discharge for those who cooperated with the court proceedings and were deemed to be "honest." *See, e.g.*, An Acte for the Better Reliefe of the Creditors Againste Suche as Shall Become Bankrupte, 1 Jac., ch. 15 (1603-1604) (Eng.); An Acte for the Discripceon of a Banckrupt and Releife of Credytors, 21 Jac., ch. 19 (1623-1624) (Eng.). But the defining feature of English bankruptcy law remained its focus on debtors that were unable to pay — that is, individuals or entities that were actually insolvent, even if insolvency was not strictly defined by statute. Plainly, bankruptcy was never a forum-shopping device or a means of centralized dispute resolution; it was a last resort for a debtor in financial ruin or for creditors seeking equitable distribution of a debtor's remaining estate.

A separate and discrete set of "insolvency" laws addressed non-trader and non-merchant debtor relief. *See generally* 1 Collier on Bankruptcy 20.01; *see also* 2 William Blackstone, Commentaries *475-77 (discussing who qualified as a "trader"). But while insolvency and bankruptcy were not identical concepts, they were inextricably linked. Indeed, despite the "difficulty of discriminating with any accuracy between insolvent and bankrupt laws," the bankruptcy laws "contain[ed] those regulations which [were] generally

found in insolvent laws," and the insolvency laws "contain[ed] those which [were] common to a bankrupt law."  *See Sturges v. Crowninshield*, 17 U.S. (4 Wheat.) 122, 195 (1874).  Put otherwise, "the line of partition between" bankruptcy and insolvency was "not so distinctly marked as to enable any person to say, with positive precision, what belongs exclusively to the one, and not to the other class of law."  *Id.* at 194.

In sum, the early bankruptcy and insolvency statutes each tied relief to a debtor's inability to meet fixed financial obligations.  And those laws distinguished clearly between those who were simply facing litigation, and those who were truly insolvent or unable to pay their debts as they came due.  A debtor who could pay his debts, therefore, was not what the Founders would have ever considered "bankrupt."  *See, e.g.*, *In re Reiman*, 7 Ben. 455, 494-94 (1874) (describing bankruptcy "for the benefit and relief of creditors and their debtors, in cases in which the latter are unable or unwilling to pay their debts").  Only those "grown bankrupt like a broken man," "who hath not money," could seek relief through bankruptcy.  *See* William Shakespeare, Richard II, act II, sc. 1, ls. 267, 269.

2.

Colonial America inherited much of the English bankruptcy regime, but adapted it in various ways.  Because the English Parliament did not enact a comprehensive insolvency framework for the colonies, each colonial legislature developed its own insolvency or "debtor-relief" laws.  Those laws were often more lenient than the English bankruptcy statutes and reflected local economic realities, including a heavy reliance on credit and the absence of strong centralized courts.  *See generally* Bruce E. Mann, *Republic of Debtors: Bankruptcy in the Age of American Independence* 23-25 (2002).

Colonial insolvency laws were primarily designed to relieve individual debtors, many of whom were farmers, laborers, or small tradespeople. Such laws often provided for voluntary proceedings, allowing debtors to come forward, surrender their assets, and seek release from imprisonment or execution of judgment. *See, e.g.*, 1 *Acts and Resolves of the Province of Massachusetts Bay* (21 vols., Boston, 1869-1922) (providing for release from debtor's prison in Colonial Massachusetts); *Colonial Laws of New York* 2, 753-56 (providing for assignment of servitude to discharge of "petty debtors"). But even in the colonies, the availability of such remedies was contingent on insolvency — that is, on a debtor's factual inability to satisfy his outstanding obligations. *See, e.g.*, *See State v. Gee*, 1 Bay 163, 163 (S.C. Ct. Com. Pl. 1791) (interpreting 1759 South Carolina statute as an "insolvent debtor's law . . . intended only for the benefit of those who by accident, losses, or other misfortunes, are rendered incapable of paying their debts, and by that means had become objects of compassion"); *see also, e.g.*, *Colonial Laws of New York* 2, 669-75 (explaining that debtors made insolvent "by losses & other Misfortunes" were "the proper objects of publick compassion"). As in England, solvent individuals simply had no claim to protection under such laws. They remained subject to the full force of the ordinary legal processes.

