No. 24-1493

# United States Court of Appeals for the Fourth Circuit

BESTWALL LLC,

*Debtor-Appellee,*

THE OFFICIAL COMMITTEE OF ASBESTOS CLAIMANTS OF BESTWALL LLC,

*Creditor-Appellant.*

On Direct Appeal from the United States Bankruptcy Court
for the Western District of North Carolina, Case No. 17-31795 (LTB)

**BRIEF OF PROFESSOR D. THEODORE RAVE AS *AMICUS CURIAE* IN SUPPORT OF APPELLANT'S PETITION FOR REHEARING AND REHEARING *EN BANC***

Jonathan S. Massey
Bret R. Vallacher
MASSEY & GAIL LLP
1000 Maine Ave. SW, Suite 450
Washington, D.C. 20024
Telephone: (202) 652-4511
jmassey@masseygail.com
bvallacher@masseygail.com

*Counsel for Amicus Curiae*

September 22, 2025

# TABLE OF CONTENTS

                                                                               **Page**

INTEREST OF *AMICUS CURIAE* ................................................................... 1

ARGUMENT ................................................................................................. 2

    I.    FILING FOR BANKRUPTCY PROVIDES DEFENDANTS WITH A STAY OF ALL LITIGATION. ................................................................................... 4

    II.   BANKRUPTCY ALLOWS DEFENDANTS TO IMPOSE RESOLUTION ON EVEN THE STRONGEST PLAINTIFFS. ........................................................... 5

   III.   BANKRUPTCY ALLOWS MASS TORT DEFENDANTS TO FORUM SHOP. ........... 8

   IV.   THE TEXAS TWO-STEP EXACERBATES THE DISPARITY IN LEVERAGE BETWEEN MASS TORT DEFENDANTS AND PLAINTIFFS. ........................ 9

CONCLUSION ............................................................................................ 12

CERTIFICATE OF COMPLIANCE ................................................................. 13

CERTIFICATE OF FILING AND SERVICE ..................................................... 14

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Conner v. Long*,
   104 U.S. 228 (1881)................................................................................................11

*In re Aldrich Pump LLC*,
   No. 20-30608, 2021 WL 3729335 (Bankr. W.D.N.C. Aug. 20, 2021) .................4

*In re Aldrich Pump LLC*,
   No. 20-30608, 2023 WL 9016506 (Bankr. W.D.N.C. Dec. 28, 2023)................10

*In re Bestwall LLC*,
   606 B.R. 243 (Bankr. W.D.N.C. 2019)...................................................................4

*In re Dow Corning Corp.*,
   211 B.R. 545 (Bankr. E.D. Mich. 1997) .................................................................6

*In re LTL Mgmt., LLC*,
   637 B.R. 396 (Bankr. D.N.J. 2022),
   *rev'd and remanded*, 58 F.4th 738 (3d Cir. 2023),
   and *rev'd and remanded*, 64 F.4th 84 (3d Cir. 2023) ............................................5

*In re LTL Mgmt., LLC*,
   652 B.R. 433 (Bankr. D. N.J. 2023),
   *affirmed*, 2024 WL 3540467 (3d Cir. July 25, 2024) ............................................2

*In re Quigley Co.*,
   346 B.R. 647 (Bankr. S.D.N.Y. 2006)....................................................................6

*In re Red River Talc LLC*,
   670 B.R. 251 (Bankr. S.D. Tex. March 31, 2025)..................................................7

*Menard-Sanford v. Mabey* (*In re* A.H. Robins Co.),
   880 F.2d 694 (4th Cir. 1989)...................................................................................6

**Statutes**

11 U.S.C. § 362(a) ................................................................................................4

11 U.S.C. § 363 ....................................................................................................9

11 U.S.C. § 1104(a) .............................................................................................9

11 U.S.C. § 1121(d)(2)(A) ...................................................................................5

28 U.S.C. § 1408 ..................................................................................................8

**Rules**

Fed. R. Bankr. P. 3013 .........................................................................................6