Moreover, because there was no national bankruptcy system under the Articles of Confederation, debtors and creditors alike were subjected to a patchwork of inconsistent and sometimes conflicting laws across the several states. This lack of uniformity created confusion, promoted forum shopping, and invited inequitable outcomes. A debtor who was protected in one jurisdiction could be imprisoned in another. Creditors in different

jurisdictions might receive radically different shares of the same insolvent estate. Still, the varied "insolvent laws of [the] many . . . states" were first and foremost enacted for the relief of "unfortunate" and "honest" debtors, and thus were narrowly tailored to address real economic failure, not procedural or tactical advantages sought by solvent debtors. *See Crowninshield*, 17 U.S. (4 Wheat.) at 203.

3.

It was against this backdrop that the Founders included the Bankruptcy Clause in the Constitution. As James Madison explained, this Clause responded to a need for uniformity in the laws governing insolvency and bankruptcy. *See* The Federalist No. 42, at 282 (James Madison) (Clinton Rossiter ed., 1961); *see also Katz*, 546 U.S. at 365-66. But neither the inclusion of the Bankruptcy Clause, nor its delegation to Congress of "power . . . to establish uniform laws on the subject of bankruptcies throughout the United States," redefined bankruptcy itself. *See Int'l Shoe Co. v. Pinkus*, 278 U.S. 261, 265 (1929). The word "bankruptcy," as used in the Constitution, retained the same meaning it had acquired through the English and colonial usage. Indeed, "those from whom the word was doubtless transferred into the constitution, treat it as exactly commensurate with insolvency." *See Kunzler v. Kohaus*, 5 Hill 317, 320 (N.Y. 1843).

Founding-era dictionaries reflecting the ordinary usage of legal and economic terms confirm that the concepts of "bankruptcy" and "bankrupt" were tightly bound to the condition of insolvency — that is, a debtor's inability to pay his debts. *See, e.g.*, William Perry, *The Royal Standard English Dictionary* 51 (1777) (defining a "bankrupt" as "one who cannot pay his debts"); *see also, e.g.*, Samuel Johnson, *Dictionary of the English*

38

*Language* (1773) (defining "Bankruptcy" as "[t]he state of a man broken, or bankrupt"); 1 Thomas Sheridan, *Dictionary of the English Language* (4th ed. 1797) (defining "bankrupt" and "bankruptcy" as "[t]he state of a man" "in debt beyond the power of payment"). These definitions plainly reflect the public understanding of bankruptcy as "the act of declaring oneself a bankrupt," or "[b]roken for debt, incapable of payment, insolvent." *See* John Ash, *New and Complete Dictionary of the English Language* (1775) (defining a "bankrupt" and "bankruptcy"); *see also District of Columbia v. Heller*, 554 U.S. 570, 605 (2008) (explaining that "the examination of a variety of legal and other sources to determine *the public understanding* of a legal text in [a] period . . . is a critical tool of constitutional interpretation").

## C.

### 1.

These sources consistently reflect two key features:  First, that bankruptcy primarily involved commercial actors, such as merchants or traders, and second, that it required financial failure or nonpayment.  Notably, none of these relevant authorities define bankruptcy as a mechanism for strategic liability management by solvent entities, nor do they suggest that a party with the means to pay its debts could be properly described as "bankrupt."  The uniformity in the term's usage is particularly significant given the broader legal context, as early bankruptcy legislation presumed a debtor's insolvency as a precondition for relief.

The Founders, in using the term "Bankruptcies," would have undoubtedly drawn upon that established understanding.  After all, "[t]he Constitution was written to be

understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning." *See United States v. Sprague*, 282 U.S. 716, 731 (1931). This historical understanding should constrain the modern interpretation of the Clause and the permissible scope of federal bankruptcy jurisdiction. *See, e.g.*, *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 813-14 (2015) (using Founding-era dictionaries to ascertain original meaning). Thus, when read in light of contemporary dictionary definitions, the Bankruptcy Clause clearly refers to a legal regime designed only for insolvent debtors, not solvent corporations seeking to evade mass tort liability through complicated corporate restructuring.

At bottom, the historical record contains no suggestion that Congress would have the power to legislate a bankruptcy remedy for a solvent entity, or that the federal courts could ever exercise jurisdiction over bankruptcy petitions not grounded in genuine financial distress. In truth, the historical evidence points in a markedly different direction. As Justice Story explained, the "satisfactory . . . description of a bankrupt law" at the time of the Founding was "a law for the benefit and relief of creditors and debtors, in cases in which the latter are unable or unwilling to pay their debts." *See* 2 Joseph Story, *Commentaries on the Constitution* § 1113, at 50 n.3 (Thomas M. Cooley ed., 4th ed. 1873). And so "a law on the subject of bankruptcies," as contemplated by the Constitution, was "a law making provisions for cases of persons failing to pay their debts." *Id.*

### 2.

Early American bankruptcy statutes consistently reinforce this understanding. The Bankruptcy Act of 1800 — the first national bankruptcy law passed after Ratification —

applied only to merchants and traders, and "was in many respects a copy of the English bankruptcy statute then in force." *See Katz*, 546 U.S. at 373. The Act provided no protection to debtors who remained able to meet their obligations and, "like the English law, was conceived in the view that the bankrupt was dishonest." *See Continental Illinois Nat'l Bank & Trust Co. v. Chicago, Rock Island & Pac. Ry. Co.*, 294 U.S. 648, 670 (1935).