**Treatises**

7 Collier on Bankruptcy § 1112.07 (16th ed. 2022) ............................................2

**Legislative**

H.R. 1017, 118th Cong. (2023) ............................................................................8

H.R. 4193, 117th Cong. (2021) ............................................................................8

**Other Authorities**

"Abusing Chapter 11: Corporate Efforts to Side-Step Accountability through Bankruptcy," Hearing before Senate Judiciary Subcommittee on Federal Courts, Oversight, Agency Action and Federal Rights (Feb. 2022) ..................8

"Bankruptcy Law: Overview and Legislative Reforms," Hearing before House Judiciary Subcommittee on the Administrative State, Regulatory Reform, and Antitrust (July 2025) ......................................................................................8

Adam J. Levitin, *Judge Shopping in Chapter 11 Bankruptcy*, 2023 U. ILL. L. REV. 351 ................................................................................8

Adam Levitin, *Stuffing the Chapter 11 Ballot Box with "Junk" Claims*, CREDIT SLIPS (Apr. 26, 2024) ........................................................................7

Andrew D. Bradt, Zachary D. Clopton & D. Theodore Rave, *MDL Strikes Back*,
    110 CORNELL L. REV. __ (forthcoming 2025) ........................................................8

Anthony J. Casey & Joshua C. Macey, *In Defense of Chapter 11 for Mass Torts.*,
    90 U. CHI. L. REV. 973 (2023) ........................................................................3

D. Theodore Rave, *Bankruptcy v. Multidistrict Litigation*,
    114 CALIF. L. REV. __ (forthcoming 2025) .......................................................7

Daniel J. Bussel, *The Mass Tort Claimants' Bargain*,
    97 AM. BANKR. L.J. 684 (2023) ..................................................................4, 6

Melissa B. Jacoby, *Sorting Bugs and Features of Mass Tort Bankruptcy*,
    101 TEX. L. REV. 1745 (2023) ........................................................................6

Steve Vladeck, "The Growing Abuse of Single-Judge Districts," One First (Mar. 13, 2023) ........................................................................................................8

Thomas H. Jackson, THE LOGIC AND LIMITS OF BANKRUPTCY LAW (1986)..........11

Thomas H.L. Forster, *Note, Out of the Black Hole: Toward a New Approach to MDL Procedure*,
    100 TEX. L. REV. 1227 (2022) ........................................................................4

Troy A. McKenzie, *Toward A Bankruptcy Model for Nonclass Aggregate Litigation*,
    87 N.Y.U. L. REV. 960 (2012) ........................................................................5

Zachary D. Clopton & Andrew D. Bradt, *Party Preferences in Multidistrict Litigation*,
    107 CALIF. L. REV. 1713 (2019) ....................................................................9

# INTEREST OF *AMICUS CURIAE*[1]

Professor D. Theodore Rave is the Bernard J. Ward Centennial Professor of Law at the University of Texas School of Law. As a scholar of complex litigation and mass torts, Professor Rave has an established interest in the issues presented in this case and relevant expertise that can assist the Court in this appeal. Several of his recent articles have focused on mass tort bankruptcies, including *Dissonance And Distress In Bankruptcy And Mass Torts*, 91 FORDHAM L. REV. 310 (2022) (with Andrew D. Bradt & Zachary D. Clopton) and *MDL Strikes Back*, 110 CORNELL L. REV. (forthcoming) (with Andrew D. Bradt & Zachary D. Clopton). Most recently, he has written *Bankruptcy v. Multidistrict Litigation for Mass Torts*, 114 CALIF. L. REV. (forthcoming), which analyzes many of the questions at issue in this proceeding and shows that bankruptcy is not an appropriate forum for resolving mass torts when the defendant is not in financial distress.

Professor Rave was retained by the Official Committee of Talc Claimants as an expert witness in *In re LTL Management, LLC*, Case No. 23-12825 (Bankr. D. N.J.). The outcome of that proceeding was dismissal by the Bankruptcy Court based on the debtor's failure to satisfy the "gateway" issue of financial distress, which

---

[1] Counsel for *Amicus Curiae* certify that no party or party's counsel authored any part of this brief. No one, apart from *Amicus Curiae* and his counsel, contributed money intended to fund the brief's preparation or submission. This brief is filed by leave of the Court.