But, consistent with the Founding-era view of bankruptcy as a remedy for the honest but unfortunate debtor, Congress progressively extended voluntary bankruptcy to non-merchants and non-traders burdened by debt and in need of relief. *See Continental Illinois*, 294 U.S. at 670-71 (explaining that "the [Bankruptcy] act of 1841 and the later acts proceeded upon the assumption that [a debtor] might be honest but unfortunate"). Indeed, the "primary purposes of these acts [were] to 'relieve the honest debtor from the weight of oppressive indebtedness, and permit him to start afresh[.]'" *Id.* at 670. And although the early American bankruptcy statutes were repealed and later replaced with broader legislation, the constitutional baseline for the remedy of bankruptcy remained tied to insolvency — that is, "consistent with the principles that underpin the Nation's [bankruptcy] tradition." *See United States v. Rahimi*, 602 U.S. 680, 681 (2024).

What emerges from this relevant history is a consistent and constitutionally significant principle: Bankruptcy, as the Founders understood it, was meant for the financially distressed. It was never intended as a mechanism by which profitable enterprises could transform an honest but unfortunate debtor's shield into a sword for solvent corporations to cut down the rights of injured Americans. To be sure, the constitutional power to legislate on "the subject of Bankruptcies," set forth in Article I,

section 8 — i.e., the Bankruptcy Clause as ratified — was anchored in this well-developed legal tradition, one that aimed to ensure fairness among creditors while providing relief to debtors who were truly in distress.  This tradition, as illuminated by "the uniform popular acceptation of the word from the earliest times and in all English countries," reveals how the Bankruptcy Clause should be interpreted:  To grant Congress the "power to establish uniform laws on the subject of any person's general inability to pay his debts throughout the United States." *See Kunzler*, 5 Hill at 321.

In sum, our history and tradition does not support the majority's extension of bankruptcy protections to solvent tort defendants who seek a strategic advantage over their creditors and victims.  When bankruptcy is used in that manner, it departs not only from historical practice but from the constitutional limits of the Bankruptcy Clause itself.

## D.

It bears repeating:  Bestwall is not a debtor in distress.  It is a vehicle engineered by Georgia-Pacific to carry its asbestos liabilities while insulating its profitable operations. Bestwall possesses no business operations, generates no independent income, and exists solely to carry forward asbestos liabilities that Bestwall can fully satisfy through a Funding Agreement backed by Georgia-Pacific's billions of dollars in assets.  That Funding Agreement, by Bestwall's own admission, guarantees that it can meet its obligations in full. *See In re Bestwall*, 658 B.R. 348, 355 (Bankr. W.D.N.C. 2024).

In substance, then, Bestwall's financial position has never triggered the sort of crisis the Bankruptcy Clause was designed to address.  Its filing in the Western District of North Carolina was not a response to economic distress, but rather an effort to impose a federal

forum and automatic stay over thousands of state law tort claims. And while Congress has created statutory mechanisms to manage mass-tort bankruptcies, such statutes can only operate within the limits of Article I. Indeed, those statutes cannot transform the scope of the Bankruptcy Clause itself. Bestwall's bankruptcy may be clever, but it is not constitutional. And it is not bankruptcy as the Framers understood it.

The bankruptcy court, however, failed to engage with those constitutional boundaries. Although it correctly ascertained that the Claimants' contentions were challenges to its subject-matter jurisdiction, it then reasoned that there is "no direct evidence" about what "concept of bankruptcy" the Framers had in mind. The court thus determined that "there is no direct evidence that the Framers intended to require financial distress for bankruptcy jurisdiction." *See In re Bestwall LLC*, 658 B.R. at 365.