1

dismissal was affirmed by the Third Circuit. *In re LTL Mgmt., LLC*, 652 B.R. 433, 436 (Bankr. D. N.J. 2023), *affirmed*, 2024 WL 3540467 (3d Cir. July 25, 2024).

## ARGUMENT

Rehearing is warranted to address the panel's holding that solvent debtors suffering no financial distress may nonetheless continue to prosecute Chapter 11 cases under the protection of the Bankruptcy Code. The panel opined that the issue of financial distress could be postponed because it "may come up at future junctures—at plan confirmation, for example." 148 F.4th 233, 239. The panel added that "challenges about a debtor's eligibility for bankruptcy protection" could be raised "at plan confirmation." *Id*. at 243. But waiting until plan confirmation to address the threshold issue of financial distress will fundamentally alter the bargaining environment in which the solvent debtor's mass tort liability will be resolved.

"[T]he requirement of good faith has been held to be an implicit condition ***to the filing and maintenance*** of a bankruptcy case for over a century." 7 Collier on Bankruptcy § 1112.07 (16th ed. 2022) (emphasis added). And for good reason. Enforcing the financial distress requirement at filing and throughout the continuation of a bankruptcy proceeding helps ensure that the debtor is not using bankruptcy simply to increase its bargaining leverage vis-à-vis the tort claimants.

2

Bankruptcy is supposed to be for the benefit of the creditors—including tort creditors—not the debtor and its shareholders. Even if one accepts the view that mass torts present the kind of collective action problem that bankruptcy was designed to solve,[2] if tort claimants are to share in any value created by moving mass tort litigation into bankruptcy, they need the leverage to bargain for it. But many features of bankruptcy systematically shift bargaining leverage from mass tort plaintiffs to defendants. There is a substantial cost to waiting until plan confirmation to consider a debtor's threshold eligibility to invoke the Bankruptcy Code, because the mere filing of a bankruptcy petition changes the dynamics of the underlying mass tort litigation. The financial distress requirement plays a key gatekeeping role in preventing mass tort defendants from abandoning multidistrict litigation (MDL) for bankruptcy simply to increase their bargaining leverage and limiting bankruptcy to situations where mass tort victims are likely to share in the benefit.

Filing a bankruptcy petition increases mass tort defendants' leverage in at least three ways: by staying litigation, by imposing resolution over the objection of the strongest claimants, and by enabling defendant forum shopping. The Texas Two-Step divisional merger exacerbates the disparity in leverage between mass tort defendants and plaintiffs.

---

[2] *See* Anthony J. Casey & Joshua C. Macey, *In Defense of Chapter 11 for Mass Torts.*, 90 U. CHI. L. REV. 973 (2023).

I.  **FILING FOR BANKRUPTCY PROVIDES DEFENDANTS WITH A STAY OF ALL LITIGATION.**

Filing under Chapter 11 automatically stays all litigation against the debtor, pursuant to 11 U.S.C. § 362(a), and bankruptcy courts are often willing to enter preliminary injunctions effectively extending the reach of that stay to the debtor's affiliated companies.[3] Stays and injunctions remove plaintiffs' biggest source of leverage in mass tort litigation—the threat of jury trials and verdicts. Although mass tort litigation nearly always ends in settlement,[4] bargaining over the terms of those settlements takes place in the shadow of litigation. And plaintiffs' ability to push their cases forward toward trial is their biggest stick. The automatic stay takes that stick away and places total control over the pace of the litigation in the hands of the bankruptcy judge.[5] In addition, debtors in bankruptcy enjoy the exclusive right to

---

[3] *See, e.g.*, *In re Bestwall LLC*, 606 B.R. 243, 254-58 (Bankr. W.D.N.C. 2019); *In re Aldrich Pump LLC*, No. 20-30608, 2021 WL 3729335, at *33, *38 (Bankr. W.D.N.C. Aug. 20, 2021).