In so ruling, the bankruptcy court justified its reading of the Bankruptcy Clause by focusing on various post-ratification sources, and relied on Congressional policy statements that espoused the "liberalization of access" to bankruptcy courts in order to "remove barriers to voluntary petitions." *See In re Bestwall LLC*, 658 B.R. at 367 (citing Report of the Commission on the Bankruptcy Laws of the United States, H.R. Doc. No. 93-137, pt. 1, at 75 (1973)). And the court erroneously concluded that it possessed subject-matter jurisdiction over Bestwall's bankruptcy because "there are simply no cases at any level (of which this court is aware) that explicitly endorse the proposition that bankruptcy courts do not have subject matter jurisdiction unless a debtor has a sufficient degree of financial distress." *Id.* at 371.

It is true that "[i]n many cases, judicial precedent informs or controls the answer." *See Rahimi*, 602 U.S. at 717 (Kavanaugh, J., concurring). And, "[a]bsent precedent, there are only two potential answers" to the question of constitutional interpretation: "history or policy." *Id.* The bankruptcy court chose the latter option, i.e., "policy," and thus departed from the touchstone of constitutional interpretation — treating "[h]istory [as] the essential guidepost" to a constitutional inquiry. *See Elhady v. Kable*, 993 F.3d 208, 219 (4th Cir. 2021). It thus failed to properly assess the Constitution's text, as we have instructed, "against its historical and legal backdrop." *See Bianchi v. Brown*, 111 F.4th 438, 448 (4th Cir. 2024) (en banc).

To be sure, proper constitutional interpretation "doesn't require 'a law trapped in amber,'" and "demand[s] only a historical 'principle, not a mold." *See Bianchi*, 111 F.4th at 475 (Diaz, C.J., concurring) (quoting *Rahimi*, 602 U.S. at 739-40 (Barrett, J., concurring)). It does, however, require that the meaning of the Framers' words be viewed against the backdrop of history and tradition, rather than "contemporary, evolving beliefs about what kinds of suits should be heard in federal court." *See TransUnion*, 594 U.S. at 425. To that end, the bankruptcy court erroneously relied on congressional policy in ruling that Bestwall's bankruptcy proceeding was within its subject-matter jurisdiction. It thus impermissibly broadened its view of subject-matter jurisdiction outside of its Constitutional bounds, thereby allowing our Nation's bankruptcy system to be weaponized against thousands of tort victims, as simply a tool for delay and leverage.

That result is not what the Bankruptcy Clause was designed to permit. If the term "Bankruptcies" has a fixed constitutional meaning, it cannot be stretched to include solvent

tort defendants in civil lawsuits seeking a tactical advantage over severely injured plaintiffs. If that were possible, then any solvent defendant in any mass tort case could file for Chapter 11 to stall litigation and corral claimants into a trust. And any profitable business facing legal risk could simply offload its tort liabilities into a subsidiary or sister entity, file for bankruptcy, and invoke an automatic stay of litigation, not because it is unwilling or unable to pay its debts, but because it prefers to evade the scrutiny of a jury — as required by the Seventh Amendment — and shirk accountability for its civil wrongdoing.

Put simply, the Bankruptcy Clause does not authorize a solvent and profitable corporation to secure a cloak of immunity from accountability. And it does not authorize the federal courts to sanction an artificial bankruptcy proceeding devoid of any real financial distress. The Bankruptcy Clause should not tolerate a system where a rich and powerful corporate defendant can invoke federal bankruptcy jurisdiction in order to suppress the tort claims of sick and dying victims and evade responsibility for harms caused.

## IV.

I would reverse the judgment of the bankruptcy court, thereby dismissing Bestwall's bankruptcy filing. By treating Bestwall's petition as a bankruptcy filing within its jurisdiction, the bankruptcy court — and now this Court — have given their imprimatur to a corporate strategy that mocks the structure of Article I, subverts our Nation's history and tradition of bankruptcy, and inflicts grievous harm on our fellow Americans. The

majority's failure to confront the constitutional infirmity at the heart of this appeal does more than ratify the abuse of our bankruptcy system. It reduces the Constitution's careful allocation of legislative power relating to "Bankruptcies" to an afterthought. In doing so, it rewrites the Constitution to suit the needs of a profitable tortfeasor. And it strips tens of thousands of asbestos victims of their Seventh Amendment right to have their claims heard before a jury of their peers.

As Justice Kavanaugh has correctly emphasized, "[h]istory, not policy, is the proper guide." *See Rahimi*, 602 U.S. at 717 (Kavanaugh, J., concurring). The Framers gave Congress the power to legislate in the area of bankruptcy so that it could enact a uniform system capable of resolving genuine cases of financial distress and insolvency. Adhering to this original understanding is not optional, as it is the anchor that holds the bankruptcy system to its constitutional moorings.

I respectfully dissent.