[4] More than 97% of MDL cases are resolved in the MDL district either by motion or, more frequently, settlement. *See, e.g.*, Thomas H.L. Forster, *Note, Out of the Black Hole: Toward a New Approach to MDL Procedure*, 100 TEX. L. REV. 1227, 1228 (2022).

[5] *See*, e.g., Daniel J. Bussel, *The Mass Tort Claimants' Bargain*, 97 AM. BANKR. L.J. 684, 713-14 (2023).

propose a reorganization plan,[6] and the ability to bind nonconsenting claimants to that plan.[7]

## II. BANKRUPTCY ALLOWS DEFENDANTS TO IMPOSE RESOLUTION ON EVEN THE STRONGEST PLAINTIFFS.

Another significant source of mass tort defendant leverage in bankruptcy is the power to impose resolution over the objection of even the strongest plaintiffs. In theory, voting is tort claimants' main protection in a mass tort bankruptcy,[8] but in practice mass tort defendants can skew bankruptcy voting procedures sharply in their favor. The resolution of the plaintiffs' claims will be negotiated in the shadow of those voting rules, not the threat of trial by the strongest claims.

One way that mass tort defendants can skew bankruptcy voting procedures is by allocating voting rights to give the weakest claims the same voting power as the strongest. In a mass tort, the value of victims' claims can vary widely along many dimensions (e.g., degree of injury, evidence of causation, applicable state law, etc.). But determining the valuation of each tort claim can be difficult and costly,

---

[6] Debtors have the exclusive right to propose a reorganization plan of reorganization for four months after filing a petition, which can be extended to eighteen months. 11 U.S.C. § 1121(d)(2)(A).

[7] *See* Troy A. McKenzie, *Toward A Bankruptcy Model for Nonclass Aggregate Litigation*, 87 N.Y.U. L. REV. 960, 1002-08 (2012).

[8] *In re LTL Mgmt., LLC*, 637 B.R. 396, 416 (Bankr. D.N.J. 2022), *rev'd and remanded*, 58 F.4th 738 (3d Cir. 2023), and *rev'd and remanded*, 64 F.4th 84 (3d Cir. 2023).

5

particularly in an immature mass tort. As a result, bankruptcy courts tend to lump all tort claimants into a single creditor class[9] and estimate the value of their claims uniformly at $1 for voting purposes.[10] The one-dollar-one-vote method of estimation creates a serious risk of undervaluing the strongest claims.[11]

Even worse, uniform valuation of claims for voting purposes encourages the filing of meritless claims in bankruptcy by plaintiffs who may never have recovered in the tort system but who will be content to accept a lowball bankruptcy plan that pays them something. Some lawyers may recruit numerous weak or meritless claims to file in the bankruptcy, giving themselves control of a large voting bloc in negotiations. They may then offer these votes to the debtor in support of a lowball plan of reorganization that systematically undercompensates claimants with serious injuries. Indeed, the defendant may actively solicit the cooperation of plaintiffs' lawyers to drum up weak claims and allow the defendant to stuff the ballot box with

---

[9] In theory, the bankruptcy rules allow judges to separate tort claimants into different voting classes based on the relative value of their claims. Fed. R. Bankr. P. 3013. But, as Bussel has explained, this classification approach "is virtually never used." Bussel, *supra* note 5, at 726.

[10] *See, e.g.*, *In re Dow Corning Corp.*, 211 B.R. 545, 573 (Bankr. E.D. Mich. 1997); *Menard-Sanford v. Mabey* (*In re* A.H. Robins Co.), 880 F.2d 694, 696 (4th Cir. 1989); Melissa B. Jacoby, *Sorting Bugs and Features of Mass Tort Bankruptcy*, 101 Tex. L. Rev. 1745, 1756-57 (2023) (noting ubiquity of this practice).

[11] *See, e.g.*, *In re Quigley Co.*, 346 B.R. 647, 659 (Bankr. S.D.N.Y. 2006).

votes in favor of a plan opposed by stronger claims.[12]  Unlike an MDL, where the defendant has every incentive to try to screen out as many claims as possible, once in bankruptcy, the debtor might welcome the deluge and work with a subset of plaintiffs' counsel to design voting procedures that minimize screening of predictably friendly votes.[13]

In addition, bankruptcy shifts control over the terms of aggregation to mass tort defendants.  Both MDL and bankruptcy provide for aggregation of claims, but they operate very differently. MDL enables tort claimants and their lawyers to aggregate on their own terms, while bankruptcy empowers the defendant to impose aggregate resolution unilaterally.[14]  Claimants face the risk that the debtor will be permitted to delay payments until it establishes a bankruptcy trust, which could then pay claimants less than they would be awarded in the tort system.  These features

---

[12] *See, e.g.*, Adam Levitin, *Stuffing the Chapter 11 Ballot Box with "Junk" Claims*, CREDIT SLIPS (Apr. 26, 2024), https://www.creditslips.org/creditslips/2024/04/stuffing-the-chapter-11-ballot-box-with-junk-claims.html#more.

[13] *In re Red River Talc LLC*, 670 B.R. 251 (Bankr. S.D. Tex. March 31, 2025).

[14] *See* D. Theodore Rave, *Bankruptcy v. Multidistrict Litigation*, 114 CALIF. L. REV. manuscript at 51-53 (forthcoming), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5140220.

7

make bankruptcy particularly attractive to mass tort defendants, even if they can pay their bills on time.[15]

### III. BANKRUPTCY ALLOWS MASS TORT DEFENDANTS TO FORUM SHOP.

A bankruptcy petition increases mass tort defendants' leverage in yet another respect: defendants filing for Chapter 11 enjoy a virtually unlimited choice of venue under 28 U.S.C. § 1408, because corporate debtors can reincorporate in their preferred jurisdiction shortly before filing.[16] Perceived abuses in bankruptcy venue have spurred congressional hearings[17] and proposed legislation[18] to address these concerns.

In contrast, mass tort MDLs are overseen by judges who have been handpicked by the Judicial Panel on Multidistrict Litigation (JPML) for their skill in judicial management and willingness to take on the litigation (no judge is forced to

---

[15] *See* Andrew D. Bradt, Zachary D. Clopton & D. Theodore Rave, *MDL Strikes Back*, 110 CORNELL L. REV. __ (forthcoming 2025).

[16] *See, e.g.*, Adam J. Levitin, *Judge Shopping in Chapter 11 Bankruptcy*, 2023 U. ILL. L. REV. 351; cf. Steve Vladeck, "The Growing Abuse of Single-Judge Districts," One First (Mar. 13, 2023).

[17] *See* "Abusing Chapter 11: Corporate Efforts to Side-Step Accountability through Bankruptcy," Hearing before Senate Judiciary Subcommittee on Federal Courts, Oversight, Agency Action and Federal Rights (Feb. 2022); "Bankruptcy Law: Overview and Legislative Reforms," Hearing before House Judiciary Subcommittee on the Administrative State, Regulatory Reform, and Antitrust (July 2025).

[18] *See* H.R. 4193, 117th Cong. (2021); H.R. 1017, 118th Cong. (2023).

accept an MDL assignment). As a result, there is no opportunity for forum shopping by either plaintiffs or defendants. The parties can try to persuade the JPML to choose their preferred transferee district or judge. But a neutral body, the JPML, decides where to create the MDL and chooses the district judge best suited to handle the particular litigation. Studies have shown that when the parties agree on a preferred transferee district, the JPML usually picks that one, and when they disagree, the JPML sides with plaintiffs and defendants roughly equally.[19]

## IV.  THE TEXAS TWO-STEP EXACERBATES THE DISPARITY IN LEVERAGE BETWEEN MASS TORT DEFENDANTS AND PLAINTIFFS.

The so-called "Texas Two-Step" further exacerbates the imbalance between mass tort debtors and creditors. Indeed, the Two-Step allows a debtor and its corporate affiliates to circumvent fundamental safeguards of the Bankruptcy Code. The Code vests bankruptcy courts with the power to control the debtor's business and assets through appointment of a trustee and review of transactions. *See, e.g.*, 11 U.S.C. §§ 363, 1104(a). Under the "Two-Step," a corporate parent can keep its operating assets outside the bankruptcy court's supervision by allocating them to a sibling entity instead of the debtor. The Two-Step thus hinders the bankruptcy system's ability to control the assets that gave rise to the tort liabilities in the first place—and the assets available to satisfy those liabilities. The Two-Step also allows

---

[19] *See* Zachary D. Clopton & Andrew D. Bradt, *Party Preferences in Multidistrict Litigation*, 107 CALIF. L. REV. 1713 (2019).

a debtor to ensure that tort victims are the only creditors subject to bankruptcy, while providing that trade creditors remain outside bankruptcy and have their claims satisfied immediately and in full.

From the debtor's perspective, the Two-Step eliminates many of the disincentives to filing for bankruptcy. Bankruptcy can be a painful process, and ordinarily, a solvent debtor whose managers still have a duty of loyalty to the shareholders will have an incentive to put enough money on the table to secure the tort claimants' votes and end the ordeal quickly. But in a Two-Step bankruptcy, there is no pain to prolong. Professional fees in bankruptcy can be high, but they are easily dwarfed by the money the defendant is *not* spending on litigation costs and judgments in the tort system.[20] Tort claimants, by contrast, need to bring the bankruptcy to a close before they see any money. This combination shifts significant leverage from mass tort plaintiffs to defendants and can result in an extended period in which the debtor can effectively tranquilize tort claims. For example, the instant case has languished in bankruptcy since 2017.

\* \* \*

---

[20] *See In re Aldrich Pump LLC*, No. 20-30608, 2023 WL 9016506, at \* 10 & n.13 (Bankr. W.D.N.C. Dec. 28, 2023) (noting that "for the past three years, Debtors and the Affiliates have enjoyed . . . a 'payment holiday' from the $100 million-a-year costs they were previously incurring….")

10

For all these reasons, enforcing the financial distress requirement is imperative, even if one accepts the premise that bankruptcy's efficient procedures can create value for debtors and creditors alike. Even if bankruptcy makes the pie bigger, if defendants gain undue leverage to demand a bigger slice, plaintiffs may be left worse off, in violation of the principle at the heart of modern bankruptcy theory: that bankruptcy exists for the benefit of creditors, not the debtor.[21] When the defendant cannot afford to pay all of its creditors, bankruptcy is the only practical option. But when the realistic alternative for tort victims is neither a destructive race to exhaust a limited fund nor endless waiting in a trial queue, but rather a negotiated resolution in MDL, bankruptcy is not an appropriate means for resolving mass torts.

If bankruptcy's tools can create value, then we should ensure tort victims can share in the gains. The panel's decision runs counter to that objective.

---

[21] *See Conner v. Long*, 104 U.S. 228, 232 (1881); *see also* Thomas H. Jackson, THE LOGIC AND LIMITS OF BANKRUPTCY LAW (1986).

## CONCLUSION

The petition for rehearing should be granted.

Dated: September 22, 2025

Respectfully submitted,

*/s/ Jonathan S. Massey*
Jonathan S. Massey
Bret R. Vallacher
MASSEY & GAIL LLP
1000 Maine Ave. SW, Suite 450
Washington, D.C. 20024
Telephone: (202) 652-4511
jmassey@masseygail.com
bvallacher@masseygail.com

*Counsel for Amicus Curiae*

# CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Fed. R. App. 35(b)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 2,572 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font. As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated: September 22, 2025      */s/ Jonathan S. Massey*
                  Jonathan S. Massey

# CERTIFICATE OF FILING AND SERVICE

The undersigned hereby certifies that on September 22, 2025, I caused an electronic copy of the foregoing to be electronically filed with the United States Court of Appeals for the Fourth Circuit using the CM/ECF system, which will automatically send notification of such filing to counsel of record.

Dated: September 22, 2025  */s/ Jonathan S. Massey*
Jonathan S. Massey